**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| United States of America, *ex rel.* | |
| LYLE BEAUCHAMP, 204 2nd Street, Roundup, Montana 59072; and WARREN SHEPHERD 5680 S. Fox Hollow Avenue, Springfield, Missouri 65810-2325, | Civil Action No. 1:11-cv-371 (TSE/TRJ) |
| *Plaintiffs*, v. | |
| ACADEMI TRAINING CENTER, INC., 1001 19th Street, 19th Floor, Arlington, Virginia 22209, (f/k/a "U.S. Training Center, Inc." and "USTC"); and U.S. TRAINING CENTER, INC., 850 Pudding Ridge Road, Moyock, North Carolina 27958, | **JURY DEMAND** **UNSEALED JULY 14, 2011** |
| *Defendant*. | |

## SECOND AMENDED COMPLAINT

Plaintiffs and Relators Lyle Beauchamp ("Beauchamp") and Warren Shepherd

("Shepherd"), by their attorneys, hereby state as follows for their Complaint against Defendants

Academi Training Center, Inc. and U.S. Training Center, Inc. (collectively "Academi"):

## NATURE OF THE ACTION

1.      This case arises out of Academi's intentional submission of false claims,

statements, and reports to the United States Department of State ("State Department") in

violation of the False Claims Act, as well as Academi's unlawful retaliation against Beauchamp

and Shepherd.

2.      The State Department has a Worldwide Personal Protective Services ("WPPS")

program whereby it retains protective service personnel ("PRSs") to protect United States

officials and embassies abroad, as well as certain foreign government officials. Pursuant to the WPPS program, the State Department entered into a contract with Academi, then operating under the name Blackwater, to protect United States officials and the United States Embassy in and around Kabul, Afghanistan.

3.      To provide the security services that the State Department required, Academi in turn entered into agreements to pay PRSs with military and/or law enforcement experience, including Beauchamp and Shepherd, to travel to Afghanistan and to provide protective services or other related support.

4.      The State Department's contract with Academi required as a "necessary condition" that Academi re-qualify each of its PRSs every three months for proficiency with five specified firearms – M4 assault rifle, Glock pistol, shotgun, M240 belt-fed machine gun, and M249 "SAW" belt-fed machine gun. In addition, certain personnel are required to qualify with additional weapons. For example, Designated Defensive Marksmen must qualify with either the M24 or M25 sniper rifle (depending on which rifle they are issued). The contract specified in detail for each weapon how Academi must conduct the weapons qualification, and it further required Academi to submit the scores from these firearms qualification tests to the State Department.

5.      Since April 2007 at the latest, Academi has chosen not to subject its PRSs in Afghanistan to the State Department's contractually required weapons qualification tests for the M240 and M249 machine guns in all but a few instances. The State Department's WPPS Contract makes clear that a PRS who is not qualified quarterly with all required weapons may not provide protective services as part of the WPPS program. To avoid the disqualification of its personnel, and the resulting penalties that Academi is required to pay to the federal government,

Academi systemically has fabricated scores for its PRSs with the M240 and M249 and submitted those fabricated scores to the State Department. During some quarterly weapons qualifications, Academi's firearms instructors did not require the PRSs to fire the M240 and/or M249 at all.

6. Academi also knowingly submitted false claims and reports to the State Department that misreported the duties that certain PRSs performed. Academi's contract with the State Department requires Academi to provide a specified number of PRSs with particular qualifications for particular positions on protection details, and the contract imposes penalties upon Academi for staffing shortfalls. To obfuscate staffing shortfalls in hard-to-fill positions such as Designated Defensive Marksman ("DDM," essentially a sniper), Academi falsely reported and billed the tasks that certain PRSs, including Beauchamp and Shepherd, performed. For example, Academi for years billed the State Department for a DDM, Timothy Powers, who in reality served only as the camp cook. On information and belief, Academi sent the cook out on a couple of missions at most, and Academi did not even issue him a rifle for much of his deployment.

7. Academi also unlawfully retaliated against Beauchamp and Shepherd when it learned that they would testify in *U.S. ex rel Davis v. U.S. Training Center, Inc.*, Case No. 1:08-cv-01244 (E.D. Va.), a False Claims Act case adverse to Academi. Indeed, Academi terminated Beauchamp, who had received consistently positive performance reviews, approximately two weeks after an Academi officer confronted him about his intent to testify in *Davis*. Academi then further retaliated against Beauchamp by causing the State Department to place him on a "Do Not Use" list that effectively precludes him from obtaining any further contracts or employment in the private security industry. Although Academi has not yet terminated

Shepherd, it has prevented him from working as a Shift Leader, retaliated in his performance reviews, and subjected him to other acts of retaliation.

8.      Beauchamp and Shepherd have direct and independent knowledge of Academi's fraud.  Accordingly, they bring this case on behalf of the Federal Government under the False Claims Act, 31 U.S.C. § 3739 et seq., and Beauchamp further seeks compensation for the unlawful injuries that Academi has inflicted by terminating him in violation of § 3730(h) of that Act.

## THE PARTIES

### I.      Plaintiff-Relator Lyle Beauchamp

9.      Plaintiff-Relator Lyle Beauchamp is a decorated veteran of law enforcement who served for almost 16 years in the Minneapolis Police Department, from 1987 to 2002.  From 1987 to 1997, Beauchamp served as a sniper on the Department's Emergency Response Unit.  From 1991 to 1992, he also was assigned to the Minneapolis FBI's SWAT team as a Sniper Team Leader.  Beauchamp also spent four years in the Tactical Service Division, an elite unit comprised entirely of SWAT officers within the Minneapolis SWAT team.  As a member of the Tactical Service Division, Beauchamp responded to riots, protected dignitaries, and provided protection for approximately 1000 high-risk warrants.   Eventually, he was promoted to Sergeant, a role in which he supervised 38 officers.

10.      As a law enforcement officer, Beauchamp earned numerous commendations and awards.  He received three personal commendations for bravery and courage, a unit commendation for outstanding arrest of a dangerous felon, and a Chief's Award for Merit.

11.      In 2002, Beauchamp shifted his career to federal law enforcement by attending the Air Marshal Academy and graduating in the top of his class.  After completing his training, he was assigned to the Minneapolis Air Marshal field office, where he supervised 65 Air

Marshals who would monitor high risk flights throughout the world.  In August 2004, Beauchamp left the Air Marshals to join Academi, then operating under the name Blackwater.

12.     Academi sent Beauchamp to Iraq in August 2004 for training, and Beauchamp began working for Academi in Iraq as part of an advance team that surveys venues to be visited by the United States Ambassador and/or other dignitaries for security risks, safe spots, helicopter landing spots, entry and exit points, and other attributes relevant to security.

13.     In 2005, Academi promoted Beauchamp to Shift Leader of Academi's Quick Reaction Force detail, which responds to threats to persons or locations protected by other Academi details.

14.     In September 2005, Academi promoted Beauchamp to tactical commander of the protective detail for the United States Ambassador to Iraq's private residence.  Beauchamp's team was tasked with the protection of the residence and its inhabitants 24 hours a day, 7 days a week.

15.     Beginning in May 2006, Beauchamp took a five month leave of absence from Academi.  After he returned in October 2006 for a DDM qualification, Academi sent him to Afghanistan in December 2006.  There, he was assigned to the Hammer 4 detail, the Quick Response Force, as a DDM.

16.     In October 2007, Academi promoted Beauchamp to the position of Operations Security Specialist in the Operations Center located in the American Embassy in Kabul, Afghanistan, a position in which he coordinated the various Academi details operating in and around Kabul.

17.     In May 2008, Academi promoted Beauchamp again, this time to Operations Chief.  In that role, Beauchamp reported only to Academi's highest official in Afghanistan,

Project Manager Sean Flaherty ("Flaherty"), and it was Beauchamp's responsibility to assign missions and interact with certain dignitaries.

18. In an October 2008 evaluation, Flaherty was complementary in very specific terms regarding Beauchamp's performance as an Operations Chief, giving Beauchamp a superior rating in all categories. Flaherty praised Beauchamp's teamwork, stating:

> Mr. Beauchamp consistently demonstrates he is a team player and will do what it takes for the Detail to be successful. He works long hours as the Ops Chief and has demonstrated that he is committed to giving the Detail all the necessary support they need to be successful. He works well in the TOC [Tactical Operations Center] and with all other agencies working out of the Embassy.

Flaherty praised Beauchamp's professionalism:

> Mr. Beauchamp's professionalism is one of his strongest assets. The RSO [State Department Regional Security Officer] shop has exceptional comments about Mr. Beauchamp's personality and disposition. They say he has a good rapport with all the Chief of Mission personnel he interacts with on a daily basis. He is polite, professional and helpful. He is in a high profile position, and he has proven himself to be a good representative for BW [Blackwater].

Flaherty also had very positive comments regarding Beauchamp's integrity:

> Mr. Beauchamp takes responsibility for his actions without regard for their consequences. He has an easy-going, even-keeled personality that works well in the extremely hectic TOC. In addition, Mr. Beauchamp offers great candor when discussing issues. He always provides thoughtful feedback and answers to difficult questions.

19. Beauchamp has been approved by the Department of State as a Deputy Program Manager, Operations Chief, Operations Security Specialist, Detail Leader, Deputy Detail Leader, Shift Leader, DDM, and Personal Security Specialist.

20. Beauchamp resides at 204 2nd Street, East, Roundup, Montana 59072.

## II.    Plaintiff-Relator Warren Shepherd

21.    Plaintiff-Relator Warren Shepherd is a veteran both of the United States Marine Corps and law enforcement. From 1983 to 1988, Shepherd served as a Marine, rising to the rank of Corporal. After his honorable discharge from the Marine Corps, Shepherd joined the North Carolina State Highway Patrol as a State Trooper. Shepherd served as a State Trooper for 16 years, from 1988 to 2004.

22.    In 2004, Shepherd retired from the North Carolina State Highway Patrol to join Academi, then operating under the name Blackwater. During his eight years with Academi, Shepherd has provided protective services in the United States in the wake of Hurricane Katrina, in Pakistan, in Iraq, and most recently in Afghanistan.

23.    From on or about March 8, 2006 to April 27, 2009, Shepherd provided protective services through Academi to the State Department in Iraq. When Shepherd first arrived in Iraq, Academi assigned him as a PSS to Ambassador Zalmay Khalilzad's protection detail. In September 2007, Academi promoted Shepherd to be the Shift Leader of a team, Raven 2. During his time in Iraq, Shepherd served as a Shift Leader for three different teams, Raven 2, Raven 5, and Raven 10.

24.    Following the September 16, 2007 Nisour Square incident, in which Academi (then operating as Blackwater Worldwide) contractors shot and killed 17 persons in Baghdad, the United States government in 2009 transferred the contract to protect United States diplomats in Iraq from Academi to a different private security company, Triple Canopy, Inc. As part of that transition, Academi relocated Shepherd from Iraq to its base near Kabul, Afghanistan.

25.    In Afghanistan, Shepherd has served as a Shift Leader for two teams, Hammer 6 and Hammer 8, and also has served in Ambassador William E. Todd's personal protection detail.

26.     During his service in Iraq and Afghanistan, Shepherd has received numerous certificates from the State Department recognizing the value of his contributions, including certificates issued in May 2011, August 2007, June 2007, May 2007, and January 2007.

27.     Shepherd has been approved by the Department of State as a Deputy Detail Leader, Shift Leader, and Personal Security Specialist. Nevertheless, since Academi discovered that Shepherd agreed to testify in a False Claims Act case in which Academi was a defendant, Academi only has allowed Shepherd to work in the lowest position for which he is qualified, the Personal Security Specialist position.

28.     Shepherd currently resides at 5680 S. Fox Hollow Avenue, Springfield, Missouri 65810-2325.

**III.    Defendant Academi Training Center, Inc.**

29.     Defendant Academi is the private security company formerly known as Blackwater USA, Blackwater Worldwide ("Blackwater"), and later U.S. Training Center, Inc.  In 2009, the company changed its name to Xe.  In December 2011, the company changed its name again to Academi.  Academi's CEO, Ted Wright, told the Washington Post that this most recent name change was made "to reflect the changes we made in the company."

30.     Erik Prince, a former Navy Seal, founded Blackwater (and thus Academi) in 1997.  Academi's primary business is to provide diplomatic security services to the United States government, and in particular to the State Department, on a contractual basis.  Historically, the company now known as Academi has been the State Department's largest private security contractor.

31.     Academi provides what it describes as "security solutions" to government agencies and private corporations around the world.  According to its website, Academi "specializes in: [t]raining and support for domestic and international clients; [p]ersonnel and

facility security services; [m]ission support and staff augmentation; [r]isk management and security services consulting; [s]tability support, crisis response and forward base operations; [and t]raining for civilians, law enforcement and military personnel."

32.     Academi's corporate headquarters is located at 1001 19th Street, 19th Floor, Arlington, Virginia 22209.

33.     On information and belief, Defendant Academi Training Center, Inc. is the successor in interest to Defendant U.S. Training Center, Inc. ("USTC"). USTC's last known address is 850 Pudding Ridge Road, Moyock, North Carolina 27958. Academi Training Center, Inc.'s website identifies the facility at that location as its training facility.

## JURISDICTION AND VENUE

34.     This Court has personal jurisdiction over Defendant Academi under Federal Rule of Civil Procedure 4(k)(1)(a) and Virginia's long-arm statute, Va. Code § 8.01-328.1, as Academi's corporate headquarters is located in Arlington, Virginia.

35.     This Court has general federal question subject matter jurisdiction over the Plaintiffs' claims under the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA"), pursuant to 28 U.S.C. § 1331. This Court also has jurisdiction pursuant to 31 U.S.C. § 3732, in which Congress specifically endowed this Court with subject matter jurisdiction over actions brought under the FCA.

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Academi resides in this judicial district by virtue of the location of its corporate headquarters in Arlington, Virginia.

## GENERAL ALLEGATIONS

**I.    Academi's Contracts with the State Department**

**A.    The WPPS Contract**

37.    In 2005 the State Department awarded Academi (then operating under the name Blackwater) the Worldwide Personal Protective Services Contract ("WPPS Contract").  Under the WPPS Contract and the task orders issued thereunder, Academi is to provide security services in Iraq and Afghanistan, as well as operate a local program management office in the Washington, DC area.  The WPPS Contract, in the introductory Section C.1.1, describes in general terms the types of services that Academi could be required to provide:

> Under the Diplomatic and Antiterrorism Act of 1986, the Bureau of Diplomatic Security (DS) of the Department of State has a broad range of responsibilities that include protection of personnel and facilities both domestic and abroad.  The Worldwide Personal Protective Services (WPPS) initiative is an effort by the Department of State to pre-plan, organize, set up, deploy and operate Contractor protective services details for the protection of U.S. and/or certain foreign government high-level officials whenever the need arises.  In certain circumstances, and when directed, Contractors may be required to recruit, evaluate, and train, local government or third-country foreign nationals in established personal protective security procedures, conduct protective security operations overseas with them, and provide trained protective security personnel for short or long-term special domestic security situations.

38.    The WPPS Contract sets forth the terms that govern Academi's provision of services to the State Department.  Under the WPPS Contract, the State Department requests specific protective services through "Task Orders."  Section C.1.5.2 of the WPPS Contract states:

> As required, the Contracting Officer (CO) will issue Task Order Requests to the holders of this WPPS contract.  The Contractor(s) shall develop proposals in response to the Task Order Requests. The Government will evaluate the proposal(s), negotiate as

necessary, and notify the winning Contractor(s) of award of the Task Order.

39.     In general, the Task Orders that the State Department issues pertain to a specific location where the State Department retains a private security company like Academi to provide security details to protect ambassadors and other United States and foreign dignitaries.   Section C.2.3 of the WPPS Contract states that "worldwide regions of probable protective services include, but are not limited to the following:"

- Africa;

- Southwest/Southeast Asia and Southeast Island Nations of Asia;

- South Asia;

- North and South America and the Caribbean;

- Eastern and Western Europe; and

- Near East.

40.     Section C.2.1 of the WPPS Contract identifies the types of services Academi could be called upon to provide in a State Department issued Task Order, including:

- Recruiting, screening, and selecting applicants for protective service ("PRS") details and support positions;

- Training PRS and PRS support personnel;

- Planning, managing, and performing protection of persons and facilities;

- Providing mobile protection, including by automobile, boat, and airplane;

- Providing intelligence information for PRS details;

- Providing translator/interpreter services;

- Providing medical services;

- Providing guard services; and

- Providing logistical support for protective services details.

11

41.     The WPPS Contract contains numerous provisions that require Academi personnel to satisfy specified firearms qualification requirements, including the requirement that Academi's PRS personnel be re-qualified with all required firearms once every three months. Indeed, firearms qualifications are prominent throughout the WPPS Contract.

42.     The WPPS Contract sets forth certain "Necessary Conditions" that Academi is required to meet with respect to its performance of State Department Task Orders. Section C.4(c) of the WPPS Contract defines "Necessary Conditions" as follows:

> **Definition of Necessary Conditions.** Each Service Area has one or more measurable performance requirements that address the primary results or outcomes desired for that area. Accompanying these performance requirements are supporting requirements, called Necessary Conditions, which must be met or complied with in order to achieve the results required by the performance requirement. Necessary Conditions often address the business rules within the contractual relationship, form, fit, function and interface requirements, mandated work processes, data formats, work hours, etc. None of the latter appears in the current statement of work. Necessary conditions may also be identified in the Task Orders.

43.     Section C.4.3.2.1 of the WPPS Contract states that "[t]he Contractor shall ensure that only personnel satisfactorily trained in accordance with Department of State standards are used in the performance of work under this contract. This includes the completion of training before entering into work and maintaining that level of training throughout the performance of work under any specific Task Order."

44.     Section C.4.3.2.1 then further sets forth "**Necessary Condition 4.3.2.1**" which requires Academi, *inter alia*, to re-qualify all of its PRS detail members every three months on all required firearms and to submit each PRS's score to the State Department on a specified form, stating:

> The Contractor shall: … Ensure that all armed PRS detail members and armed guards are re-qualified on all required firearms on a

quarterly basis using the prescribed courses of fire to DS [Bureau of Diplomatic Security] standards. All re-qualification shall be documented on Qualification Record Forms (see Appendix H).

45.     In addition to providing PRS details to protect individuals as specified by the State Department, the WPPS Contract in Section C.4.3.7.1 also envisions that Academi may provide guards to protect the "living/housing compounds required in support of the performance of PRS details." Through **Necessary Condition 4.3.7.1**, the WPPS Contract requires Academi to maintain such a guard force and "[e]nsure that the guard force maintains the following logs and records: … administrative files, which shall at a minimum include personnel records, investigation records, and training records on all employees working under the contract."

46.     The WPPS Contract, in Section C.4.3.7.2, requires Academi guard personnel to re-qualify on all required firearms every three months, stating that "[t]he Contractor shall: … Ensure that all armed guards are re-qualified on all required firearms on a quarterly basis in accordance with the DS approved Contractor training plans. All re-qualification shall be documented on Qualification Record Forms (see Appendix H)."

47.     Section C.4.6 of the WPPS Contract requires Academi to submit various reports to the State Department, including a "Weekly Status Report" that includes information regarding "PRS training" and a "Monthly Total Contract Performance Report" that includes "assessment of performance against all requirements in active Task Orders."

48.     Appendix C to the WPPS Contract imposes general qualification requirements for Academi's contractor personnel who are citizens of the United States. Among other requirements, the contractors must "[m]eet firearms proficiency pre-requisites, including formal training on: Familiarity with every weapon used by a PRS detail[;] Familiarity with weapons safety concerns and procedures[; and] Have fired each weapon at an acceptable level of proficiency[.]"

13

49.     Appendix D of the WPPS Contract imposes the same firearms qualification requirements for Academi's contractors who are "local (host country) and third-country foreign nationals."

50.     Appendix H of the WPPS Contract contains a "Firearms Qualification Record Form" that Academi was to use.   The heading on the form states:

**UNITED STATES DEPARTMENT OF STATE**
**BUREAU OF DIPLOMATIC SECURITY**
**FIREARMS TRAINING UNIT**

**FIREARMS QUALIFICATION RECORD FORM**

51.     The State Department subsequently developed a different form for firearms qualifications.  That form is entitled "WPPS – High Threat Protection Weapons Qualification Record" and bears the State Department's seal.  In addition to reporting qualifications for the M4 assault rifle, Glock pistol, and a shotgun, the form also has space for qualifications for two belt-fed machine guns, the M240 and the M249 "SAW."   The State Department also has an additional score sheet for DDMs to qualify with either the M24 or M25 sniper rifles.

52.     In Appendix L to the WPPS Contract, "[t]he Government reserves the right to observe all firearms training conducted by the Contractor."  Appendix L further mandates that all required firearms training be provided by a "Certified Firearms Instructor:"

> The Contractor shall ensure that all firearm training conducted by the Contractor is performed under the instruction of a Certified Firearms Instructor(s).  Firearms instructors shall be qualified at a level necessary to provide firearms instruction for the weapons identified in the contract and each individual Task Order.

53.     Appendix N to the WPPS Contract identifies firearms with which Academi PRS personnel must be proficient and must re-qualify every three months.  The identified firearms include: semi-automatic pistol; shotgun; M4 rifle; M249 SAW; and M240B.

54.     Appendix N also contains detailed instructions regarding how Academi must qualify its personnel with the identified firearms.  For the semi-automatic pistol, for example, it requires that a specific kind of target be used and prescribes a 6-stage firing sequence.  For each stage, Appendix N further prescribes the distance to target, rounds to be fired, time limit, and firing position.  It also specifies how hits on the target are to be scored and what score is required to qualify with the weapon.

55.     Appendix N contains similarly specific multi-stage qualification procedures for the other identified weapons, although the test for each weapon is different.  In particular, the specified qualification procedures for the two belt-fed machine guns, the M240 and M249, require Academi to use different targets and to set up additional "no shoot" targets that simulate civilians.

56.     Section 12.2 of Appendix G specifies details regarding the ammunition that Academi must use in its training exercises.

57.     The WPPS Contract, in Attachment G to Section J, also contains a "Deadly Force Policy."  In that Policy, the State Department twice forbids Academi personnel from carrying or using firearms for which they have not been qualified quarterly.  Section 10 of the Deadly Force Policy states that "No PSS [Personal Security Specialist] shall carry a firearm unless: The PSS has qualified with assigned weapon(s) in accordance with contract terms and conditions …."  Similarly, Section 14 similarly states: "To be authorized to carry a Department-issued or approved firearm, a PSS shall qualify by meeting or exceeding a specified score with a Department-issued or approved firearm in accordance with the contract.  Under no circumstance shall a PSS carry a firearm if he or she has not successfully completed the required firearms qualification procedures."

58.     The WPPS Contract specifically requires that every protection detail that the State Department requires through a Task Order must be fully staffed with qualified personnel. To enforce this requirement, the WPPS Contract imposes financial penalties when Academi fails to staff a detail fully. Section H.15 of the Contract contains a provision under the heading **PRICE DEDUCTION FOR LESS THAN 100% MANNING** ("Deduct Clause"), which states in part:

> The full manning of protection details is extremely important to the safety of the principal being protected as well as the remainder of the protection detail. Manning shortfalls have been a major problem based on past experience with protective details by the High Threat Protection Office. Therefore, this contract will have strong incentives to man details by the proposed deployment date and retain high staffing levels on all task orders.
>
> If deployments are made on time and staff is retained 100% of the time no deductions to the award price will be made. If manning falls below a minimum or the correct number of personnel are not deployed on time, a large reduction in the award price will be made in addition to not being able to invoice the hours/days not worked. The deduct for PRS members is $1,800 per day and the deduct for support personnel is $1,200 per day. The deduct is based on the extra labor that is levied upon the Regional Security Officer at the post by the manning shortages.

59.     Two categories of the Academi conduct at issue in this case trigger the Deduct Clause. First, Academi's failure to qualify its PRSs with required weapons rendered those PRSs ineligible to serve on State Department details. Accordingly, Academi's failure to staff protective details with qualified personnel triggered Academi's obligation under the WPPS Contract to pay a penalty of $1,800 a day for each position on a detail that was not manned by an appropriately qualified PRS. Second, Academi routinely failed to staff protection details at the levels required in Task Order 4 (discussed below), and Academi obfuscated those failures by falsely reporting to the State Department the positions that particular PRSs filled on a daily basis.

### B.    Task Order 4

60.     In accordance with the terms of the WPPS Contract, the State Department issued

Task Order 4 to Academi on December 2, 2005 to address a need for protective services in

Afghanistan.  Section 6.0 of Task Order 4 describes the security services that Academi must

provide and states in part:

> In accordance with the Department of State's (DoS) Worldwide
> Personal Protective Services (WPPS II) contract, the Bureau of
> Diplomatic Security (DS) has a requirement for protective services
> in Afghanistan for (1) the U.S. Ambassador to Afghanistan, (2)
> U.S. Embassy Foreign Service Officers performing official duties,
> (3) visiting government and non-government personnel supporting
> official U.S. Government business, and (4) individuals or groups
> who are directly supporting development or reconstruction for or
> in conjunction with the U.S. Agency for International
> Development.

61.     Task Order 4 specifies in Section 6.0 that "[t]he contractor's [Academi's] effort

shall be under the daily oversight of the RSO [State Department Regional Security Officer] or

the RSO's designee."

62.     Task Order 4, in Section 7.0, describes the protective services that Academi is to

provide as two operations, stating:

> The first operation is to provide protection and safety for (1) the
> U.S. Ambassador to Afghanistan, (2) U.S. Embassy Foreign
> Service Officers performing official duties, and (3) visiting
> government and non-government personnel supporting official
> U.S. Government business.  The protective details that will be
> performing the above protective services will be comprised of
> sixty-one (61) experienced and trained personnel working under
> the direction of the RSO.
>
> *         *         *
>
> The second operation is to provide a protective detail of fourteen
> (14) experienced and trained personnel working under the direction
> of the RSO to ensure the safety of U.S. government and non-
> government personnel who are directly supporting development or

reconstruction for or in conjunction with the U.S. Agency for International Development (USAID).

63. Section 7.0 of Task Order 4 further defines the required composition for each team, stating that "A team consists of: 1 shift leader, 10 PSS, 1 PSS/EMT-I, and 2 PSS/DDM." Accordingly, Task Order 4 requires one emergency medical technician ("EMT") and 2 DDMs on every detail.

64. Section 7.1 of Task Order 4 identifies, in the aggregate, the persons and positions required for the four teams that will staff the details required for the first operation and the one team that will perform the sole detail required for the second operation:

**SUB-SERVICE AREA AND STAFFING POSITIONS – PROTECTIVE SERVICE DETAILS – STRUCTURE AND OPERATION**

**Operation 1**:  Protective detail for the U.S. Ambassador to Afghanistan, (2) the U.S. Embassy Foreign Service Officers, and (3) both government and non-government personnel visiting Afghanistan in support of U.S. Government Official Business.

The protection details shall be comprised as follows:

**Operation 1: Protective Service Details**

| Item | Position<br>Embassy PSD (4 Teams) | Nationality | Quantity | Security Clearance Requirements |
|------|-----------------------------------|-------------|----------|--------------------------------|
| a. | Detail Leader | U.S. | 1 | Top Secret |
| b. | Deputy Detail Leader | U.S. | 1 | Top Secret |
| c. | Shift Leaders | U.S. | 4 | Secret |
| d. | Personal Security Specialists | U.S. | 43 | Secret |
| e. | PSS/EMT-I | U.S. | 4 | Secret |
| f. | PSS/DDM | U.S. | 8 | Secret |

As noted in Paragraph 7.0, the protective service personnel for Operation 1 equates to four (4) teams of PSS and five (5) additional protective service personnel that will support these 4 teams as directed by the RSO.

**Operation 2:** Protection Detail for U.S. Government and non-government personnel supporting development or reconstruction for or in conjunction with the U.S. Agency for International Development.

The protection detail shall be comprised as follows:

**Operation 2: Protective Security Detail**

| Item | Position<br>PSD Primary Support<br>USAID (1 Team) | Nationality | Quantity | Security<br>Clearance<br>Requirements |
|------|---------------------------------------------------|-------------|----------|---------------------------------------|
| a. | Shift Leaders | U.S. | 1 | Secret |
| b. | Personal Security Specialists | U.S. | 10 | Secret |
| c. | PSS/EMT-I | U.S. | 1 | Secret |
| d. | PSS/DDM | U.S. | 2 | Secret |

65.     Section 7.1 of Task Order 4 also requires Academi to provide an overall Project Manager, two "PSS/Firearms Instructors," and two Operations Security Specialists, among other support positions, as "protective support personnel."

66.     A section of Task Order 4 entitled "GFP Weapons" specifies the weapons that Academi personnel on the protective details will be issued and must be qualified to use. The specified weapons include: Glock 19 semi-automatic pistol; Remington 870 shotgun; Colt M4 assault rifle; M249 machine gun; and M240 machine gun.

**II.     Academi's False Weapons Certifications and Billings for Unqualified Personnel.**

67.     From April 2007 until September 2011, and again for certain qualifications in 2012, Academi routinely has falsified weapons qualifications of PRSs for submission on official forms to the State Department. Indeed with few exceptions, since April 2007 Academi has failed to score its independent contractors on the M240 and M249 in Afghanistan.

68.     The WPPS Contract requires Academi to test all of its PRSs quarterly with five weapons – Glock 19 semi-automatic pistol; Remington 870 shotgun; Colt M4 assault rifle; M249 machine gun; and M240 machine gun.

69.     Academi generally performs weapon qualifications by team.  For example, Beauchamp performed his weapon qualifications with the other members of the Hammer 4 team while he was assigned to that team.

70.     Academi can qualify up to approximately 27 PRSs at a time on the firing range near Kabul, Afghanistan.  One Academi Lead Firearms Instructor, and two subordinate Firearms Instructors, administer the weapons qualifications.  Every Academi employee or contractor who performs a weapons qualification is required to sign-in at the range prior to his or her qualification.

71.     The WPPS Contract requires Academi to use a specified target – the DSQ-1A ("Izzy") Target – for the PRSs' qualifications with the pistol, shotgun, and rifle.  The WPPS Contract requires Academi to use a different target – the IPSC target – for the PRSs' qualifications with the M240 and M249 belt-fed machine guns.  Additionally, the WPPS Contract requires Academi to set up configurations of "shoot" and "no shoot" targets for the M240 and M249 belt-fed machine gun qualifications.

72.     For all weapons qualifications, including the M240 and M249 belt-fed machine guns, the WPPS Contract in Appendix N to Section C (Section C.15) requires Academi to score each PRS's performance with each weapon by counting the number of hits the PRS achieves within a specified area of the designated target.

    a.  For the M249 belt-fed machine gun qualification, the WPPS Contract requires:

        "**SCORING**: Requires 70 out of 70 Hits anywhere on the IPSC Targets/No Hits on 'No Shoot' Targets."

b.  For the M240 belt-fed machine gun qualification, the WPPS Contract requires: "SCORING: Requires 40 out of 40 Hits anywhere on the IPSC Targets/No Hits on 'No Shoot' Targets."

73.  The State Department later reduced the difficulty of its qualification requirements with the M249 and M240, on information and belief because PRSs were having difficulty qualifying with those weapons. For the M249 for example, the State Department revised its scoring to require a score of 56 out of a maximum of 70 points, with a one point deduction for every miss and a five point deduction for every hit on a "no shoot" target.

74.  The WPPS Contract qualification requirements for the other required weapons – pistol, rifle, and shotgun – similarly allow the PRS to miss several shots and still pass the qualification. For example:

a.  For semi-automatic pistols, the WPPS Contract requires each PRS to fire "three magazines of 13 rounds each (40 rounds total)/fired on the DSQ-1A ('Izzy');" "**SCORING**: five points for each hit within the 'Vital Area', four points for each hit on the silhouette outside the 'Vital Area' // 200 points maximum /160 points (80%) is minimum passing/qualifying score."

b.  For shotguns, the WPPS Contract requires the following: "**SCORING**: Ten rounds of #OO buckshot (90 pellets) total. One point per pellet hit anywhere on the body of the silhouette of the DSQ-1A [Izzy] target. Minimum qualifying score for OO buckshot (90 pellets) is 72 pellet hits."

75.  During a typical weapons qualification, the Academi Firearms Instructors begin by having the PRSs qualify with the smallest caliber weapon, the M4 rifle. As set forth in the WPPS Contract, each PRS fires the required number of rounds from the required distances with a

particular weapon. The Firearms Instructors then have the PRSs secure their weapons. When the Firearms Instructors conduct a weapons qualification properly, the subordinate Firearms Instructors approach to examine each target, count hits, mark misses, and write a score for hits on the targets, and the Lead Firearms Instructor then follows behind the subordinate Firearms Instructors and record each shooter's score on a master scoresheet. After the M4 qualification, the Academi Firearms Instructors repeat the same process for the pistol and shotgun qualifications.

76. After the weapons qualifications with the rifle, pistol, and shotgun, the WPPS Contract specifies that the Firearms Instructors must set up new and different targets, as well as "no shoot" targets, in specified configurations for the M240 and M249 belt-fed machine gun qualifications.

77. If conducted as required by the WPPS Contract, the M240 and M249 belt fed machine gun qualifications are more difficult for a PRS to pass than the weapon qualifications for the pistol, shotgun, and rifle. The M240 and M249 are heavier and more challenging to operate. They are automatic weapons that require the PRS to control the number of rounds fired in a burst. The PRS must manipulate the belt of ammunition feeding into those weapons. The PRS must avoid no-shoot targets. The PRS also is required to fire the M249 while moving.

78. For many PRSs, particularly those from a law enforcement rather than a military background, the first time that they fire an M240 or M249 is in Afghanistan. Academi currently does not provide live fire training with the M240 or M249 in Moyock (although it had provided such training several years ago). Indeed, on information and belief Academi lacks necessary permits and permission to acquire and field those weapons in its Moyock, North Carolina facility. Academi does maintain one older model M240 or M249 that it uses to teach PRSs how

to disassemble, maintain, operate, and assemble the weapon, but Academi does not allow PRSs to fire that weapon. Accordingly, many PRSs have limited or no experience firing the M240 and M249 at the time they first are required to qualify with the weapon.

79. Weapons qualifications with the M240 and M249 also are more time consuming than the qualifications with other weapons. For the pistol, rifle, and shotgun, Academi's Firearms Instructors can qualify up to approximately 27 PRSs at a time, and those three weapons qualifications can be performed without changing the targets. In contrast, the Firearms Instructors in an M240 or M249 qualification must score and change the targets between each shooter to keep track of hits and misses. Additionally, ordinarily only 4 PRSs attempt to qualify with the M240 and M249 (two PRSs firing M240s and two PRSs firing M249s) at one time, for a variety of reasons, including:

- The State Department requires the Firearms Instructors to set up a configuration of "shoot" and "no shoot" targets for each PRS, which take up room on adjacent firing lanes;

- The nature of these weapons requires a Firearms Instructor to supervise no more than two shooters at one time; and

- The teams generally fire their team-issued M249s, which they bring with them to the range, and each team is issued only a limited number of M249s.

80. To comply with the State Department's mandated procedures for M240 and M249 qualifications, Academi's Firearms Instructors are required to have the PRSs shoot the required number of shots at the required distances (25 and 50 meters), go up to the targets to score hits and misses, and then replace the targets for the next shooter. Firearms Instructors cannot score the PRSs' performance with the M240 and M249 belt fed machine guns without approaching the target to count hits and misses, just as the Firearms Instructors do for the qualifications with the pistol, rifle, and shotgun, all of which are fired at closer ranges. Academi's Firearms Instructors

also cannot distinguish one PRS's performance from another's without changing the targets between shooters.

81. Academi conducts PRS weapons qualifications in Afghanistan only one day a week. As a result, Academi conducts weapons qualifications for two groups of up to approximately 27 contractors every qualification day so that it ostensibly can meet the State Department's mandate that every PRS be re-qualified with all five required weapons every three months.

82. The State Department allows a PRS who fails a weapon qualification only two additional chances to qualify with the weapon. On the day of the failed qualification, an Academi Firearms Instructor trains the PRS and provides him with a second attempt to pass the qualification. If the PRS fails the second attempt, he is given a week of remedial training followed by a third attempt at the weapon qualification. If the PRS fails this third attempt at qualifying with the weapon, he is disqualified permanently from serving as a PRS on State Department contracts and sent back to the United States.

83. Academi faces strong incentives to avoid disqualifying its PRSs because they fail a weapons qualification. Under the WPPS Contract, Academi is subject to penalties if one of its PRSs is returned to the United States for unsatisfactory performance, such as for failure of a weapons qualification. Section C.4.3.3 of the Contract states: "Should a Contractor's employee be discharged or returned to the U.S. (or to a third country in the case of foreign nationals) due to dissatisfaction with the assignment or for unsatisfactory performance, the Contractor shall be assessed a negative incentive in accordance with the Section H, Incentives." As discussed above in Paragraph 58, Section H.15 of the WPPS Contract contains the Deduct Clause, which imposes

penalties on Academi for failing to staff fully any detail with the team members that a task order, in this case Task Order 4, requires.

84.     After a day of weapons qualifications, the Lead Firearms Instructor and one of the subordinate Firearms Instructors usually return to the Firearms Instructors' office at Camp Grizzly to record the scores on the official State Department forms and to enter the scores into a computer database.

85.     Academi also distributes a copy of the State Department's "Role of the DS Firearms Instructor" manual to PRSs who participate in its Firearms Instructor training course. In that manual, the State Department states:

> Firearms instructors must perform their duties in an ethical manner at all times.  Instances may occur for example, when a student is just below the passing score on a course, and the "suggestion" is made to modify the score upwards.  This is not only unethical conduct, but also subjects those involved to civil liability and other possible action for knowingly filing a false document[.]  Further, it does not address an obvious need for increased training to ensure the actual competence of the student in question.  Ethical conduct must always be displayed by professionalism of their training agency and to protect themselves, fellow workers, and their agency f[ro]m potential liability.

86.     The State Department's "Role of the DS Firearms Instructor" manual further prohibits ad hoc modification of firearms training and qualification requirements, stating that "DS firearms instructors must adhere to all established DS firearms training doctrine" as stated in official "formal doctrine" documents for four reasons:

a.    "Adherence to doctrine reduces or eliminates instructor liability;"

b.    "Following doctrine ensures the uniformity of instruction (and thus performance) of all personnel trained, even in a decentralized setting;"

c.  "Changes in techniques or procedures can be uniformly disseminated and passed on to personnel through the updating of documents, which support formal doctrine;" and

d.  "Techniques and procedures presented by the FTU [Firearms Training Unit] have been thoroughly tested, validated, and verified."

87.     Except for a few instances (mostly involving a substitute firearms instructor), Academi did not properly qualify its PRSs – including Beauchamp, Shepherd, and the other PRSs on their details – with the M240 and M249 belt-fed machine guns during their deployments in Afghanistan.  Numerous times, Academi's Firearms Instructors did not require PRSs even to fire the M240 and/or M249 during weapons qualifications.

88.     On the evenings after weapons qualifications, Academi's Lead Firearms Instructor and one of the subordinate Firearms Instructors would return to the Firearms Instructor's office on Camp Grizzly and fabricate scores for the PRSs with the M240 and M249. Academi recorded these fabricated scores on official State Department forms and submitted the fabricated scores to the State Department.

89.     Academi's fabrication of weapons qualifications has been systemic and persistent, spanning the tenure of numerous Lead Firearms Instructors in Afghanistan.

90.     Beauchamp and Shepherd have personal knowledge of Academi's submission of false weapon qualification reports to the State Department and fraudulent billing for PRSs who lacked the required weapons qualifications.  Academi submitted numerous Firearms Qualification Record Forms to the State Department for Beauchamp and Shepherd that falsely report that they were scored on the M240s and M249s when they were not.   Academi falsified Beauchamp's score cards for weapons qualifications that took place from April 2007 to May

2011. Just as a few examples, Beauchamp's score cards from October 4, 2010, April 3, 2010, July 23, 2010, January 27, 2011, April 1, 2011 and April 8, 2011 are fraudulent. Likewise, Shepherd's score cards for weapons qualifications beginning in April 2009 until a qualification in September 2011 are fraudulent. The scorecards that Academi submitted to the State Department for every PRS that purportedly qualified with Beauchamp and Shepherd on those dates are fraudulent. No PRS that performed firearms qualifications with Beauchamp and Shepherd on these and many other dates was scored properly for the M240 and M249 qualifications.

91. Academi falsely certified that they and other PRSs had passed the State Department's mandated weapons qualification for the M240 and M249, when in reality Academi had not scored the PRSs' performance with those weapons or in some instances even required the PRSs to fire those weapons at all.

92. Academi fraudulently billed the State Department for these PRSs under Task Order 4 even though the PRSs had not qualified with the M240 and/or M249 and therefore were ineligible to serve in the WPPS program. Academi also improperly avoided penalties due under the Deduct Clause by failing to disclose that its PRSs were not qualified to man the details required by Task Order 4.

**III.     False Reports and Billings Regarding Duties Performed.**

93. Academi also submitted false reports and bills to the State Department that misrepresented who performed certain roles and services on the details required by Task Order 4. Academi made these misrepresentations to obfuscate that it was not fully manning details as Task Order 4 requires, and was staffing positions with PRSs who had not been approved by the State Department for that position, and therefore was liable for penalties under the Deduct Clause. Academi also submitted false claims to the State Department for services not rendered.

27

94.     Beauchamp and Shepherd have personal knowledge of Academi's false billing and false reports, as they were in Afghanistan and know what positions they and other individuals filled and how Academi billed the State Department for their and the other individuals' services.

95.     Historically, Academi has had difficulty recruiting PRSs that are qualified to fill certain roles, including DDM and EMT, that Task Order 4 requires for each detail. Academi routinely fielded teams that had one or no DDMs, even though Task Order 4 requires each team to include 2 DDMs. To obfuscate this shortfall, Academi falsely reported to the State Department that certain PRSs were serving as DDMs when in reality those PRSs were serving in other roles.

96.     Beginning on or about November 23, 2009, Academi repeatedly billed the State Department for the services of Timothy Powers as a Shift Leader. In reality, Powers was the head cook for Camp Grizzly in Afghanistan. His primary job responsibility was to oversee the cooking staff, which was comprised primarily of local Afghans. Powers went on a few missions, at most. Documents dated March 10, 2011 reflect that Powers was shown as a DDM on Team 3 when in fact he had not worked on Team 3 since at least January 2011. Indeed for much of his time in Afghanistan, he did not even check a weapon out of the armory.

97.     Academi reported to the State Department that Brad Glisson was working as a DDM in April, May, and June 2009, and it billed for his services accordingly. In reality, Glisson actually was working in an office as a Detail Leader.

98.     From about June 2009, John Little was billed as Deputy Detail Leader, Detail Leader or Project Manager, but those positions were filled by other Academi personnel, and Little never went on a mission.

99.     From about October 13, 2009, Wade Wills was billed as a DDM for the Anvil 1 team.  In fact, he was working in headquarters to verify other contractors' biographies.  On or about December 23, 2009, Wills was working at the Tactical Operations Center, although he was being billed as the only DDM for the Anvil 1 team.  At the time, the Anvil 1 team was operating without any DDMs in violation of Task Order 4.

100.     On or about November 23, 2009, Operations Chief Troy Anderson admitted that he was concerned about Academi's management placing personnel in one position and billing the State Department for a different position.  Anderson admitted that the company had falsely billed for his, Timothy Powers', Wade Wills', and another Operation Chief's services.

101.     On or about April 15, 2010, Kirkland Gregor admitted that Tim Knowles had not been approved by the State Department as an Operations Chief, but Academi nevertheless had assigned him to work in that position.

102.     In late summer 2010, Academi billed the State Department for Kenny Hankins' services as a DDM.  In fact Hankins was serving as the Shift Leader for Anvil 2.

103.     On or about October 1, 2010, Rich Richter, the Hammer 4 Shift Leader, admitted that he had been paid as an Operations Chief for thirty days and numerous days as an OSS, when in fact he was working in the field on a personal security detail.

104.      On or about January 14, 2011, Relator Shepherd was informed that Deputy Detail Leader Thomas Koch and Team 8 Shift Leader Michael Puppolo were being moved to positions as DDMs because of personnel shortages at those positions.  However, Koch did not work as a DDM.  Instead, he continued to work in headquarters.

105.     On or about March 9, 2011, Frank Liles, a Shift Leader from Team 4, admitted that Patrick Houghteling had been serving as the Shift Leader for Team 4 even though he had not

been approved by the State Department to work in that position. Liles also admitted that Steve Cardella was serving as a Shift Leader for Team 8, beginning on or around January 2, 2011, even though the State Department had not approved Cardella to serve as a Shift Leader.

106. Academi billed the State Department for Paul Ellis's services as a Shift Leader, when Ellis actually was working as a Personal Security Specialist ("PSS"). On another occasion, Academi falsely billed the State Department for Ellis's services as Operations Chief, when Ellis was actually working as a Shift Leader. The person actually working as the Operations Chief on those dates was Tim Zapata, who was not qualified or approved by the State Department for that position.

107. Academi falsely billed the State Department for Steve McKenzie's services for at least seven months as a DDM, when he actually was working as a Shift Leader.

108. Ernest Davis (whose call sign was "Moonshine") was assigned to Hammer 7 as a PSS on Academi's staffing records submitted to the State Department, but in fact he worked at Academi's Camp Grizzly, did not perform missions with Hammer 7, and did not attend Hammer 7 meetings.

109. Academi billed the State Department for Tom Koch's and Michael Puppolo's services as DDMs, while they actually served in leadership positions in Camp Grizzly and did not go on missions.

110. Academi personnel involved in the false billing include, but are not limited to, Thomas Koch, Kyle Huttenlocker, John Little, Danny West, John Powder, Brad Glisson, Kurt Scheuermann, James Overton, Tracy West, and Bob Nesall.

111. Reasonable discovery will establish the identities of other Academi personnel who engaged in the false billing scheme, including corporate management in Moyock, North

Carolina and Arlington, Virginia. Reasonable discovery also will establish that Defendant engaged in a systemic pattern of changing job titles to maximize Academi's profits and hide the contractual penalties that Academi owed to the State Department.

112. In November 2010, Relator Beauchamp informed Academi executive Anthony Valusek about the widespread false billing in Kabul by telephone and e-mail, giving numerous specific examples. Valusek told Beauchamp that there was an investigation going on, and asked him not to speak about these matters except to company lawyers. On information and belief, Valusek took no effective action to halt the fraud or report it to the State Department.

113. To prevent discovery of the fraudulent billing, Academi altered the Relators', Paul Ellis's, and other personnel's payroll records in December 2010 and January 2011.

## IV. Academi's Retaliation Against Beauchamp

114. For six years, Beauchamp worked as a PRS for Academi in both Iraq and Afghanistan. During that period, Academi gave Beauchamp uniformly positive reviews that graded him as "Superior" in all respects for as long as Academi has used its current evaluation form.

115. Academi promoted Beauchamp repeatedly. He began working as a PSS, and throughout his career Academi promoted him to positions as a DDM, Shift Leader, Operations Security Specialist, and finally Operations Chief, which is a senior position that reports solely to the Project Manager, Academi's highest official in Afghanistan.

116. In late 2007 and early 2008, Beauchamp learned that although he was working as an Operations Chief in the United States Embassy, Academi was submitting bills to the State Department indicating that he was serving as a DDM and was paying Beauchamp at the lower DDM rate. Beauchamp had discussions regarding this false billing with both William ("Billy") Rae and Detail Leader Juan Jimenez in which he indicated that this was improper because

31

Academi was reporting false information to the State Department and because Beauchamp was being underpaid as a result.

117.    Despite Beauchamp's exemplary service and "superior" performance ratings, Academi transferred Beauchamp to the position of DDM on the Hammer 4 team in February 2009.

118.    In early 2011, Academi learned that Beauchamp had agreed to testify regarding his knowledge of certain allegedly fraudulent billing practices by Academi in connection with a *qui tam* lawsuit pending in the United States District Court for the Eastern District of Virginia as *U.S. ex rel Davis v. U.S. Training Center, Inc.*, Case No. 1:08-cv-01244 ("*Davis*").

119.    On or around March 25, 2011, Anthony Valusek confronted Beauchamp regarding whether he intended to testify in the *Davis* case. Beauchamp stated that he did intend to testify. Valusek then ended the conversation. On information and belief, Anthony Valusek was Academi's Vice President for WPPS Programs at the time of this conversation.

120.    After this conversation with Valusek, Beauchamp began to be shunned by Academi leadership personnel at Camp Grizzly. In one example, Beauchamp walked into the mess hall, and State Department liason Chris Craig leaned over and commented to Beauchamp's superior and then both men directed piercing glares towards Beauchamp.

121.    On or about May 9, 2011, Beauchamp was informed by fellow Academi contractors that his name was on a list of PRSs whom Academi was sending back to the United States. As he was not scheduled for a leave, Beauchamp believed that Academi had made a mistake. Yet later that day, he was called into a meeting with Project Manager Kurt Schueruman, Shift Leader Brad Glisson, Deputy Detail Leader Kyle Huttenlocker, Jason

Wellborn, and other Academi senior leadership and informed that he was being terminated. On information and belief, Academi terminated Beauchamp for agreeing to testify in *Davis*.

122.     After Beauchamp returned to the United States, he was unable to obtain employment from other private security companies and informed that he had been placed on the State Department's "Do Not Use" list. State Department Agent John Connors originally informed Beauchamp that he had not been placed on the "Do Not Use" list, but in August 2011 Connors confirmed that the State Department had in fact placed Beauchamp on that list.

123.     When Beauchamp inquired with the State Department regarding why he had been placed on the State Department's "Do Not Use" list, the State Department forwarded Beauchamp's inquiry to Anthony Valusek and Anthony Sagenetti of Academi for a response. To date, no one at Academi or the State Department has provided an explanation for why Beauchamp has been blacklisted from any further work on State Department contracts.

124.     Currently, Beauchamp is working as a commercial truck driver at a fraction of his former pay and prior professional fulfillment. Given his age and the specialized nature of his professional experience in the military and law enforcement, he has been unable to secure income comparable to what he made in the private security industry.

**V.     Academi's Retaliation Against Shepherd**

125.     Shepherd has worked as a PRS for Academi in both Iraq and Afghanistan for more than six years. Prior to the time that Academi discovered that Shepherd had agreed to testify in the *Davis* case, Academi gave Shepherd uniformly positive reviews.

126.     Academi promoted Shepherd to positions of leadership. He began working as a PSS, and throughout his career Academi promoted him to be a Shift Leader for three details in Iraq (Raven 2, Raven 5, and Raven 10) and two details in Afghanistan (Hammer 6 and Hammer 8).

127.     In early 2011, Academi learned that Shepherd had agreed to testify regarding his knowledge of certain allegedly fraudulent billing practices by Academi in connection with *Davis*.  On or around March 24, 2011, while Shepherd was in the United States on leave, Tony Sanganetti called Shepherd to confront him regarding whether he had agreed to testify in *Davis*, and Shepherd informed Academi that he had agreed to testify.

128.     When Shepherd returned to Camp Grizzly in Kabul, Afghanistan, he was confronted with a hostile environment.  No one in leadership other than his direct Shift Leader would speak to him, and indeed Academi's senior leadership would not respond when Shepherd spoke directly to them.  Academi began changing his leave schedule without informing him, and it prohibited him from working as a Shift Leader, instead requiring him to work as a PSS for a lower rate of pay.  It also began giving him more negative performance reviews.

## CAUSES OF ACTION

I.     **First Cause of Action – Academi Knowingly Presented False Claims for Payment in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).**

129.     Plaintiffs-Relators Beauchamp and Shepherd incorporate by reference the preceding paragraphs as if set forth fully herein.

130.     Through the acts described above, Academi knowingly presented false claims for payment to the State Department.  Every claim that Academi has submitted to the State Department for a PRS who had not qualified quarterly with the M240 or M249 is a false claim.  Every invoice that Academi has submitted to the State Department for a PRS who did not perform the services reflected in that invoice is a false claim.

131.     In the WPPS Contract, the State Department requires Academi to re-qualify its PRSs quarterly with the M240 and M249, and it forbids any PRS who has not qualified with those weapons from providing protective services under that Contract.  Nevertheless, Academi

billed the State Department for ineligible PRSs whom Academi knew had not re-qualified quarterly with the M240 and M249 as the WPPS Contract requires.

132.     In the WPPS Contract and Task Order 4, the State Department requires Academi to staff a specific number of PRSs with specific skills in specific roles for every detail.  Academi submitted false claims reflecting that particular PRSs performed certain services in Afghanistan that those PRSs did not perform.

133.     Pursuant to 31 U.S.C. § 3729(a)(1), Academi is liable for three times the amount it received from the State Department as a result of these false claims, as well as civil penalties of $5,500 to $11,000 per claim, as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 and 28 C.F.R. § 85.3.

## II.     Second Cause of Action – Academi Knowingly Made False Records and Statements Material to False or Fraudulent Claims for Payment in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

134.     Plaintiffs-Relators Beauchamp and Shepherd incorporate by reference the preceding paragraphs as if set forth fully herein.

135.     Through the acts described above, Academi knowingly made false statements and records to support its claims for payment to the State Department.  Academi made false statements and records regarding PRSs' quarterly weapons qualifications with the M240 and M249.  Academi also made false statements and records regarding the services that certain PRSs purportedly provided to the State Department.

136.     Academi made false statements and submitted false records to the State Department to justify billing for PRSs who had not re-qualified quarterly with the M240 or M249.  Every weapons qualification form that Academi submitted to the State Department for a PRS who did not qualify with the M240 or M249 is a false record that contains false statements,

as is every bill that Academi sent to the State Department seeking payment for the services of those contractually disqualified PRSs.

137.    Academi's false statements and records regarding its PRSs' weapons qualifications with the M240 and M249 are material to Academi's claims for payment to the State Department for the services provided by those PRSs.  The WPPS Contract states that quarterly qualification with all required weapons, including the M240 and M249, is a "necessary condition" of the Contract.

138.    Academi also made false statements and submitted false records to the State Department regarding the services that certain PRSs purportedly provided on a daily basis. Academi used these false statements to bill the State Department for services that either were not provided, or were provided by someone else who may not possess the proper qualifications or State Department approval.

139.    Academi's false statements and records regarding the services that certain PRSs purportedly provided are material to the claims Academi submitted to the State Department seeking payment for those services.  The WPPS Contract and Task Order 4 require details to be manned by a combination of PRSs with specified skill sets and in particular roles.  Academi falsified statements and records to justify billing the State Department for services that were not provided at all, or that were provided by someone without the required experience and approval. For example, Academi frequently misrepresented that it staffed details with DDMs when in fact no DDM was on the team, thereby breaching the WPPS Contract and Task Order 4 and jeopardizing the safety of the US or foreign dignitary whom the detail was tasked to protect.

140.    Pursuant to 31 U.S.C. § 3729(a)(1), Academi is liable for three times the amount it received from the State Department as a result of the false claims that Academi supported with

the material false statements and reports discussed above, as well as civil penalties of $5,500 to $11,000 for each false statement and record, as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 and 28 C.F.R. § 85.3.

**III.    Third Cause of Action – Academi Knowingly Concealed and Improperly Avoided an Obligation to Pay Penalties to the State Department in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).**

141.    Plaintiffs-Relators Beauchamp and Shepherd incorporate by reference the preceding paragraphs as if set forth fully herein.

142.    As discussed above, the WPPS Contract contains a Deduct Clause that specifies the penalties that the State Department imposes for any failure by Academi to fully staff protection details as required in Task Order 4.

143.    Academi made and submitted falsified weapon qualification forms and billing records to the State Department to obfuscate that it was staffing protection details with ineligible PRSs who had not been qualified quarterly with the M240 and M249 as the WPPS Contract requires.

144.    Academi also made and submitted falsified staffing reports and billing records to the State Department to obfuscate its failure to fully staff protection details.  Academi frequently failed to staff certain hard-to-fill positions, such as DDM, and it frequently staffed positions with unqualified and/or unapproved personnel.  Nevertheless, Academi made and submitted falsified records and invoices reflecting that these positions had been staffed fully and appropriately.

145.    Pursuant to 31 U.S.C. § 3729(a)(1), Academi is liable for three times the amount of penalties it improperly avoided with the material false statements and reports discussed above, as well as civil penalties of $5,500 to $11,000 for each false statement and record, as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 and 28 C.F.R. § 85.3.

**IV.    Fourth Cause of Action – Academi Retaliated Against Lyle Beauchamp in Violation of the False Claims Act, 31 U.S.C. § 3730(h).**

146.    Plaintiffs-Relators Beauchamp and Shepherd incorporate by reference the preceding paragraphs as if set forth fully herein.

147.    The False Claims Act ("FCA") is a statutory scheme designed to discourage fraud against the federal government.  Congress amended the FCA in 1986 to add an anti-retaliation provision to protect whistleblowers.  The current iteration of that provision is 31 U.S.C. § 3730(h)(1), which states:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

The purpose of Congress's amendment of the FCA to protect whistleblowers was to assure those like Beauchamp and Shepherd who are considering exposing fraud that they are legally protected from retaliatory acts.

148.    Academi retaliated against Beauchamp for engaging in conduct that is protected under the False Claims Act.  Specifically, Academi terminated Lyle Beauchamp on or about May 9, 2011 for agreeing to testify in a lawsuit, the *Davis* case, alleging that Academi violated the False Claims Act by submitting false claims to the State Department for services that it purportedly, but had not actually, rendered.

149.    In the six years before his termination, Beauchamp received consistently positive performance reviews.  Academi graded Beauchamp "Best" or "Superior" (the highest category depending on the form that Academi used at the time) in most or all categories.  Beauchamp never received a below average grade from Academi on any review prior to his termination.

150.     During his work for Academi, Beauchamp was paid between $510 and $600 a day, depending on the position at which Academi billed the State Department for his time, with an additional signing bonus of up to $5,000.

151.     Academi became aware of Beauchamp's agreement to testify in the *Davis* lawsuit approximately five weeks before it terminated him.  Academi retaliated against and terminated Beauchamp as a direct result of his agreement to testify as a witness in *Davis*.

152.     In this case, there can be no reasonable dispute that Academi anticipated litigation arising out of Beauchamp's protected conduct.   Beauchamp had agreed to testify in a pending False Claims Act case brought by another relator, thus litigation for Academi was not only a distinct possibility, but a current reality.

153.     The subject matter of Beauchamp's testimony related directly to a violation of the False Claims Act – Academi's alleged submission of bills to the State Department for services that Academi had not provided.

154.     When Academi terminated Beauchamp, it had full knowledge of his protected activities.  Academi officer Anthony Valusek confronted Beauchamp regarding Beauchamp's intent to testify in the *Davis* case five weeks before Academi terminated Beauchamp.

155.      After terminating Beauchamp, Academi caused the State Department to preclude Beauchamp from obtaining further work as a security contractor by having Beauchamp placed on the State Department's "Do Not Use" list.

156.     As a result of Academi's efforts to have Beauchamp placed on the State Department's "Do Not Use" list, Beauchamp has been unable to obtain contract work in the private security industry.

**V.     Fifth Cause of Action – Academi Retaliated Against Warren Shepherd in Violation of the False Claims Act, 31 U.S.C. § 3730(h).**

157.     Plaintiffs-Relators Beauchamp and Shepherd incorporate by reference the preceding paragraphs as if set forth fully herein.

158.     Academi retaliated against Shepherd for engaging in conduct that is protected under the False Claims Act.  Specifically, Academi has subjected Shepherd to a hostile environment, refused to allow Shepherd to work as a Shift Leader, and subjected Shepherd to reviews that do not accurately reflect his performance in retaliation for his agreement to testify in the *Davis* case regarding certain allegations that Academi violated the False Claims Act by submitting false claims to the State Department for services that it purportedly, but had not actually, rendered.

159.     Beginning in September 2007, Shepherd served primarily as a Shift Leader, first in Iraq and later in Afghanistan.  Nevertheless, Academi has refused to allow Shepherd to serve as a Shift Leader since it discovered Shepherd's agreement to testify in the *Davis* case, and it instead has required him to work at the lower, and lower paid, position of PSS.

160.     In this case, there can be no reasonable dispute that Academi anticipated litigation arising out of Shepherd's protected conduct.  Beauchamp had agreed to testify in a pending False Claims Act case brought by another relator, thus litigation for Academi was not only a distinct possibility, but a current reality.

161.     The subject matter of Shepherd's testimony related directly to a violation of the False Claims Act – Academi's alleged submission of bills to the State Department for services that Academi had not provided.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs-Relators Beauchamp and Shepherd request that the Court enter judgment in their favor and against Academi as follows:

a. That Academi must cease and desist from violating the False Claims Act;

b. That Academi must pay an amount equal to three times the total amount that it knowingly and falsely billed the United States for PRSs who were not properly qualified with the M240 and M249;

c. That Academi must pay an amount equal to three times the total amount that it knowingly and falsely billed the United States for PRSs who did not perform the roles, duties, tasks, or services reflected on the bills and supporting documentation;

d. That Academi must pay a civil penalty in the maximum statutory amount of $11,000 for each false claim, bill, statement, and record that Academi submitted to the United States in violation of 31 U.S.C. § 3729(a)(1);

e. That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

f. That Relators be awarded all costs and expenses incurred in bringing this action, including attorneys' fees; and

g. That the United States, Beauchamp, and Shepherd receive all such other relief as the Court deems just and proper.

WHEREFORE, Plaintiff Beauchamp further requests that judgment be entered in his favor and against Academi as follows:

a. An award of $600 a day from March 24, 2011 through the date of trial;

b. A doubling of the award of $600 a day from May 9, 2011 through the date of trial pursuant to 31 U.S.C. § 3730(h)(2) as an award for Academi's unlawful termination of Beauchamp;

c. Compensation in an amount to be proven at trial as special damages pursuant to 31 U.S.C. § 3730(h)(2) for Academi's unlawful retaliation in precluding Beauchamp from obtaining contracts in the private security industry;

d. Reinstatement of Beauchamp to a senior leadership position to be paid at a daily rate of $600;

e. Prejudgment interest pursuant to 31 U.S.C. § 3730(h)(2);

f. Attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h)(2);

g. An award of appropriate exemplary damages for Academi's willful and malicious retaliation in an amount to be proven at trial; and

h. An award for such other and further relief as this Court deems just and proper.

WHEREFORE, Plaintiff Shepherd further requests that judgment be entered in his favor and against Academi as follows:

a. An award of the difference in pay between Shepherd's compensation as a PSS and the compensation that Academi has paid Shift Leaders with experience commensurate with Shepherd's experience for a period beginning on March 24, 2011 and through the date of trial;

b. A doubling of the award made pursuant to the above paragraph under 31 U.S.C. § 3730(h)(2);

c. Compensation in an amount to be proven at trial as special damages pursuant to 31 U.S.C. § 3730(h)(2) for Academi's unlawful retaliation against Shepherd, including subjecting him to a hostile work environment;

d. Reinstatement of Shepherd to a Shift Leader position to be paid at the same rate Academi is paying to Shift Leaders with experience commensurate with Shepherd's experience;

e. Prejudgment interest pursuant to 31 U.S.C. § 3730(h)(2);

f. Attorneys' fees and costs pursuant to 31 U.S.C. § 3730(h)(2);

g. An award of appropriate exemplary damages for Academi's willful and malicious retaliation in an amount to be proven at trial; and

h. An award for such other and further relief as this Court deems just and proper.

## Jury Request

Plaintiffs-Relators Beauchamp and Shepherd hereby request a trial by jury for all issues so triable.

Date: November 19, 2012

Respectfully submitted,

_____/s/_____
William E. Copley
Virginia State Bar No. 43960
August J. Matteis, Jr. (admitted *pro hac vice*)
Neesa Sethi (admitted *pro hac vice*)
WEISBROD MATTEIS & COPLEY PLLC
1900 M Street, N.W., Suite 850
Washington, D.C.  20036
Telephone:  (202) 499-7901
Facsimile:  (202) 478-1795
Email:  wcopley@wmclaw.com

*Counsel for Lyle Beauchamp and Warren Shepherd*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2012, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to the following:

Brian Tully McLaughlin
CROWELL & MORING LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
Email: bmclaughlin@crowell.com

*Counsel for U.S. Training Center, Inc.*


_____/s/_____
William E. Copley
Virginia State Bar No. 43960
August J. Matteis, Jr. (admitted *pro hac vice*)
Neesa Sethi (admitted *pro hac vice*)
WEISBROD MATTEIS & COPLEY PLLC
1900 M Street, N.W., Suite 850
Washington, D.C. 20036
Telephone: (202) 499-7901
Facsimile: (202) 478-1795
Email: wcopley@wmclaw.com

*Counsel for Lyle Beauchamp and Warren Shepherd*