**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| United States of America, *ex rel.*<br><br>LYLE BEAUCHAMP and WARREN SHEPHERD,<br><br>　　　　　*Plaintiffs*,<br>　v.<br><br>ACADEMI TRAINING CENTER, INC. (F/K/A U.S. TRAINING CENTER, INC.),<br><br>　　　　　*Defendant*. | Civil Action No. 1:11-cv-371 (TSE/TRJ) |

**RELATORS' OPPOSITION TO DEFENDANT ACADEMI'S
OMNIBUS MOTION TO DISMISS RELATORS'
FRAUD CLAIMS AND STAY RELATORS' RETALIATION CLAIMS**

William E. Copley (VSB # 43960)
August J. Matteis, Jr. (admitted *pro hac vice*)
Neesa Sethi (admitted *pro hac vice*)
WEISBROD MATTEIS & COPLEY PLLC
1900 M Street, N.W., Suite 850
Washington, D.C. 20036
Telephone: (202) 499-7901
Facsimile: (202) 478-1795
Email: wcopley@wmclaw.com

*Counsel for Plaintiffs Lyle Beauchamp and Warren Shepherd*

Dated: December 21, 2012

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ......................................................................................................................2

I.      The Davises Alleged Different Fraudulent Schemes. ........................................................2

II.     Beauchamp and Shepherd Allege that Academi Engaged in Two Different
        Fraudulent Schemes..........................................................................................................3

III.    Academi Terminates Winston and Wheeler for Reporting the False Weapons
        Qualification Scheme. ......................................................................................................4

ARGUMENT ...........................................................................................................................7

I.      The *Beauchamp* SAC is Not Barred by the First-to-File Rule because it Contains
        Allegations of Two Fraudulent Schemes that Were Not Alleged in *Davis*........................7

        A.      *Beauchamp* is not a Related Action Based on the Facts Underlying *Davis*
                Because the Two Cases Involve Completely Distinct and Separate
                Fraudulent Schemes..............................................................................................7

        B.      The False Billeting Scheme Was Not Alleged In *Davis*. .....................................10

        C.      The False Weapons Qualification Scheme Was Not Alleged in *Davis*.................12

        D.      The *Davis* Case Is Not "Pending" Because a Judgment was entered for the
                Defendants in this Court, the Fourth Circuit Affirmed the Decision, and no
                Further Appeals Will Be Filed. ...........................................................................14

II.     Relators' *Qui Tam* Claims are Not Barred by the False Claims Act's Public
        Disclosure Provision, 31 U.S.C. § 3730(e)(4). ..................................................................15

        A.      The False Claims Act's Public Disclosure Provision is No Longer
                Jurisdictional......................................................................................................15

        B.      Relators' Claim Regarding Academi's Falsification of Weapon
                Qualification Reports to the State Department is not Barred by the False
                Claims Act's Public Disclosure Provision. ..........................................................17

                1.      The *Winston* Complaint Does Not Preclude the Relators' False
                        Weapons Qualifications Claims in this Case............................................18

                2.      The Other Purported "Public Disclosures" that Academi Identifies
                        Were Not Public and/or Did Not Disclose the "Allegations or
                        Transactions" that Comprise the Substance of the Relators' Claim..........22

        C.      Relators are Original Sources of Information Regarding Academi's False
                Claims and Reports Regarding Who Filled What Role in Afghanistan. ...............29

III.    Relators' Claims Are Not Barred by Rule 12(b)(6). ..........................................................32

        A.      Relators' Allegations of the False Weapons Qualification Scheme
                Properly State Claims for Relief...........................................................................33

B.      Relators' Allegations of the Avoidance of Deduct Clause Penalties in the False Billeting Scheme Properly State a Claim for Relief. ...................................35

IV.     Relators Have Satisfied Rule 9(b) by Pleading Fraud with Particularity. .........................36

A.      Relators' Allegations of the False Weapons Qualification Scheme Are Sufficiently Particular. ...........................................................................................37

B.      Relators' Allegations of the False Weapons Qualification Scheme Are Sufficiently Particular with Respect to How Academi Over-Billed the Government. ......................................................................................................39

C.      Relators' False Billeting Allegations Are Sufficiently Particular. ........................41

V.      The Retaliation Claims Should Not Be Stayed for Arbitration Because Academi's Draconian Arbitration Provision Is Unenforceable. ...........................................................43

A.      This Court Should Determine the Threshold Question of Arbitrability. ...............43

B.      The ICSA Arbitration Provision is Unenforceable Because It Impermissibly Precludes Relators from Vindicating Federal Statutory Rights and is Substantively Unconscionable. ........................................................45

CONCLUSION ...................................................................................................................48

# **TABLE OF AUTHORITIES**

## **Cases**

*Agri-Tech, Inc. v. Brewster Heights Packing, Inc.*, Case Nos. 92-2007, 92-2011, 1993 WL
398486 (4th Cir. Sept. 28, 1993) ....................................................................................43

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008) .........................................16

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) .............................................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)................................................................................32

*Assaad v. Am. Nat'l Ins. Co.*, No. 10-3712, 2010 WL 5416841 (N.D. Cal. Dec. 23, 2010).........47

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................................33

*Campbell v. Redding Med. Ctr.,* 421 F.3d 817 (9th Cir. 2005).....................................................14

*Capella v. United Tech. Corp.*, 3:94-CV-2063, 1999 WL 464536 (D. Conn. June 3, 1999)..........9

*Cf. U.S. ex. rel. Jones v. Collegiate Funding Servs., Inc.*, 469 Fed. App'x 244 (4th Cir. 2012)...40

*Cole v. Burns Int'l Security Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) ..................................47

*Diesselhorst v. Munsey Bldg., L.L.L.P.*, No. 04-3302, 2005 WL 327532 (D. Md. 2005).............44

*Dingle v. Bioport Corp.*, 388 F.3d 209 (6th Cir. 2004) ...............................................................22

*Domingo v. Ameriquest Mortg. Co.*, 70 F. Appx. 919 (9th Cir. 2003).........................................47

*Dumais v. Am. Golf Corp.,* 299 F.3d 1216 (10th Cir. 2002) ........................................................46

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)....................................................44

*Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009)......................................25

*Gourley v. Yellow Transportation, LLC*, 178 F. Supp. 2d 1196 (D. Colo. 2001) .........................47

*Graham County Soil & Water Cons. Dist. v. U.S. ex rel. Wilson*,130 S. Ct. 1396 (2010)............25

*Granite Rock Co. v. Int'l B'hood of Teamsters*, 130 S.Ct. 2847 (2010) .......................................43

*Green v. Short*, No. 06-CVS-22085, 2007 WL 2570821 (N.C. Super. Ct. Mar. 9, 2007) ...........44

*Grundstad v. Ritt,* 106 F.3d 201 (7th Cir. 1997) .........................................................................46

*Hamrick v. Aqua Glass, Inc.*, No. 07-3089, 2008 WL 2853992 (D. Or. Feb. 20, 2008) .............47

*Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999) ...............................................45, 47

*Hooters of Am., Inc. v. Phillips*, 39 F. Supp. 2d 582 (D.S.C. 1998)...............................................47

*In re Checking Account Overdraft Litig.*, 685 F.3d 1269 (11th Cir. 2012)...................................46

*In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals)*, 566 F.3d 956 (10th Cir. 2009)........9

*In re Pharmaceutical Ind. Avg. Wholesale Price Litig.*, No. 07-11618, 2008 WL 2778808 (D. Mass. July 15, 2008)............................................................................................................9

*Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165 (9th Cir. 2003) ...................................................46

*Johnson v. Circuit City Stores, Inc.*, 2000 WL 19166 (4th Cir. 2000)....................................45, 46

*Kennard v. Comstock Res., Inc.,* 363 F.3d 1039 (10th Cir.2004)...................................................26

*King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192 (4th Cir. 1998) ................................12

*Lexie v. State Farm Mut. Atuo. Ins. Co.*, 469 S.E.2d 61 (Va. 1996) ............................................43

*Martek Biosc. Corp. v. Zuccaro*, No. 04-3349, 2004 WL 2980741 (D. Md. Dec. 23, 2004) .......44

*McCarthy v. Azure,* 22 F.3d 351 (1st Cir.1994) ............................................................................46

*Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784 (2010) ................................................................16

*Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.* 276 F.3d at 1032 ................23

*Murray v. United Food & Commercial Workers International Union*, 289 F.3d 297 (4th Cir. 2002)........................................................................................................................45, 48

*Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191 (3d Cir. 2010) ......................................................46

*Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538 (E.D. Pa. 2006)..................................47

*Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir. 1997)...............................................47

*Peabody Holding Co., LLC v. United Mine Workers of America*, 665 F.3d 96 (4th Cir. 2012)...44

*Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280 (11th Cir. 2001) ...................................45

*Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010) ................................................................47

*Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010).............................................................16

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)......................................................................27

*Sherer v. Green Tree Servicing LLC,* 548 F.3d 379 (5th Cir. 2008)..............................................46

*Sherwood v. Blue Cross*, No. 07-633, 2007 WL 2705262 (E.D. Cal. Sept. 14, 2007)..................47

*U.S. ex rel Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011) ......................................................23

*U.S. ex rel Davis v. Prince*, 753 F. Supp.2d 569 (E.D. Va. 2011) ...........................................17, 18

*U.S. ex rel Jones Collegiate Funding Servs., Inc.*, 469 Fed. Appx. 244 (2012)............................26

*U.S. ex rel Vuyyuru v. Jadhav*, 555 F.3d 337 (4th Cir. 2009) .......................................................30

*U.S. ex rel. Banignan v. Organon USA Inc.*, No. 07-12153, 2012 WL 1997874 (D. Mass. June 1, 2012).................................................................................................................................9

*U.S. ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204 (D.C. Cir. 2011) .................................................9

*U.S. ex rel. Capella v. United Tech. Corp.*, 3:94-CV-2063, 1999 WL 464536 (D. Conn. June 3, 1999).................................................................................................................................9

*U.S. ex rel. Carter v. Haliburton Co.*, No. 1:11CV602, 2011 WL 6178878 (E.D. Va. Dec. 12, 2011)...........................................................................................................................10, 14

*U.S. ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361 (7th Cir. 2010)...............8, 14

*U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838 (D.C. Cir. 2012) .........................30

*U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 577 (E.D. Va. 2011) ..............................passim

*U.S. ex rel. Davis v. U.S. Training Ctr., Inc.*, No. 11-2180, 2012 WL 6052051 (4th Cir. Dec. 6, 2012)...............................................................................................................................15

*U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573 (E.D. Va. 2010).....38

*U.S. ex rel. Dorsey v. Dr. Warren E. Smith Cmty. Mental Health/Mental Retardation & Substance Abuse Ctrs.*, CIV.A. 95-7446, 1997 WL 381761 (E.D. Pa. June 25, 1997).......9

*U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13 (1st Cir. 2009)....................25

*U.S. ex rel. Goldberg v. Rush University Medical Center*, 680 F.3d 933 (7th Cir. 2012) ............23

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 694 F. Supp. 2d 48 (D. Mass. 2010) ..................9

*U.S. ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp.2d 633 (E.D. Va. 2010)............................29

*U.S. ex rel. Pfeifer v. Ela Med., Inc.*, No. 07-cv-01460, 2010 WL 1380167 (D. Colo. Mar. 31, 2010).................................................................................................................................9

*U.S. ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104 (1st Cir. 2010)........................................22

*U.S. ex rel. Poteet v. Medtronic*, 552 F.3d 503 (6th Cir. 2009) ...................................................13

*U.S. ex rel. Rost v. Pfizer, Inc.* 507 F.3d 720 (1st Cir. 2007) .........................................................25

*U.S. ex rel. Rostholder v. Omnicare, Inc.*, No. 07-cv-1283, 2012 WL 3399789 (D. Md. Aug. 14, 2012)..............................................................................................................................40, 41

*U.S. ex rel. Siller v. Becton Dickinson & Co. By & Through Microbiology Sys. Div.*, 21 F.3d 1339 (4th Cir. 1994) .......................................................................................................27

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994)......................26

*U.S. ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, CIV.A. 5:00CV-39-M, 2004 WL 2403114 (W.D. Ky. Sept. 30, 2004)................................................................................9

*U.S. ex. Rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573 (E.D. Va. 2010)...41

*United States ex rel Mathews v. Bank of Farmington*, 166 F.3d 853 (7th Cir. 1999) ..................25

*United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214 (D.C. Cir. 2003)........................................................................................................................8

*United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512 (9th Cir.1995) .................26

*United States ex rel. Springfield Term. Rail. Co. v. Quinn*, 14 F.3d 645  (D.C. Cir. 1994)....18, 22

*United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493 (11th Cir.1991)............................26

*Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005) ................................47

## **Statutes**

31 U.S.C. § 3729(a)(1)(A) ..............................................................................................................29

31 U.S.C. § 3729(a)(1)(B) ..............................................................................................................29

31 U.S.C. § 3729(a)(1)(G) ..............................................................................................................30

31 U.S.C. § 3730(b)(5) ..............................................................................................................passim

31 U.S.C. § 3730(h)..........................................................................................................................12

31 U.S.C. § 3730(e)(4) ....................................................................................................................24

## **Rules**

Rule 9(b) ....................................................................................................................................passim

Rule 12(b)(6) ...................................................................................................................................32

## PRELIMINARY STATEMENT

Lyle Beauchamp and Warren Shepherd (respectively, "Beauchamp" and "Shepherd," or collectively, "Relators") blew the whistle on Academi Training Center, Inc. ("Academi")[1] for engaging in two schemes that defrauded the U.S. government.  Relators are quintessential whistleblowers in that they were insiders with direct and independent knowledge of the fraudulent schemes, which occurred while Relators were deployed as private security personnel by Academi in Afghanistan.  In a futile attempt to avoid discovery and trial, Academi now moves to dismiss Relators' Second Amended Complaint ("*Beauchamp* SAC") in its entirety.

Relators filed the *Beauchamp* SAC to narrow the number of claims at issue and to provide additional details of the fraudulent schemes so that the parties could more efficiently focus discovery and the trial.  The *Beauchamp* SAC specifically alleges two fraudulent schemes that resulted in a large number of false claims.  First, Academi systematically submitted labor musters to the U.S. Department of State (the "State Department") that were false because the musters listed personnel as working in positions ("billets") in which, in fact, they did not work ("False Billeting" scheme).  Second, Academi systematically submitted fabricated weapons scores to the State Department every quarter to satisfy mandatory contract conditions and then charged the State Department for the services of personnel who did not meet those qualification requirements ("False Weapons Qualification" scheme).  As a result of these fraudulent schemes, the State Department grossly overpaid Academi under the terms of the Worldwide Personal Protective Services ("WPPS") contract.

Academi's defenses fail for three overarching reasons: (1) the fraudulent schemes at issue – False Billeting and False Weapons Qualification – were not alleged in *Davis*; (2) Relators were

---

[1] Academi was formerly known as Blackwater USA, Blackwater Worldwide ("Blackwater"), and later U.S. Training Center, Inc.  In 2009, the company changed its name to Xe.  In December 2011, the company changed its name again to Academi.  All references to Academi herein are inclusive of the company's former identities.

subjects of Academi's fraud and experienced it firsthand; and (3) the allegations of these two

fraudulent schemes are pled with exacting specificity in the *Beauchamp* SAC.  Given Academi's

arguments and this Court's holdings in *Davis*, Academi's position in this case – that the False

Billeting and False Weapons Qualification schemes were at issue in *Davis* – is remarkable.

## BACKGROUND

### I.    The Davises Alleged Different Fraudulent Schemes.

On December 1, 2008, Melan and Brad Davis filed a sealed complaint against Academi

pursuant to the FCA.  In their Complaint, First Amended Complaint, and Second Amended

Complaint (respectively, "*Davis* Complaint," "*Davis* FAC," and "*Davis* SAC", or collectively,

"*Davis* Complaints"), the Davises alleged that Academi engaged in various schemes to defraud

the government in connection with (1) a United States Department of Homeland Security

contract to provide security services on the Gulf Coast after Hurricane Katrina ("Katrina

Contract");[2] and (2) a State Department WPPS contract related to providing security services in

Iraq and Afghanistan (the "WWPS II").

With respect to WWPS II, the Davises alleged that Academi "submitted false claims to

the State Department on a monthly basis from June 2005 to May 2009, resulting from at least

three separate fraudulent schemes."[3]  The three fraudulent schemes were (1) "submit[ting]

inflated 'muster sheets,'" that reflected contractors being "in-country" when in fact they were not

("Not In-Country" scheme); (2) "submit[ing] false documentation that inflated the amount of

cost-reimbursements for travel and other expenses" ("Travel Expense" scheme); and (3)

"bill[ing] the government for worthless services because [Academi] provided unqualified

personnel to provide security services on the WPPS II contract, including security contractors

---

[2] *See* Academi Br., Ex. 3 (*Davis* SAC) ¶¶ 16-23.  The Davises' Katrina allegations are not at issue in this motion because this case involves only false claims submitted in connection with WWPS II and corresponding task orders.
[3] *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 577 (E.D. Va. 2011).

who (i) repeatedly used excessive and unjustified force, (ii) took steroids, and (iii) sold weapons illegally" ("Worthless Services" scheme).[4]  This Court dismissed the Davises' Worthless Services claim pursuant to the FCA's public disclosure bar, holding that the scheme had been publicly disclosed and the relators were not original sources.[5]

The allegations and claims related to the Not In-Country scheme and the Travel Expense scheme survived Academi's motion to dismiss.  The Davises attempted to make the False Billeting scheme a part of the trial, but Academi argued vehemently that False Billeting was never alleged in the *Davis* Complaints and was not a part of the case.  The Court agreed.[6]

## II.    Beauchamp and Shepherd Allege that Academi Engaged in Two Different Fraudulent Schemes.

On March 22, 2011, Relators Lyle Beauchamp and Warren Shepherd provided information to the government that included detailed evidence of the False Billeting scheme.[7]  On April 8, 2011, Beauchamp and Shepherd filed claims under seal against Academi pursuant to the FCA (the "*Beauchamp* Complaint").[8]  The *Beauchamp* Complaint was amended on May 24, 2011 (the "*Beauchamp* FAC").[9]  In conjunction with filing the *Beauchamp* FAC, Beauchamp and Shepherd provided a supplemental disclosure to the government that included detailed evidence of the False Weapons Qualification scheme.[10]

Lyle Beauchamp worked for Academi from August 2004 through May 2011 in a number of positions, including Sniper ("DDM"), Shift Leader, Operations Chief, Operations Security Specialist, Detail Leader, Deputy Detail Leader, and Personal Security Specialist.[11]  Despite

---

[4] *Id.*
[5] *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 590-96 (E.D. Va. 2011).
[6] *See infra* Argument I.D.
[7] *See* Declaration of Susan L. Burke ¶ 5, December 21, 2012, attached hereto as Ex. 9.
[8] *See Beauchamp* Complaint, attached hereto as Ex. 1.
[9] *See Beauchamp* FAC, attached hereto as Ex. 2.
[10] *See* Declaration of Susan L. Burke ¶ 6, December 21, 2012, attached hereto as Ex. 9.
[11] *See Beauchamp* SAC ¶¶ 9-20, attached hereto as Ex. 3.

receiving consistently high reviews and accolades, Academi abruptly terminated him after Academi discovered that he was a whistleblower.[12]  Warren Shepherd, who served as a Marine and State Trooper, worked for Academi from 2004 to the present.[13]  He served as a Shift Leader in the past, but after Academi discovered that he was a whistleblower, it has allowed him to serve only as a Personal Security Specialist, the lowest position for which he is qualified.[14]

The *Beauchamp* Complaint and FAC contain allegations that Academi engaged in the following fraudulent schemes that led to overbilling the government: (1) the False Billeting Scheme;[15] (2) the submission of fraudulent drug test results to the State Department ("False Drug Testing" scheme);[16] (3) the submission of invoices to the State Department for gear that never was never provided to the security personnel ("Fraudulent Gear" scheme);[17] and (4) the False Weapons Qualification scheme.[18]

On November 19, 2012, Relators filed the *Beauchamp* SAC.  The False Billeting and False Weapons Qualification schemes are the only two schemes alleged in the *Beauchamp* SAC and the only two schemes now at issue in this matter.  While the SAC adds detail to some of the allegations, the two alleged fraudulent schemes have been pled consistently with the FAC.

## III.   Academi Terminates Winston and Wheeler for Reporting the False Weapons Qualification Scheme.

In April 2012, counsel was contacted by Robert Winston ("Winston") and Alan Wheeler ("Wheeler"), two firearms instructors whom Academi had just terminated from their positions in Afghanistan for reporting fraud that they witnessed on Academi's shooting range in Kabul. [19]

---

[12] *See id.* ¶¶ 117-121.
[13] *See id.* ¶¶ 21-28.
[14] *See id.* ¶¶ 127-128.
[15] *See Beauchamp* Complaint ¶¶ 13-24, attached as Ex. 1; *Beauchamp* FAC ¶¶ 12-22, attached as Ex. 2.
[16] *See Beauchamp* Complaint ¶¶ 25-29, attached as Ex. 1; *Beauchamp* FAC ¶¶ 23-27, attached as Ex. 2.
[17] *See Beauchamp* Complaint ¶ 30, attached  as Ex. 1; *Beauchamp* FAC ¶ 35, attached as Ex. 2.
[18] *See Beauchamp* FAC ¶¶ 28-34, attached as Ex. 2.
[19] *See* Declaration of August J. Matteis, Jr. ¶ 4, December 21, 2012, attached hereto as Ex. 10.

Alan Wheeler had been a decorated police officer his entire career.[20]  Robert Winston had a distinguished career in the military and in law enforcement. [21]

One of the primary functions of Academi's firearms instructors was to train and qualify the personal security personnel in firing the various weapons on which the State Department contractually required them to qualify each quarter.  The qualifications and methods of qualifications were mandatory conditions under WPPS II and Task Order 4, the applicable task order for work performed by Academi in Kabul.[22]  Academi was required to qualify each contractor on five different weapons every quarter, including two belt-fed weapons, the M-240 and the M-249.[23]  The contract required certain specific scores on each weapon, and the scores had to be submitted to the State Department on firearms qualification certification sheets.[24]

Almost immediately upon their arrival as Firearms Instructors in Kabul, Winston and Wheeler noticed serious problems in how the qualifications related to the M-240 and M-249 were being scored.  For example, on Winston's first or second qualification testing day, he noticed that Timothy Enlow, the Lead Firearms Instructor, was not scoring the contractors on those weapons while they were firing on the range.[25]  In order to accurately score the shooting, it was necessary to count the "hits" on targets by approaching the targets after each contractor fired his weapon and then replacing the target with a new target for the next shooter.[26]  Enlow was doing neither of these things.[27]  On one of the first qualification sessions on which Winston and Wheeler served together in Kabul, they witnessed an instance where a group of contractors failed

---

[20] Winston's and Wheeler's Complaint ("*Winston* Complaint") ¶¶ 27-28, attached hereto as Ex. 6.
[21] *Id.* ¶¶ 12-13.
[22] *Id.* ¶¶ 47-62, 69.
[23] *Id.* ¶ 58.
[24] *Id.* ¶¶ 55-56, 59-60.
[25] *Id.* ¶¶ 108-118.
[26] *Id.* ¶ 113.
[27] *Id.* ¶¶ 115, 121.

to fire the M-249 because Enlow had forgotten to bring it to the range.[28]   That night Enlow

directed Wheeler to enter falsified scores for the contractors' M-249 scores when in fact they had

not even fired the weapon that day.[29]

Winston and Wheeler spent the following few days investigating what they believed to be

the potential fraud.[30]   Specifically, Winston looked for exemptions from the State Department

that could justify Academi's actions.[31]   Finding none, they decided that they had no choice but to

follow Academi's code of conduct and report this behavior to their superiors on Monday, March

26, 2012.[32]   The conduct that they reported was precisely the same conduct described in the

*Beauchamp* Complaint, FAC and SAC:  the False Weapons Qualification scheme.

Remarkably, Academi terminated Winston and Wheeler two days later on March 28,

2012.[33]   After being sent home, Winston and Wheeler contacted counsel because of counsel's

involvement in the *Beauchamp* case.[34]   Relators, through counsel, contacted the attorney at DOJ

who was assigned to investigate *Beauchamp*.[35]   Counsel advised DOJ that he represented

Winston and Wheeler, who were fired by Academi for the exact same conduct alleged in the

*Beauchamp* case.[36]   Winston and Wheeler were interviewed by DOJ and the State Department on

June 1, 2012 and June 21, 2012, respectively.  On July 12, 2012, Winston and Wheeler filed their

own complaint (the "*Winston* Complaint") for retaliation under 31 U.S.C. § 3730(h) and a

number of state law claims in the United States District Court for the Eastern District of Virginia,

and the case has been assigned to Judge O'Grady.

---

[28] *Id.* ¶ 123.
[29] *Id.* ¶ 126.
[30] *Id.* ¶¶ 127-129.
[31] *Id.* ¶ 129.
[32] *Id.* ¶ 131.
[33] *Id.* ¶ 140.
[34] *See* Declaration of August J. Matteis, Jr. ¶ 4, attached hereto as Ex. 9.
[35] *Id.* ¶ 5.
[36] *Id.* ¶ 6.

Academi moved to dismiss the case on the grounds that an arbitration clause found in each Independent Contractor Services Agreement ("ICSA") governed all disputes regarding Winston and Wheeler's work in Kabul.  At oral argument on the motion, Judge O'Grady stated that certain provisions of the arbitration clause were "ridiculous."[37]  However, because the state law claims required some degree of procedural unconscionability to get around the arbitration clause, Judge O'Grady asked the parties to take discovery regarding the circumstances surrounding the signing of the ICSAs.[38]  The parties conducted the limited discovery and a briefing schedule is set for late January 2013.

## ARGUMENT

I. **The *Beauchamp* SAC is Not Barred by the First-to-File Rule because it Contains Allegations of Two Fraudulent Schemes that Were Not Alleged in *Davis*.**

Academi argues that this entire case should be dismissed because claims related to the False Billeting and False Weapons Qualification schemes are barred by the FCA's first-to-file rule based on *Davis*.  *Davis* cannot bar this case because it did not contain any allegations about those two fraudulent schemes and it is no longer even pending.

The first-to-file rule, 31 U.S.C. § 3730(b)(5), provides that "[w]hen a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."  Under the language of the statute, the relevant inquiry is thus (1) whether the second case is a "related action based on the facts underlying" the first case; and (2) whether the first case is "pending."  As set forth below, the fraudulent schemes alleged in *Beauchamp* are not based on any facts underlying the fraudulent schemes alleged in *Davis* and, in any event, *Davis* is no longer is "pending."

A. ***Beauchamp* is not a Related Action Based on the Facts Underlying *Davis***

---

[37] Hearing on Mot. at 21.22, Sept. 7, 2012, attached hereto as Ex. 7.
[38] *Id.* at 22.5-17, 23.9-14.

**Because the Two Cases Involve Completely Distinct and Separate Fraudulent Schemes.**

Academi argues that *Beauchamp* is related to *Davis* and that the first-to-file rule therefore mandates dismissal of the later-filed action.  As set forth below, the *Beauchamp* SAC alleges that Academi violated the FCA by defrauding the government through two fraudulent schemes that were never alleged in *Davis*.

The word "related" has been interpreted by courts to mean something less than "identical," but "[i]t is not enough that claims be related in the loose sense that they arise out of the same general kind of wrongdoing; they must also have facts in common."  *U.S. ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 363 (7th Cir. 2010).  Every court of appeals that has considered the meaning of "related" in this provision has held that for two cases to be "related" they have to have the same "material" or "essential" facts.  *Id.* (collecting cases from seven other circuits).

Academi correctly states that "[t]o determine whether a later action is related to an earlier one, the relevant inquiry is whether the [later-filed] [c]omplaint alleges a *fraudulent scheme* the government already would be equipped to investigate based on the earlier-filed complaint."[39]  Thus, cases are related for the purposes of 31 U.S.C. § 3730(b)(5) if they allege "materially similar situations that objectively reasonable readings of the original complaint, or investigations launched in direct consequence of that complaint, would have revealed . . . ."  *Chovanec*, 606 F.3d at 365.

The first-to-file rule does not, however, bar a later-filed complaint where "(1) it alleges a different type of wrongdoing, based on different material facts than those alleged in the earlier suit; and (2) it gives rise to a separate recovery of actual damages by the government."  *U.S. ex*

---

[39] Academi Br. at 3 (citation omitted and emphasis added).

*rel. Capella v. United Tech. Corp.*, 3:94-CV-2063, 1999 WL 464536, at *9 (D. Conn. June 3, 1999) (complaint for falsely billed depreciation costs did not put the government on notice of falsely billed insurance); *see also U.S. ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, CIV.A. 5:00CV-39-M, 2004 WL 2403114, at *8-9 (W.D. Ky. Sept. 30, 2004).

"In applying [the above] standard, the Court asks whether the earlier and later actions possess the typical qualities of a parasitic relationship, such that the subsequent suit receives support or advantage without offering any useful or proper return." *Capella*, 1999 WL 464536, at *9; *see also In re Natural Gas Royalties Qui Tam Litig. (CO2 Appeals)*, 566 F.3d 956, 961 (10th Cir. 2009) ("The first-to-file bar thus functions both to eliminate parasitic plaintiffs who piggyback off the claims of a prior relator . . . .").[40]

The cases relied upon by Academi do not say otherwise. Indeed, those cases involved first-filed complaints and later-filed complaints that alleged the ***same fraudulent scheme***. *See, e.g.*, *U.S. ex rel. Branch v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009) (first-filed complaint alleged a fraudulent scheme uncovered by State Farm insiders to shift Hurricane Katrina wind losses to the government by falsely characterizing them as covered flood losses under FEMA flood policies, and later-filed complaint merely provided examples of properties that were the subject of that fraudulent scheme); *U.S. ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011) (both complaints alleged that Sallie Mae entities engaged in the fraudulent scheme of improperly granting forbearances on loans in order to keep billing the

---

[40] *U.S. ex rel. Dorsey v. Dr. Warren E. Smith Cmty. Mental Health/Mental Retardation & Substance Abuse Ctrs.*, CIV.A. 95-7446, 1997 WL 381761, at *3 (E.D. Pa. June 25, 1997). Where different fraudulent schemes lie at the heart of the earlier and later complaints whereby proof of a distinct set of facts is necessary to show the falsity of the claims, the later complaint is not barred by the first-to-file rule. *See U.S. ex rel. Pfeifer v. Ela Med., Inc.*, No. 07-cv-01460, 2010 WL 1380167, at *9 (D. Colo. Mar. 31, 2010); *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 694 F. Supp. 2d 48, 58-59 (D. Mass. 2010); *In re Pharmaceutical Ind. Avg. Wholesale Price Litig.*, No. 07-11618, 2008 WL 2778808, at *3 (D. Mass. July 15, 2008); *Tillson*, 2004 WL 2403114, at *6; *Capella*, 1999 WL 464536, at *9; *Dorsey*, 1997 WL 381761, at *4; *see also U.S. ex rel. Banigan v. Organon USA Inc.*, No. 07-12153, 2012 WL 1997874, at *10 (D. Mass. June 1, 2012).

government for servicing those loans); *U.S. ex rel. Carter v. Haliburton Co.*, No. 1:11CV602, 2011 WL 6178878, at *7 (E.D. Va. Dec. 12, 2011) (allegations from earlier filed complaint "provide[d] the government with knowledge of 'the essential facts of a fraudulent scheme'").

In assessing the first-to-file question, Academi and Relators agree that the court's inquiry is limited to a "side-by-side comparison" of the two complaints to determine whether the earlier complaint "suffices to put the U.S. government on notice of [the] allegedly fraudulent … practices" in the later complaint.[41]  As set forth below, the two fraudulent schemes alleged in the *Beauchamp* SAC were never alleged in the *Davis* Complaints and the government was not on notice from *Davis* to investigate those claims.

### B.      The False Billeting Scheme Was Not Alleged In *Davis*.

Academi argues that the False Billeting Scheme was alleged in the *Davis* Complaints, so the first-to-file rule bars the False Billeting claim from being litigated in this case.  Given the position taken by Academi in *Davis* – that not a single allegation regarding False Billeting exists in the *Davis* Complaints – Academi's argument and position in this case is remarkable.

As described above, the *Davis* relators alleged three separate fraudulent schemes related to the WPPS Contract:  the Not In-Country, the Travel Expense, and the Worthless Services schemes.  The False Billeting scheme was never alleged in the *Davis* Complaints.  Nonetheless, Academi now argues repeatedly that False Billeting was alleged in the *Davis* Complaints:

- "A reasonable reading of the Davis complaint, therefore, encompasses the SAC's allegations of the same basic fraud – billing for labor services not rendered in the positions listed in the same invoices at issue in *Davis*."[42]

- "[a] comparison of the factual allegations in the [*Davis* and *Beauchamp*] complaints reveals a striking similarity to their assertions of labor fraud."[43]

---

[41] *See* Academi's Mem. In Support of Mot. to Dismiss ("Academi Br.") at 3 (citing *Batiste*, 659 F.3d at 1209.
[42] Academi Br. at 12.
[43] *Id.* at 10.

- "Relators' SAC alleges those same essential facts, only adding details of *how* the labor descriptions of where personnel were listed (on the same invoices at issue in *Davis*) were allegedly false."[44]

Academi's position in *Davis* was precisely the opposite of these arguments.  When the *Davis* relators attempted to bring in the False Billeting claim prior to trial and this Court initially agreed to allow that to happen, Academi filed an emergency motion to reconsider.  As set forth below, Academi argued vehemently that only the Not-In-Country and Travel Expense schemes were alleged in *Davis* and that (1) the False Billeting allegations were ***never pled***, (2) Academi had no notice of False Billeting throughout discovery, and (3) the False Billeting issue never arose in *Davis* until Beauchamp and Shepherd appeared as witnesses in the case.[45]

Academi repeatedly argued to this Court in *Davis* that False Billeting was never pled in that case:

- The " relators' 'musters' allegation relates solely to the issue of billing for personnel who were not in-country."[46]

- "the so-called 'musters' allegation encompassed only a single alleged scheme to defraud . . . . that single alleged scheme is that USTC **'claimed money for people who *weren't* there.'**"[47]

- "Notably, there is not one statement in either the SAC or the relators' statements of material fact which articulates false billeting as a basis for the false musters allegations – not one."[48]

- The *Davis* "relators have *never* asserted – in the SAC, their statements of material disclosure, deposition testimony, declarations, or otherwise – that the SAC includes the billeting allegation or that they have any knowledge of that allegation."[49]

- The 'billeting' issue – whether defendants violated the False Claims Act by billing independent contractors in labor categories they did not work – was not in this case

---

[44] *Id.* at 9.
[45] Mot. for Recons. at 1, 3, 8, 9, May 26, 2011, attached hereto as Ex. 5.
[46] *Id.* at 9.
[47] *Id.* at 3.
[48] *Id.* at 9.
[49] *Id.* at 8.

until last week."[50]

- The False Billeting scheme was "a second, totally different, heretofore unpled, alleged scheme – namely, that the musters were false because, although the individuals on the muster were in fact present, they were listed in a position for which they were not serving (*i.e.*, a billeting allegation)."[51]

Academi ironically argued that the first mention of the False Billeting scheme appeared in the *Davis* case when the affidavits of Beauchamp and Shepherd were introduced in that matter:  "Nor was there any relevant allegation or evidence in the case [of false billeting] until the filing of [Beauchamp and Shepherd's] declarations."[52]

This Court accepted Academi's position that the *Davis* Complaints contained no allegations of the False Billeting scheme and reversed its decision to allow that claim to proceed to trial:  "Put simply, the SAC contains only a single allegation of fraud relating to false musters; that is, the musters were false because personnel were listed as "in country" when they were not."[53]  Indeed, "[t]he SAC cannot be construed to encompass the allegation that defendants changed the job designations on the musters to show that personnel were working in positions that they did not actually work."[54]

Thus, Academi has unabashedly switched its position before this Court and, as a result, should be judicially estopped from arguing in this case that the *Davis* Complaints contained allegations of False Billeting.  *See King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998).  This is precisely what the Fourth Circuit described as "playing fast and loose with the courts," and it should not be tolerated.  *King*, 159 F.3d at 196.

**C.     The False Weapons Qualification Scheme Was Not Alleged in *Davis*.**

---

[50] *Id.* at 1.
[51] *Id.* at 3.
[52] *Id.* at 13.
[53] Judge Ellis's Order at 4, June 1, 2011, attached hereto as Ex. 4.
[54] *Id.*

Academi argues that the False Weapons Qualification scheme is barred by the first-to-file rule because they are related to the "Worthless Services" allegations made in the *Davis* Complaints. Yet, the *Davis* Complaints contain no allegations related to the False Weapons Qualification scheme and the government would have had no way of knowing to investigate that scheme based on the *Davis* Complaints.

Nevertheless, Academi argues that the Worthless Services allegations from *Davis* are "related" to the False Weapons Qualification scheme alleged in *Beauchamp* because both schemes involve whether Academi personnel were "qualified."[55] But the Worthless Services scheme has nothing whatsoever to do with the False Weapons Qualification scheme. Indeed, this Court described the Worthless Services claim as "bill[ing] the government for worthless services because [Academi] provided unqualified personnel to provide security services on the WPPS II contract, including security contractors who (i) repeatedly used excessive and unjustified force, (ii) took steroids, and (iii) sold weapons illegally." *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 569, 577-78 (E.D. Va. 2011). Those allegations were completely unrelated to, and gave the government no notice of, the False Weapons Qualification scheme, which involved firearms instructors who fabricated scores on quarterly belt-fed weapons certification sheets.

Moreover, this Court dismissed the Davises' Worthless Services claim pursuant to the FCA's public disclosure bar. Accordingly, because those allegations were dismissed, they cannot bar claims in a later-filed action. *See U.S. ex rel. Poteet v. Medtronic*, 552 F.3d 503, 516-17 (6th Cir. 2009) ("[I]f the first complaint is either jurisdictionally precluded . . . or legally incapable of serving as a complaint [under Rule 9(b)] then it does not properly qualify as a 'pending action' brought under the FCA."); *Walburn,* 431 F.3d at 972 (finding that an earlier filed complaint's failure to comply with Rule 9(b) rendered it legally infirm from its inception,

---

[55] *See* Academi Br. at 7-8.

and thus unable to preempt a later-filed action); *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 825 (9th Cir. 2005) (holding that "the first-to-file rule of § 3730(b)(5) bars only subsequent complaints filed after a complaint that fulfills the jurisdictional prerequisites of § 3730(e)(4)").

> **D.    The *Davis* Case Is Not "Pending" Because a Judgment was entered for the Defendants in this Court, the Fourth Circuit Affirmed the Decision, and no Further Appeals Will Be Filed.**

Academi argues that the *Davis* case is "pending" within the meaning of 31 U.S.C.

§ 3730(b)(5) because the *Beauchamp* Complaint was filed prior to the *Davis* trial.  While Academi cites a district court decision in this district and a third circuit decision that do in fact support Academi's argument, *see U.S. ex rel. Carter v. Haliburton Co.*, No. 1:11cv602, 2011 WL 6178878, at *8 (E.D. Va. Dec. 12, 2011); *Grynberg*, 390 F.3d at 1279, a more recent decision from the Seventh Circuit supports unequivocally the argument that the *Davis* case is not pending.  As set forth below, the Seventh Circuit's reading of the statutory language is more accurate and the *Davis* case in fact is not "pending."

Judge Easterbrook, writing the opinion for a panel on the Seventh Circuit, interpreted the provision in *U.S. ex rel. Chovanec v. Apria Healthcare Grp., Inc.,* 606 F.3d 361 (7th Cir. 2010), a case relied upon by Academi throughout their brief.[56]  The Seventh Circuit held unequivocally in *Chovanec* that the first-to-file bar applies only while the first action is still pending in the district court.  606 F.3d at 365.  There, the district court dismissed a complaint with prejudice that was brought under the FCA after two prior complaints that constituted "related actions" under 31 U.S.C. § 3730(b)(5) had settled.  *Id.* at 362.  The Seventh Circuit vacated the district court's decision and remanded with instructions to dismiss without prejudice so the relator could file another FCA claim that would no longer be barred by the first-to-file rule.  The Seventh Circuit reasoned as follows:

---

[56] *See* Academi Br. at 4-6.

> The district court dismissed the complaint with prejudice.  As we explained above, however, § 3730(b)(5) applies only while the initial complaint is "pending."  [The two earlier-filed complaints] are no longer pending (and weren't pending when the district court denied Chovanec's motion for reconsideration), so she is entitled to file a new qui tam complaint – entitled, that is as far as § 3730(b)(5) goes.

*Chovanec*, 606 F.3d at 365.

Academi prevailed in *Davis* at trial and the Fourth Circuit affirmed.  *See U.S. ex rel. Davis v. U.S. Training Ctr., Inc.*, No. 11-2180, 2012 WL 6052051 (4th Cir. Dec. 6, 2012).  Accordingly, the first-to-file rule fails to preclude *Beauchamp* on a second ground.

## II.     Relators' *Qui Tam* Claims are Not Barred by the False Claims Act's Public Disclosure Provision, 31 U.S.C. § 3730(e)(4).

### A.     The False Claims Act's Public Disclosure Provision is No Longer Jurisdictional.

Academi is incorrect when it asserts that "[t]he FCA's public disclosure bar is jurisdictional in nature."[57]  The provision, 31 U.S.C. § 3730(e)(4), ceased to be jurisdictional when Congress removed the provision's reference to jurisdiction as part of the 2010 amendments.  Accordingly, this Court should deny Academi's motion to dismiss for lack of subject matter jurisdiction.

The Supreme Court of the United States in *Arbaugh v. Y&H Corp.*, established a "readily administrable bright-line rule" that a statutory provision is jurisdictional only if Congress expressly states that it is jurisdictional in the provision's text:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

---

[57] *See* Academi Br. at 12.

*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 502 (2006).[58]

Congress amended the FCA's public disclosure provision in the Affordable Care Act effective March 23, 2010, prior to the initiation of this lawsuit.[59]  In that amendment, Congress removed the express reference to jurisdiction from the provision's text, which now begins: "The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed …." 31 U.S.C.A. § 3730(e)(4)(A).[60]  Under the bright line test of *Arbaugh*, Congress' decision to remove the reference to jurisdiction from § 3730(e)(4) renders the provision non-jurisdictional. *See* 546 U.S. at 502; *see also U.S. ex rel. Siller v. Becton Dickinson & Co. By & Through Microbiology Sys. Div.*, 21 F.3d 1339, 1344 (4th Cir. 1994) (holding with respect to a different FCA provision that "mere use of the word 'shall' in section 3730(b)(4) is not enough to render that provision a jurisdictional requirement).  Congress's amendment of § 3730(e)(4) after *Arbaugh* also indicates a legislative intent to render the public disclosure provision non-jurisdictional, because courts "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1795 (2010).[61]

Congress' decision to revoke the jurisdictional nature of the FCA's public disclosure provision has at least two consequences – in addition to requiring denial of Academi's motion pursuant to Rule 12(b)(1) – for Academi's motion.  First, courts traditionally took evidence and

---

[58] *See also Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1248 (2010) (applying *Arbaugh* to "conclude that the Copyright Act's § 411(a)'s registration requirement is nonjurisdictional").

[59] *See* Academi Br. at 14.

[60] Prior to amendment, the provision stated: "No court shall have *jurisdiction* over an action under this section based upon the public disclosure of allegations or transactions …."

[61] Moreover, "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008).  Congress chose to retain express reference to jurisdiction in other provisions of the same subsection. *Compare* 31 U.S.C. § 3730(e)(4) *with* § 3730(e)(1) and (e)(2).

treated the allegations of the complaint as "mere evidence" when defendants raised public disclosure because § 3730(e)(4) was considered jurisdictional.  *See U.S. ex rel Davis v. Prince*, 753 F. Supp.2d 569, 573 n.2 (E.D. Va. 2011).  That approach no longer is appropriate.  Rather, pursuant to Rule 12(b)(6), the Court "must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, Academi's invocation of factual disputes based on materials outside of the pleadings – although potentially relevant later to a motion for summary judgment – has no proper place at this stage of the proceedings.

Second, Academi's request for "jurisdictional discovery" based on the FCA's public disclosure provision is unwarranted.[62]  Academi seeks one-sided discovery where Academi has full license to probe Relators' knowledge and records while producing none of its own. Whatever merit such a request for one-sided bifurcation may have had before March 23, 2010, it has no merit now that § 3730(e)(4) is just another statutory requirement for an FCA claim.

**B.      Relators' Claim Regarding Academi's Falsification of Weapon Qualification Reports to the State Department is not Barred by the False Claims Act's Public Disclosure Provision.**

The substance of Relators' claim for the False Weapons Qualification scheme is that Academi failed to qualify its WPPS personnel with the M240 and M249 machine guns by scoring their performance, and that Academi misrepresented that failure to the State Department by submitting fabricated scores. As discussed below, neither the true or misrepresented state of these facts was disclosed publicly prior to the initiation of this lawsuit.

In its Memorandum, Academi largely ignores applicable precedent regarding what it

---

[62] *See* Academi Br. at 32, 35n.15.

means to disclose the "allegations or transactions" that are the substance of a relator's claim. Section 3730(e)(4)(A) requires a court to dismiss an FCA claim only "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." A public disclosure must reveal "'allegations or transactions' and not merely information." *Davis*, 753 F. Supp.2d at 580. This Court, like many others, has looked to *United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994) for the applicable standards. *See Davis*, 753 F. Supp.2d at 580-81 and n.17. An allegation is "a conclusory statement implying the existence of provable supporting facts." *Id.* A "transaction" is a statement of the essential elements of a fraud, which this Court defines as "a misrepresented state of facts (the X element) and a true state of facts (the Y element)." *Id.* at 581. Thus, "a qualifying 'public disclosure' must reveal either (1) an allegation of fraud; or (2) a false state of facts and a true state of facts from which fraudulent activity may be inferred." *Id.* Only then does it "put the government on notice to the possibility of fraud." *Id.*

As discussed below, Academi identifies only one public disclosure – the *Winston* Complaint – that contains the allegations or transactions of Relators' claims, and Relators disclosed those allegations to the government repeatedly before the *Winston* Complaint was filed. The other materials that Academi relies upon are not qualifying public disclosures because they do not disclose substantially similar allegations or transactions and/or they are not public.

### 1.  The *Winston* Complaint Does Not Preclude the Relators' False Weapons Qualifications Claims in this Case.

The *Winston* Complaint does not preclude Relators' claims because Relators are original sources of the "allegations and transactions" regarding Academi's false weapons qualifications pursuant to 31 U.S.C. § 3730(e)(4)(B)(i). The *Winston* Complaint was filed on July 12, 2012. Prior to that filing, the Relators disclosed to the government every "allegation or transaction" in

the *Winston* Complaint that Academi identifies in its brief as "substantially similar" to the

Relators complaint.  The "allegations or transactions" that Academi identifies as "substantially

similar" are (i) "the failure to shoot during weapons qualifications" and (ii) the "failure to

properly score during weapons qualifications."  Here, Relators' status as original sources renders

these similarities irrelevant.

The FCA's disclosure provision does not bar any claim in which "the person bringing the

action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  The provision

defines an original sources as:

> For purposes of this paragraph, "original source" means an individual who
> either (i) prior to a public disclosure under subsection (e)(4)(a), has
> voluntarily disclosed to the Government the information on which
> allegations or transactions in a claim are based, or (2) who has knowledge
> that is independent of and materially adds to the publicly disclosed
> allegations or transactions, and who has voluntarily provided the
> information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B).  Here, Relators disclosed to the government the information that

forms the basis for their allegations regarding "Academi's failure to shoot during weapons

qualifications" and "failure to properly score during weapons qualifications" repeatedly.

First, Relators disclosed this information in Statements of Material Disclosures that they

submitted to the United States Department of Justice, Civil Division in May 2011.[63]

Beauchamp's Statement of Material Disclosure contains 12 detailed paragraphs describing

specific instances in which he was qualified with the M-240 and M-249 belt fed machine guns

even though he did not shoot or was not scored with one or both weapons.[64]  In paragraph 48, he

specifically disclosed that "Blackwater has routinely falsified weapons qualifications by

---

[63] *See* Declaration of Susan Burke, counsel for Plaintiffs (Dec. 21, 2012) ¶ 6,  attached as Exhibit 9.
[64] *See* Statement of Material Disclosure by Lyle Beauchamp, ¶¶ 48-60.

independent contractors for submission to the Department of State."[65]  He further disclosed that "Blackwater routinely failed to score the independent contractors on the M-240 and M-249" including in "Afghanistan"  and that he "was never scored on this weapon" during his deployment to Afghanistan.[66]

In the following paragraphs, Beauchamp provided specific dates, the names of the firearms instructors who signed fraudulent weapons qualifications forms, and the names of other personnel who also did not fire or were not scored with the M-240 and M-249 machine guns.  As just one example, paragraph 60 of Beauchamp's Material Statement discloses:

> On May 5, 2011, Hammer 4 (Quick Response Force) was tasked to transport 22 Columbian guards from Camp Grizzly to the KMTC training facility.  During the qualifications for M-240 and M-249, the Columbians and 7 PSS personnel (including Dennis Felder, Steve Scoggins, Troy Barney, Rob Militello, Ken Pauli (Anvil 2 Shift Leader), Rex Humphrey and 1 other unknown to me), lined up on the two weapons systems and fired.  The range master (Scott Lambin), and the firearms instructors (Dustin McPhillips and Jeremy Miller) did not score any of the targets.  Everyone "passed" as no one had to shoot the weapons a second time.[67]

Beauchamp further described how he witnessed Academi personnel shoot very poorly and still pass the weapons qualification for the M-240 and M-249.

> During the shooting exercise with the M-240 and M249s, all three weapons were fired simultaneously.  No scores were recorded.  I observed one Columbian shoot very poorly.  He shot ten rounds into the ground, yet he and everyone else passed.[68]

Shepherd similarly disclosed that "Blackwater … falsifies weapons qualifications of the independent contracts to the Department of State."[69]

> "On April 4, 2011, I did not fire the M-240 or the M-249.  I left the range early that day with Glenn Macapagal to drive to the embassy.  However, the weapons qualification sheet for that day indicates that I received scores for

---

[65] *Id.* ¶ 48.
[66] *Id.*
[67] *Id.*
[68] *Id.* ¶ 58.
[69] Statement of Material Disclosure by Warren Shepherd ¶ 28, attached hereto as Tab D to Ex. 9.

firing those two weapons.  This is false."[70]

Relators made similar disclosures in the *Beauchamp* FAC on May 24, 2011.  In the FAC,

Relators disclosed to the Government, among other information:

- USTC [n/k/a Academi] routinely falsifies weapons qualifications of independent contractors for submission to the Department of State.  USTC routinely failed to score the independent contractors on the M-240 and M-249 in Iraq and Afghanistan;[71]

- Neither Mr. Beauchamp nor Mr. Shepherd were ever scored on these weapons during their deployments in Afghanistan;[72]

- Weapons score cards for both Mr. Beauchamp and Mr. Shepherd indicate that they were scored on the M-240s and M-249s when they were not. Mr. Beauchamp's score cards from October 4, 2010, April 3, 2010, July 23, 2010, January 27, 2011, April 1, 2011 and April 8, 2011 are fraudulent;[73] and

- Mr. Shepherd's score card from April 4, 2011 is fraudulent.[74]

On April 18, 2012, Relators through counsel notified Diana Younts, Department of

Justice, Civil Division, of the circumstances surrounding Academi's wrongful termination of

Robert Winston and Allan Wheeler and offered to provide them as corroborating witnesses.

> The two assistant instructors, Robert Winston and Al Wheeler, reported that the lead instructor, Tim Enlow, was fraudulently making up individual firearms test scores that were then submitted to DOS to show that the individuals were qualified to use the weapons for which the contract required testing. … These wrongful terminations are very significant to our case because the two whistleblowers corroborate what our relators have alleged in their Complaint regarding the false weapons qualification records.  Specifically, because the government relied on false qualification sheets submitted by USTC, the government paid USTC for the work of contractors who were not qualified under the terms of the contract.  I now represent the two whistleblowers in addition to the relators, and I would be happy to provide more details to help you with your investigation. [75]

Ms. Younts and Danielle Cole Pasquale, Special Agent, United States Department of State,

---

[70] *Id.* ¶ 30.
[71] *See* Beauchamp FAC ¶ 28, attached as Exhibit 2.
[72] *Id.* ¶ 29.
[73] *Id.* ¶ 30.
[74] *Id.* ¶ 31.
[75] *See* Email from A. Matteis, counsel for Relators, to Diana Younts, United States Department of Justice, Civil Division (Apr. 18, 2012), attached hereto as Tab A to Ex. 10.

Office of Inspector General interviewed Robert Winston in the Civil Division's offices in

Washington D.C. as a corroborating witness for the Relators on June 1, 2012.[76]  Ms. Younts and

Ms. Pasquale, among other government officials, interviewed Allan Wheeler  at the same

location on June 21, 2012.[77]   Ms. Younts and Ms. Pasquale questioned Robert Winston and

Allan Wheeler extensively regarding the information that forms the basis for the common

weapons qualification allegations in the Relators' complaint.[78]  During these and other meetings,

Relators through counsel also described in detail the relevant provisions in the WPPS contract,

including the provisions that specify that scored quarterly weapons qualifications with the M-240

and M-249 machine guns are "necessary conditions."[79]  In short, Relators disclosed the

information in their Complaint and in the *Winston* Complaint repeatedly before the *Winston*

Complaint was filed and therefore are original sources under 31 U.S.C. § 3730(e)(4)(B)(i).

> **2.      The Other Purported "Public Disclosures" that Academi Identifies Were Not Public and/or Did Not Disclose the "Allegations or Transactions" that Comprise the Substance of the Relators' Claim.**

The other purported "public disclosures" that Academi identifies either do not disclose

the "allegations or transactions" in the Relators' Complaint or are not "public."

The *Davis* Complaints.  The *Davis* Complaints do not disclose the "allegations or

transactions" that form the basis of the Relators' FCA claims.  "[A] qualifying 'public

disclosure' must reveal either: (1) an allegation of fraud; or (2) a false state of facts and a true

state of facts from which fraudulent activity may be inferred."  *Davis*, 753 F. Supp.2d at 581; *see

also Springfield*, 14 F.3d at 655; *U.S. ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 110 (1st

Cir. 2010); *Dingle v. Bioport Corp.*, 388 F.3d 209, 212 (6th Cir. 2004).

---

[76] *See* Declaration of August J. Matteis, counsel for Relators, ¶ 7 (Dec. 21, 2012) ("Matteis Decl."), attached hereto as Ex 10.
[77] Matteis Decl. ¶ 7.
[78] Matteis Decl. ¶ 8.
[79] Matteis Decl. ¶ 9.

At base, Academi relies upon references in the *Davis* Complaints to "unqualified personnel," but ignores that "critical elements" of the Claims in *Davis* – "facts showing that at least some contractors: (i) engaged in excessive and unjustified force; (ii) took steroids and other drugs; and (iii) sold weapons illegally" – bear no similarity to the allegations of false weapons qualifications in this case. 753 F. Supp.2d at 592.  Academi offers no argument for how allegations of excessive force, steroid use, and illegal weapon sales could "put the government on notice" that Academi was not scoring its personnel's quarterly firearm qualifications with the M-240 and M-249 and reporting fabricated scores.  *See id.* at 581.

Courts repeatedly have rejected similar attempts by defendants to overgeneralize prior disclosures to justify precluding FCA claims that rest on genuinely new and material information regarding different frauds.  For example, the Seventh Circuit held in *U.S. ex rel. Goldberg v. Rush University Medical Center* that "a very high level of generality is inappropriate, because then disclosure of some frauds could end up blocking private challenges to many different kinds of fraud."  680 F.3d 933, 935-36 (7th Cir. 2012); *see also U.S. ex rel Baltazar v. Warden*, 635 F.3d 866, 868 (7th Cir. 2011); *Minnesota Ass'n of Nurse Anesthetists*, 276 F.3d at 1044 (disclosure of one scheme for Medicare billing fraud involving the duplicative efforts of anesthesiologists and anesthetists did not preclude FCA claim alleging different fraud arising out of such efforts).

This case and *Davis* bear significantly less resemblance than the complaints and disclosures in the above-referenced cases.  The *Davis* plaintiffs did not even mention weapon qualifications, much less frauds that Relators allege with respect to those allegations.  Accordingly, the *Davis* complaints are not qualifying disclosures.

*Davis* Opposition to Motion to Dismiss.  Academi carves up a statement taken out of

context from the Opposition to a Motion to Dismiss filed in *Davis* in a further attempt to

misconstrue *Davis* to be a public disclosure of the claims in this case.  Specifically, Academi

takes a quote regarding illegal drug abuse, carves out the all of the references to drugs, and then

presents the quote as an overgeneralized allegation about personnel qualifications generally.  The

entire statement, with the text that Academi excised in bold and italics, states:

> Relators allege that Defendants, motivated by the desire to make more
> money and to avoid having to pay penalties for failure to fulfill the
> contractual requirements regarding the number of personnel, engaged in a
> systemic and ongoing scheme to defraud the United States by supplying
> unfit personnel who were  not qualified to carry weapons and act as security
> guards.  ***This scheme involved Defendants knowingly men [sic] and***
> ***sending them into Iraqi and Afghani streets despite knowing that they***
> ***were on steroids and other judgment-altering drugs.***
>
> * * *
>
> Defendants duped the United States into believing that they had provided
> the requisite number of qualified personnel capable of safely carrying
> deadly weapons ***and making split-second judgments regarding potential***
> ***physical threats to American diplomats.  Had the United States known***
> ***that Defendants were providing unqualified personnel who were under***
> ***the influence of various judgment-altering substances, the United States***
> ***would not have paid for those worthless services, and would not have***
> ***approved giving these men deadly weapons.  In addition, the United States***
> ***would have imposed penalties on Defendants for failing to provide***
> ***enough qualified personnel.***  The United States, however, did not know the
> truth because Defendants engaged in a systemic effort to hide the fraud.
> Relators allege this effort to hide the fraud including falsifying documents
> ***and drug test results***, destroying documents that would have revealed facts,
> and taking other steps to dupe the United States in paying millions of
> dollars for worthless services.[80]

Academi's excessively-editorial approach to citation only underscores the differences between

the allegations in *Davis* and the allegations in this case.  The *Davis* plaintiffs made claims about

illegal drugs, excessive force, and arms smuggling – not quarterly weapons qualifications.

<u>2007 Program Management Review Report and Accompanying Files</u>.  The 2007 Program

---

[80] *See Davis* Plaintiffs' Opp'n to Defs.' Mot. To Dismiss, Academi Br., Ex. 7.

Management Review Report is not a public disclosure because it is not public. Academi does not even assert that the document is available to the public. Rather, Academi argues that disclosure of this document to a single government official "constitutes a public disclosure under the FCA," citing *United States ex rel Mathews v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999). Academi Br. at 14. Academi's argument is baseless for four reasons.

First, Academi relies on *Mathews* for this proposition, but the Seventh Circuit "overruled" the *Mathews* analysis of what constitutes a public disclosure in *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009).

Second, Academi's argument is contrary to controlling Supreme Court precedent applying the plain language of § 3730(e)(4) to hold that "[i]t is the fact of 'public disclosure' – not Federal Government creation or *receipt* – that is the touchstone of § 3730(e)(4)(A)." *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1405 (2010) (emphasis added); *see also Davis*, 753 F.Supp.2d at 580.

Third, Academi's argument is irreconcilable with the plain language of § 3730(e)(4). The ordinary understanding of the term "public" means "something apart from the government itself." *U.S. ex rel. Rost v. Pfizer, Inc.* 507 F.3d 720, 729 (1st Cir. 2007) (abrogated on other grounds *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)). Congress repeatedly uses the term "Government" in the FCA but never equates it with the public. *See, e.g.*, 31 U.S.C. § 3730(e)(4)(B); *id.*

Fourth, Academi's argument is irreconcilable with the 1986 amendment to the False Claims Act, which Congress enacted to "'encourage more private enforcement suits.'" *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 26 (1st Cir. 2009) (quoting S.Rep. No. 93-345, at 23-24 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5288-89)). Congress:

> "abolish[ed] the 'government knowledge' regime entailed by the 1943
> jurisdictional bar, which Congress concluded 'proved too restrictive of qui
> tam actions, resulting in the under-enforcement of the FCA.'" Congress
> replaced the "government knowledge" regime with one, as shown by the
> "public disclosure bar, focused on the "public disclosure of information
> given to the government." As put by the D.C. Circuit, "Congress thus
> changed the focus of the jurisdictional bar from evidence of fraud inside the
> government's overcrowded file cabinets to fraud already exposed in the
> public domain."

*Id.* at 26 (citations omitted).  Accordingly, courts repeatedly have held that disclosures to the

government are not public disclosures for purposes of  31 U.S.C. § 3730(e)(4).  *See, e.g., U.S. ex*

*rel Jones Collegiate Funding Servs., Inc.*, 469 Fed. Appx. 244 (2012); *Kennard v. Comstock*

*Res., Inc.,* 363 F.3d 1039, 1043 (10th Cir.2004); *United States ex rel. Schumer v. Hughes*

*Aircraft Co.,* 63 F.3d 1512, 1518 (9th Cir.1995); *United States ex rel. Williams v. NEC Corp.,*

931 F.2d 1493, 1496 n. 7 (11th Cir.1991); *see also U.S. ex rel. Springfield Terminal Ry. Co. v.*

*Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1994) (holding that if materials are not "in the public eye, no

rational purpose is served – and no 'parasitism' deterred – by preventing a *qui tam* plaintiff from

bringing suit based on their contents").

Factually, there is no evidence, or even a suggestion by Academi, that the 2007 Program

Management Review Report has been disclosed to the public.  On the contrary, the State

Department has classified the document as "sensitive but unclassified."[81] According to the State

Department's published guidelines, this designation is designed to prevent public disclosure of a

document, even in response to an otherwise applicable FOIA request:

> Sensitive but unclassified (SBU) information is information that is not
> classified for national security reasons, but that warrants/requires
> administrative control and protection from public or other unauthorized
> disclosure for other reasons. SBU should meet one or more of the criteria
> for exemption from public disclosure under the Freedom of Information Act
> (FOIA) (which also exempts information protected under other statutes), 5

---

[81] *See* Academi Br, Ex. 8.

U.S.C. 552, or should be protected by the Privacy Act, 5 U.S.C. 552a.[82]

Accordingly, the document on its face confirms that it is not a public disclosure.[83]

Even if the 2007 Program Management Report had been publicly disclosed, it does not disclose the allegations and transactions at issue in this case. The report addressed the qualification of base guards in Iraq – not actual protective service personnel in Afghanistan – with the M-249 machine gun. Importantly, the issue raised in the report was not that Academi was required to qualify its Iraqi base guards with the M-249 machine gun under the WPPS contract – the contract imposed no such requirement – but rather that Academi gratuitously had provided its base guards with an M-249 but not taught them how to use it. Nothing in the 2007 Program Management Report disclosed that Academi was not scoring its personnel with the M-240 and M-249 machine guns, or that Academi was submitting fabricated scores to the State Department to satisfy WPPS contract requirements.

<u>Hearing Before the House Committee on Oversight and Government Reform</u>. Academi also relies upon a statement by Rep. Henry A. Waxman during a Congressional hearing, but once again carves out relevant portions of Rep. Waxman statement in an attempt to overgeneralize a

---

[82] U.S. Department of State Foreign Affairs Manual Volume 12- Diplomatic Security, 12 FAM 540, SENSITIVE BUT UNCLASSIFIED INFORMATION (SBU), available on the State Department's website at http://www.state.gov/documents/organization/88404.pdf  (last visited December 21, 2012).

[83] Academi also argues in a footnote that this document was publicly disclosed based on the unsupported assertion that it was produced by the State Department in the *Davis* case.  *See* Academi Br. at 25 n. 13.  The disclosure of documents in private discovery does not constitute a public disclosure unless the materials are filed with a Court. *Springfield*, ("Until discovery materials are filed with the court, we doubt that the discovery process conducted between two private litigants could itself constitute a public disclosure within the meaning of § 3730(e)(4)(A)"); s*ee also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) ("[Discovery] proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice."); *U.S. ex rel. Siller v. Becton Dickinson & Co. By & Through Microbiology Sys. Div.*, 21 F.3d 1339, 1350 (4th Cir. 1994) ("information disclosed through civil litigation *and on file with the clerk's office* should be considered a public disclosure of allegations in a civil hearing for purposes of section 3730(e)(4)(A)") (emphasis added).  This Court entered a protective order in *Davis* that prohibited disclosure of the 2007 Program Management Review Report.  *See* Protective Order, *Davis*, attached as Exhibit 12.   The State Department, in addition to designating the document "sensitive but unclassified," expressly invoked the protections of the protective order. *See* Academi Br. Ex. 22. Academi's bald speculation that counsel for the *Davis* relators violated this Court's protective order cannot convert protected discovery materials that were never filed in Court into public disclosures for purposes of § 3730(e)(4)(A).

prior public disclosure to encompass fraud claims that were in no way disclosed. The entire

sentence by Rep. Waxman that Academi cites, with the excised text in bold and italics, is:

> ***By necessity, the initial group hired to support the Afghanistan operation***
> did not meet the criteria identified in e-mail traffic and had some
> background and experience shortfalls overlooked in favor of getting the
> requisite number of personnel aboard ***to start up on the contract***.

The excised material makes clear that Rep. Waxman was talking about Academi's hiring

deficiencies, not its post-hiring, WPPS contract-mandated, quarterly weapons qualifications with

the M-240 and M-249 machine guns.  Academi's attempts to overgeneralize Rep. Waxman's

statement to encompass a completely different fraud has no merit.  *See Goldberg*, 680 F.3d at

935;  *Baltazar*, 635 F.3d at 868; *Minnesota Ass'n of Nurse Anesthetists*, 276 F.3d at 1044.

     <u>State Department Commissioned Audit by Cotton & Co.</u>  This document is not a public

disclosure because there is no evidence that it is public.  As discussed above, Academi's

assertion that the document is a "public disclosure" because it has been provided to a

government official has no merit.  The very first page of this document (after the cover page)

confirms that it has not been disclosed publicly, stating:

**IMPORTANT NOTICE**

> This report is intended solely for the official use of the Department of State,
> Broadcasting Board of Governors, or any agency or organization receiving
> a copy directly from the Office of Inspector General.  No secondary
> distribution may be made, in whole or in part, outside the Department of
> State, the Broadcasting Board of Governors, or by other agencies or
> organizations without prior authorization by the Inspector General.  The
> Inspector General will determine public availability of the document under
> U.S. Code, 5 U.S.C. 552.  Improper disclosure of this report may result in
> criminal, civil, or administrative penalties.

In short, there is no evidence that the Cotton & Co. report has been disclosed to the public, and

the document itself strongly indicates that it has not been disclosed publicly.

     Additionally, the document contains neither Relators' allegation of fraud nor the

28

transaction on which that allegation is based.  The report merely states that the auditors cannot confirm whether Quarterly Firearms Qualifications were completed as required by the WPPS II contract based on the records provided.  The report does not suggest that Academi did not score its personnel with weapons.  Nor does it suggest that Academi submitted fabricated scores for its personnel to the State Department.  Accordingly, the Cotton & Co. report does not disclose the allegations in the Relators' complaint.

House Committee on Oversight and Government Reform Memorandum.  Academi half-heartedly cites this Memorandum as a public disclosure, but it does not even attempt to identify a statement therein that could preclude Relators claims.  The document does not appear to mention the topic of weapon qualifications.

### C.    Relators are Original Sources of Information Regarding Academi's False Claims and Reports Regarding Who Filled What Role in Afghanistan.

Relators are original sources pursuant to 31 U.S.C. § 3730(e)(4)(B)(ii) for their claims regarding Academi's fraudulent billing practices.  Section 3730(e)(4)(B)(ii) defines an "original source" to include a person "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  At base, the FCA's public disclosure provision is based on the principle that "the complainant must contribute something to the suit if he is to benefit from it financially."  *U.S. ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp.2d 633, 636 (E.D. Va. 2010).  A relator can provide this value either by bringing a previously undisclosed fraud to light, or by providing admissible evidence, such as eyewitness testimony, that facilitates the government's ability to prosecute an action regarding a known fraud.  As the D.C. Circuit has explained:

> The relator's information can be different and more valuable to the
> government than the information underlying the public disclosure, which

29

> might be nothing more than speculation or rumors.  The relator may have an
> eyewitness account or important documents supporting the public
> allegation, but not available from any other source, which could aid the
> government.

*U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838 (D.C. Cir. 2012).  A relator can

provide such value by providing personal knowledge of either prong of the "transaction"

underlying his or her FCA claim:

> [T]o qualify as an original source, a relator does not have to have personal
> knowledge of all elements of a cause of action.  Direct knowledge of the
> anesthesiologists' operating room practices would be enough.  A false claim
> consists of a representation contrary to fact, made knowingly or recklessly.
> If the relator has direct knowledge of the true state of facts, it can be an
> original source even though its knowledge of the misrepresentation is not
> first-hand.

*Minnesota Ass'n of Nurse Anesthetists*, 276 F.3d at 1050; *see also Springfield*, 14 F.3d at 657

(holding that an original source need only possess "direct and independent knowledge of *any*

essential element of the underlying fraud transaction").

Academi (at 33) misplaces reliance upon *U.S. ex rel Vuyyuru v. Jadhav*, 555 F.3d 337,

347-48 (4th Cir. 2009) for the false proposition that "a relator must be an original source as to

the facts supporting each element required to state a claim under the FCA."  *Vuyyuru* specifically

disavowed requiring the relator to "prove the particulars of the individual Medicare or Medicaid

claims" to qualify as an original source.  *Id.* at 353.  Indeed, the Relator in *Vuyyuru* fell short of

"original source" status because he only had knowledge of one specific improper billing incident

for a patient, and that one patient was not Medicare-eligible.  *Id.*

Moreover, even if *Vuyyuru* had required independent knowledge of every element of an

FCA claim, Congress's 2010 amendment abrogates any such requirement.  The amendment

clarified that a relator is an original source if he or she provides information that "materially adds

to the publicly disclosed allegations or transactions."  31 U.S.C. § 3730(e)(4)(B)(ii).  The

30

provision cannot be read with fidelity to the text as permitting a Court to dismiss a claim under § 3730(e)(4) when the Relator has provided material information regarding one or more, but less than all, elements of an FCA claim.  Rather, Congress's amended language is consistent with authorities holding that a Relator who provides independent material information regarding any element of a claim is an original source.  *See Minnesota Ass'n of Nurse Anesthetists*, 276 F.3d at 1050; *Springfield*, 14 F.3d at 657.

In this case, Relators provided information to the government prior to filing this case that materially adds to the information in the public domain, including with respect to each element of their FCA claims.  Relators were in Academi's camp in Afghanistan where the services at issue were performed.  Relators and their colleagues, friends, and teammates were the subject of Academi's fraud.  Relators have first-hand knowledge of that fraud, and they provided that knowledge in Statements of Material Disclosures to the United States Department of Justice on March 22, 2011, more than two weeks before they filed this action on April 8, 2011.[84]

Beauchamp disclosed numerous instances of Academi improperly billing for his own time and the time of other personnel, none of which had previously been disclosed to the public. He disclosed the general overarching False Billeting scheme, including identifying the source of admissions regarding WPPS contract requirements:

> Blackwater fraudulently represented contractors working in positions and did this in order to avoid paying contractual penalties for failing to supply the required number of personnel.  Detail Leader Juan Jimenez told me the daily penalty was $1,500 per day for protective service personnel (PRS) positions and $1,800 per day for Designated Defensive Marksmen and Medics.  Each PRS detail was supposed to have two Designated Defensive Marksmen, and Blackwater had particular difficulty supplying enough qualified personnel to meet this requirement.[85]

---

[84] *See* Email from S. Burke, counsel for Relators, to S. Alderson, Department of Justice, Civil Division, forwarding Statements of Material Disclosures, (Mar. 22, 2011), attached as Exhibit 11.
[85] Statement of Material Disclosure by Lyle Beauchamp at ¶ 7, attached hereto as Tab C to Ex. 9.

Beauchamp specifically alleged that Academi falsely billed for his time, and that the payroll records he received and admissions by specifically identified Academi officials (e.g., Deputy Detail Leader Thomas Koch) provide further evidence of this False Billeting scheme.[86]  He also provided numerous examples of other Academi contractors that performed services in one role, yet Academi billed for them in a different role.[87]  Accordingly, Relator Beauchamp is an original source with respect to the False Billeting claims.

Relator Shepherd similarly disclosed numerous instances of the False Billeting scheme. Specifically, he alleged that Academi falsely billed for his time, and that the payroll records and admissions by Academi officials (e.g., Shift Leader Frank Liles and Danny West) provide evidence of this False Billeting.[88]  He also provided numerous examples of False Billeting by Academi regarding other contractors.[89]  For example, he disclosed that Academi's log of its personnel's activities, called a "PERSTAT," shows that "Blackwater billed Timothy Powers as a DDM" when in fact "Powers actually runs the chow hall in the Kabul camp."[90]  Accordingly, Relator Shepherd also is an original source with respect to the billing fraud claims in the Relators' Complaint.

## III.    Relators' Claims Are Not Barred by Rule 12(b)(6).

Relators have more than met their burden to adequately allege facts that support their claims for relief.  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" whereby the court can draw a "reasonable inference that the defendant is liable for the conduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 678 (2009) (quoting *Bell Atlantic Corp. v.*

---

[86] *See id.* ¶¶ 8-13.
[87] *See id.* ¶¶ 15-27.
[88] Statement of Material Disclosure by Warren Shepherd at ¶¶ 9, 11, 13-14, 16, attached hereto as Tab D to Ex. 9.
[89] *Id.* ¶¶ 19-23.
[90] *See id.* ¶¶ 19.

*Twombly*, 550 U.S. 544 (2007)).  To state an FCA claim under 31 U.S.C. § 3729(a)(1), "the plaintiff must prove: (1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due."  *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003).  Academi's assertion that Relators' FCA claims are barred by Rule 12(b)(6) is baseless.

### A.  Relators' Allegations of the False Weapons Qualification Scheme Properly State Claims for Relief.

Relying on a mischaracterization of Relators' allegations of the False Weapons Qualification scheme, Academi contends that Relators fail to state a claim because their allegations "depend[] on an unsubstantiated and incorrect statement of what the WPPS contract required."[91]  Academi further contends that "Relators did not point to a single contract provision that supports their assertion that 'mandated procedures' required FIs to go up to the target to score hits and misses and to replace the targets after each shooter."[92]  To be clear, Relators have not misread or ignored the WPPS Contract.  Rather, Academi misunderstands the crux of the False Weapons Qualification allegations, which is that in order to *comply* with the WPPS contractual requirement of quarterly weapons qualifications on the M240 and M249, the firearms instructor must actually *score* each shooter on each weapon – something the instructors failed to do and subsequently attempted to cover up.

Relators' allegations with respect to the False Weapons Qualification scheme and related over-billing plainly identify the contractual requirements that Academi failed to meet.  As Academi itself acknowledges in its Motion to Dismiss, Appendix N to Section C of the WPPS

---

[91] Academi Br. at 36-37.
[92] *Id.* at 37.

Contract "identifies the requirements for how weapons qualification tests were to be performed, including . . . the minimum score the shooter must attain in order to qualify on each weapon."[93]   In addition, Necessary Condition 4.3.2.1 in Section C.4.3.2.1 of the WPPS Contract requires Academi to re-qualify its protective service personnel ("PRSs") on a quarterly basis and submit each PRS's score to the State Department on a specified firearms qualification form.[94]   Similarly, Section 14 of Attachment G to Section J states: "To be authorized to carry a Department-issued or approved firearm, a PSS shall qualify by meeting or exceeding a specified score with a Department-issued or approved firearm in accordance with the contract.  Under no circumstance shall a PSS carry a firearm if he or she has not successfully completed the required firearms qualification procedures."[95]

Relators' allegations also plainly show how Academi failed to meet those contractual requirements.  In practice, the only possible way to score a shooter on a M240 or M249 qualification round is to approach the targets to tally hits and misses and then replace the targets for the next shooter.[96]   Because the firearms instructors, who were witnessed personally by Beauchamp and Shepherd on the firing range, did not perform this procedure on the specified instances, they never actually scored the shooters.[97]   Without legitimate scores, the shooters were not properly qualified under the terms of the WPPS Contract and were ineligible to serve in the WPPS program.[98]

Academi's failure to follow this necessary condition of the WPPS Contract is not, as Academi contends, a mere breach of contract.  From the fabrication of weapons test scores (false

---

[93] *Id.* at 37-38.
[94] *See Beauchamp* SAC ¶ 44, attached hereto as Ex. 3.
[95] *See id.* ¶ 57.
[96] *See id.* ¶¶ 75, 79-80.
[97] *Id.* ¶¶ 87, 90-91.
[98] *See id.* ¶ 92.

statements) to the fraudulent submission of weapons qualification forms (false records) to the

billing fraud (false claims) that followed, the presence of fraud in Relators' allegations is

obvious.[99] Those false records and statements were material to Academi's false claims for

payment to the State Department for services provided by unqualified PRSs, in violation of 31

U.S.C. § 3729(a)(1)(B).[100] PRSs who lacked the required firearms qualifications were ineligible

to serve in the WPPS program, and their services should not have been billed to the State

Department. Academi's submission of invoices for PRSs who did not qualify quarterly with the

M-240 or M-249 constitutes a false claim for payment in violation of 31 U.S.C.

§ 3729(a)(1)(A).[101]

> **B.      Relators' Allegations of the Avoidance of Deduct Clause Penalties in the
> False Billeting Scheme Properly State a Claim for Relief.**

Academi argues that count three of the *Beauchamp* SAC fails to state a claim because

Academi had "no obligation to pay" the government under the Deduct Clause and because the

government's decision to apply the Deduct Clause is "discretionary" and consequently could not

give rise to a present obligation.[102] Academi is wrong. The application of the Deduct Clause is

mandatory with regard to manning shortfalls, and Academi was obligated to reimburse the

government for its overpayment of the award price each month that Academi failed to meet

manning requirements.

Relators' allegations in the *Beauchamp* SAC unquestionably demonstrate why Academi

was obligated to pay the government a penalty in accordance with the Deduct Clause and how its

avoidance to do so using false records and statements gives rise to a valid claim under 31 U.S.C.

§ 3729(a)(1)(G). The application of the Deduct Clause results in a reduction to the award

---

[99] *Id.* ¶¶ 90-91, 136.
[100] *Id.* ¶ 137.
[101] *Id.* ¶ 131.
[102] Academi Br. at 42-46.

price.[103]  Academi's regular manning shortfalls triggered the Deduct Clause even though

Academi, through its fraudulent records and billing, attempted to hide this fact.[104]  Because

Academi obfuscated its manning shortfalls through the False Billeting scheme, it was able to

avoid hefty deductions to its award price each month.[105]  The government, unaware of this fact,

continued to pay Academi the full award price, resulting in systematic overpayments to

Academi.  As a result, Academi became *obligated to pay* the government to offset those

overpayments.  Because Academi used false records and bills to avoid that obligation, it is liable

under § 3729(a)(1)(G).[106]

In addition, Academi conveniently misconstrues the Deduct Clause to support its

assertion that the government's application of the clause is *discretionary* when it comes to

manning shortfalls.  The amendment that Academi cites to support this interpretation applies on

its face only when employees are "discharged or returned to the U.S. . . . due to dissatisfaction

with the assignment or for unsatisfactory performance."[107]   In such a situation, the contractor

"may be assessed a negative incentive in accordance with the Section H-15, deduction

clause."  But this is not the situation before the Court.  The amendment does not change the

terms of the Deduct Clause itself, which is mandatory, not discretionary.  The Deduct Clause

unambiguously provides that if there are manning shortfalls, "a large reduction in the award

price *will* be made in addition to not being able to invoice the hours/days not worked."[108]

## IV.   Relators Have Satisfied Rule 9(b) by Pleading Fraud with Particularity.

Relators have met Rule 9(b)'s requirement of pleading fraud with particularity.  To plead

a claim with particularity under Rule 9(b), it is generally required to allege "the time, place, and

---

[103] *Beauchamp* SAC ¶ 58, attached hereto as Ex. 3.
[104] *Id.* ¶ 59.
[105] *Id.* ¶¶ 92, 143-144.
[106] *Id.* ¶ 58.
[107] Academi Br., Ex. 25.
[108] *Beauchamp* SAC ¶ 58 (emphasis added), attached hereto as Ex. 3.

contents of the false representations, as well as the identity of the person making the

misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River*

*Co.*, 176 F.3d 776, 784 (4th Cir. 1999). The Fourth Circuit has cautioned courts to "hesitate to

dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made

aware of the particular circumstances for which she will have to prepare a defense at trial, and

(2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* As demonstrated

below, Relators have easily satisfied these standards.

> ### A. Relators' Allegations of the False Weapons Qualification Scheme Are Sufficiently Particular.

Academi asserts that Relators' False Weapons Qualification allegations fall short of Rule

9(b)'s particularity requirement. Ironically, in the context of its public disclosure bar argument,

Academi takes the opposite position, bemoaning the "more than *fifty-five* detailed paragraphs

relevant to [relators'] weapons qualifications allegations (not counting the paragraphs in the

causes of action)" in the *Beauchamp* SAC.[109] Further, the hypothetical questions to which

Academi wants answers (such as "Did the PRSs exceed the time limits or shoot from the wrong

distance?"[110]) are beside the point. Relators have met their burden of pleading the specifics with

regard to the manner in which the weapons qualifications forms were falsified and how the

relators know that they were falsified. The *Beauchamp* SAC makes clear that Relators' theory of

falsity on the False Weapons Qualification allegations arises from the firearms instructors'

representations of passing scores on the weapons qualification forms despite the instructors'

inability to determine whether the PRSs had attained passing scores given that some PRSs failed

to fire and the rest were not actually scored.

Indeed, the *Beauchamp* SAC thoroughly lays out the specific facts underlying Relators'

---

[109] Academi Br. at 22.
[110] Academi Br. at 39

False Weapons Qualification claims.  Paragraphs 42 through 57 of the *Beauchamp* SAC set forth the provisions of the WPPS Contract (and the context for those provisions) that require that Academi personnel satisfy specified weapons qualification standards.  Paragraphs 67 through 92 of the *Beauchamp* SAC demonstrate *how* these contract provisions were violated.  Simply put, Beauchamp and Shepherd and the PRSs with which Beauchamp and Shepherd attended weapons qualification drills did not qualify on the M240 and M249 because, except for a few instances, they were not scored on their shoots or because they did not actually shoot those weapons.  Without approaching each target, counting hits and misses and then replacing used targets with new targets, the instructors had no way of determining how each shooter fared and whether they had achieved a passing score.  The instructors then fabricated scores in order to fill out the required weapons qualification forms.  In paragraph 90 of the SAC, Relators identify the dates on which or the time frames during which Academi fraudulently entered scores on the weapons qualification forms.  The forms that Academi submitted to the State Department for every PRS that purportedly qualified with Beauchamp and Shepherd on or during those dates are fraudulent.

From the allegations described above, Academi can reasonably infer the identity of the firearms instructors in charge of recording scores for those weapons qualification drills, as there were only a few instructors on duty on those particular dates.  Contrary to Academi's assertions, Relators are not obligated to identify the individual bad actors, particularly given the high level of contextual detail Relators have already provided.  *See U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573, 584-85 (E.D. Va. 2010) (recognizing that where the FCA defendant is a corporate entity, the relator does not necessarily have to identify the individuals involved in the fraud, and holding that relator's allegations were specific "enough to apprise [the

defendant] of the employees who may have acted wrongly").

Accordingly, these allegations clear Rule 9(b)'s particularity hurdle, and the claims

arising from these allegations should not be dismissed.

**B.      Relators' Allegations of the False Weapons Qualification Scheme Are Sufficiently Particular with Respect to How Academi Over-Billed the Government.**

Academi also argues that the False Weapons Qualification allegations lack particularity

as to the billing fraud.  In doing so, Academi glosses over the fact that Relators have specifically

alleged the circumstances surrounding the fraud, including when, where, and how the fraud

occurred.  Through these specific details, Relators have adequately alleged a fraudulent billing

scheme designed to make the government pay for the services of unqualified PRSs.

For example, as alleged in the *Beauchamp* SAC, every firearms qualification form for

Beauchamp from April 2007 to May 2011 is fraudulent and therefore every bill for Beauchamp's

services in Afghanistan under Task Order 4 during that time period also is fraudulent.[111]

Likewise, every qualification form for Shepherd from April 2009 through September 2011 is

fraudulent and therefore every bill for Shepherd's services in Afghanistan under Task Order 4

during that time period also is fraudulent.[112]   The weapons qualification forms that Academi

submitted to the State Department for every PRS that purportedly qualified with Beauchamp and

Shepherd on those dates are fraudulent and so are the corresponding bills for their

services.[113]  Thus, any claim for services rendered by those PRSs during that time frame are

fraudulent.  The *Beauchamp* SAC also explains the basis of Relators' knowledge of the

fraudulent certifications and fraudulent bills, as Relators were physically present at the firearms

qualification drills and personally observed or received information regarding the False Weapons

---

[111] *Beauchamp* SAC ¶¶ 90-92, attached hereto as Ex. 3.
[112] *Id.*
[113] *Id.*

Qualification scheme.[114]  Relators also identify Academi personnel involved in the over-billing related to that scheme.[115]

As shown above, Relators have alleged enough information to plausibly show the existence of a False Weapons Qualification scheme and for Academi to prepare its defenses.  Relators' detailed allegations stand in stark contrast to the "complete absence" of particularity present in the cases cited by Academi.  *Cf. U.S. ex. rel. Jones v. Collegiate Funding Servs., Inc.*, 469 Fed. App'x 244, 259 (4th Cir. 2012) (finding that the relators' allegations failed to make the basic showings of the existence of false certifications and how those false certifications were material to the allegedly false claims); *U.S. ex rel. Rostholder v. Omnicare, Inc.*, No. 07-cv-1283, 2012 WL 3399789, at *15 (D. Md. Aug. 14, 2012) (finding the relator's complaint "frustratingly unspecific" due to its lack of any concrete information).

Academi also argues that Relators fail to meet Rule 9(b)'s particularity requirement because they have not identified "specific false claims."  It is entirely unreasonable for Academi to expect Relators to produce copies of the actual invoices containing fraudulent entries when Relators have sufficiently described a fraudulent scheme occurring over the course of several years.  As this Court made clear in *U.S. ex rel. Davis v. Prince*, such evidence is not necessary to meet Rule 9(b)'s particularity requirement.  No. 1:08CV1244, 2010 WL 2679761, at *2 (E.D. Va. July 2, 2010).  In *Davis*, this Court specifically refuted the defendants' suggestion that the relators produce actual copies of the allegedly fraudulent expense reports: "It appears that defendants would require relators to produce actual copies of these expense reports, but such evidence---while perhaps necessary at the summary judgment stage---is not required at the

---

[114] *Id.* ¶ 90.
[115] *Id.* ¶ 110.

threshold."[116]   The court found that the relators' identification of other reasonably specific information that would lead to the identification of the invoices was sufficient to clear Rule 9(b)'s particularity hurdle.[117]   Similarly, in *U.S. ex. Rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573 (E.D. Va. 2010), the court found that the relators did not need to identify specific false invoices where they adequately alleged a fraudulent scheme that made submission of all of the claims fraudulent.  *See also U.S. ex rel. Rostholder v. Omnicare, Inc.*, No. 07-cv-1283, 2012 WL 3399789, at *10 (D. Md. Aug. 14, 2012) (noting that the usual standard of showing specific false claims "may be relaxed where a relator has adequately alleged the existence of a fraudulent scheme").  Here, Relators have presented more than enough information for Academi to pinpoint the exact entries on the exact invoices that are fraudulent.

Accordingly, these allegations clear Rule 9(b)'s particularity hurdle, and the claims arising from these allegations should not be dismissed.

### C.     Relators' False Billeting Allegations Are Sufficiently Particular.

Relators' allegations of the False Billeting scheme also are adequately particular. Academi cites *U.S. ex rel. Rostholder v. Omnicare, Inc.*, No. 07-cv-1283, 2012 WL 3399789 (D. Md. Aug. 14, 2012) to support its blank conclusion that Relators' allegations of the false claims are "frustratingly unspecific."  But in that case, the court dismissed the claims because of a *complete* lack of specific information:

> Relator cites no specific regulation that requires the pricing data, and does not in fact appear to plead with certainty that such a requirement even exists.

> Relator asks too much of the court.  Given no specific claim pleaded, no names of specific downstream actors who submitted the alleged claims, no specific forms or processes of claims adequately described, and no theory of fraudulent conduct other than "materiality," the court simply

---

[116] *Id.*
[117] *Id.*

cannot determine that this FCA case has been adequately alleged under Fourth Circuit precedent.[118]

Unlike the vague allegations at issue in *Omnicare*, Relators have described with a high degree of specificity the circumstances surrounding the False Billeting scheme. For instance, in paragraphs 63 through 65 of the *Beauchamp* SAC, Relators cite the contractual provisions defining the required composition for each team operating under Task Order 4. In paragraphs 96 through 111 and 116 of the *Beauchamp* SAC, Relators describe the manner in which the bills were fraudulent, explaining how PRSs were being billed out for services that they did not perform. Relators specifically identify Timothy Powers, Brad Glisson, John Little, Wade Wills, Troy Anderson, Tim Knowles, Kenny Hankins, Rich Richter, Thomas Koch, Patrick Houghteling, Steve Cardella, Paul Ellis, Steve McKenzie, Ernest Davis, Michael Puppolo, and Lyle Beauchamp as being billed out for positions they did not fill. Relators also have identified a number of Academi personnel involved in the False Billeting scheme as well as the sources behind much of Relators' information.[119]  In short, Relators have provided sufficient detail to support their allegation that Academi made and submitted falsified records and invoices reflecting that each team was fully and properly staffed when that was not true.

Further, Academi wrongly assumes that Relators must lack personal knowledge of the false claims simply because they were not situated at the company headquarters during the execution of the False Billeting scheme. Relators have demonstrated their personal knowledge of the False Billeting scheme through various avenues, including their personal experience working with PRSs who were not performing the duties for which they were billed out, getting paid for services they did not perform, and receiving admissions from various individuals that knew about the false billing scheme.

---

[118] *Id.* at *15.
[119] *See id.* ¶ 110.

Despite all of this information, Academi unreasonably claims that Relators should identify the actual invoices that contain the misrepresentations.  But again, Relators are not required to do so at this stage.  *See Davis*, 2010 WL 2679761, at *2 (finding that the relators did not have to produce copies of the actual invoices to clear the Rule 9(b) hurdle).  Relators have provided more than enough specifics to allow Academi to pinpoint the invoices containing the fraudulent information.

## V.   The Retaliation Claims Should Not Be Stayed for Arbitration Because Academi's Draconian Arbitration Provision Is Unenforceable.

The Court should permit Relators' retaliation claims to be adjudicated with the rest of their claims.  As shown below, the question of the arbitrability of those claims should be decided by this Court, not an arbitrator.  Under applicable law, the arbitration provisions in Relators' ICSAs are substantively unconscionable and therefore unenforceable.  The retaliation claims should not be severed and stayed for arbitration.[120]

### A.   This Court Should Determine the Threshold Question of Arbitrability.

This Court, not an arbitrator, should decide whether Relators must arbitrate their claims against Academi.  "[E]xcept where 'the parties clearly and unmistakably provide otherwise,' … it is 'the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning' a particular matter."  *Granite Rock Co. v. Int'l B'hood of Teamsters*, 130 S.Ct. 2847, 2858 (2010); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938,

---

[120] As a threshold matter, under Virginia choice of law rules, North Carolina law applies to the interpretation of the ICSAs.  *Lexie v. State Farm Mut. Atuo. Ins. Co.*, 469 S.E.2d 61, 63 (Va. 1996) ("[C]ontracts are governed by the law of the place where made.").  Academi asserts that the law of New York should apply because the ICSA's arbitration provision ("ICSA Arbitration Provision") states that New York law governs.  Academi Br. at 49.  However, a choice of law provision is enforceable only when the parties' "transaction bears a reasonable relationship to the state selected." *See Agri-Tech, Inc. v. Brewster Heights Packing, Inc.*, Case Nos. 92-2007, 92-2011, 1993 WL 398486, at *5 (4th Cir. Sept. 28, 1993).  Here, none of the parties reside in New York, and none of the contracts in dispute regard matters involving New York.  Beauchamp and Shepherd were presented with and signed their respective ICSAs at Academi's training facility in Moyock, North Carolina.

945 (1995).  Academi argues that the ICSA's incorporation of the "Commercial Rules

(Expedited) of the American Arbitration Association (AAA)" ("Expedited Rules") constitutes

clear and unmistakable evidence that the parties intended for an arbitrator to decide any question

of arbitrability.  Academi is wrong for two reasons.  First, under North Carolina and 4th Circuit

law, the mere incorporation of association rules does not satisfy the clear and unmistakable

standard.  *See Peabody Holding Co., LLC v. United Mine Workers of America*, 665 F.3d 96, 102

(4th Cir. 2012); *Green v. Short*, No. 06-CVS-22085, 2007 WL 2570821, at *5, n.4 (N.C. Super.

Ct. Mar. 9, 2007) (holding that a reference to the AAA "commercial rules" was not a clear and

unmistakable agreement to arbitrate arbitrability).[121]  In *Peabody*, the Fourth Circuit specified

that the parties must "evince a clear intent to arbitrate arbitrability," prescribing the following

model language to demonstrate such intent: "all disputes concerning the arbitrability of particular

disputes under this contract are hereby committed to arbitration."  665 F.3d at 102-03.  And

further, after conducting a careful analysis of the exact same provision in the *Winston* matter,

Judge O'Grady concluded that it does not rise "to the specific language necessary to bind the

parties to an arbitrator's decision in the initial instance as to whether the dispute should be

subject to the arbitration clause."[122]

Second, the Expedited Rules referenced in the ICSA do not contain the Rule R-7 that

Academi relies upon or any other rule that even arguably could be construed as giving an

arbitrator the authority to decide arbitrability.[123]  Where, as here, an arbitration agreement refers

to one set of AAA rules, that reference should not be read as encompassing other, non-specified,

---

[121] *See also Bayer CropScience AG v. Dow AgroSciences LLC*,  No. 2:12-cv-047, 2012 WL 2878495, at *10 (E.D. Va. July 13, 2012); *General Components, Inc. v. Micron Tech., Inc.*, No. 2:11-cv-152, 2012 WL 1981698, at *11 (E.D. Va. June 1, 2012); *Diesselhorst v. Munsey Bldg., L.L.L.P.*, No. 04-3302, 2005 WL 327532, at *4 (D. Md. 2005) (holding that mere reference to AAA rules insufficient); *Martek Biosciences Corp. v. Zuccaro*, No. 04-3349, 2004 WL 2980741, at *3 (D. Md. Dec. 23, 2004); *Green v. Short*, No. 06-CVS-22085, 2007 WL 2570821, at *5, n.4 (N.C. Super. Ct. Mar. 9, 2007).
[122] Hearing on Mot. at 8.22-9.1, Sept. 7, 2012, attached hereto as Ex. 7.
[123] *See* Academi Br., Exs. 27, 28, ¶ 20.5.

rules.  *See Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1286 (11th Cir.

2001).  Accordingly, the ICSA Arbitration Provision's reference to the AAA's Expedited Rules

should not be read as encompassing Rule R-7.

**B.     The ICSA Arbitration Provision is Unenforceable Because It Impermissibly Precludes Relators from Vindicating Federal Statutory Rights and is Substantively Unconscionable.**

The ICSA Arbitration Provision is unenforceable because it contains at least five

unconscionable terms that impermissibly impair Relators' ability to effectively vindicate their

rights under federal law.  "[B]y agreeing to arbitrate a statutory claim, a party does not forego the

substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather

than judicial, forum."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991).  Thus,

"federal statutory claims are arbitrable only when arbitration can serve the same remedial and

deterrent functions as litigation."  *Perez v. Globe Airport Sec. Servs., Inc.*, 253 F.3d 1280, 1284

(11th Cir. 2001).  The Fourth Circuit repeatedly has struck down similar provisions that deny

federal statutory remedies, are "one-sided," "undermine the neutrality of the proceeding," or seek

to impose "unfair procedures."  *See, e.g., Murray v. United Food & Commercial Workers

International Union*, 289 F.3d 297, 302-03 (4th Cir. 2002); *Hooters of Am., Inc. v. Phillips*, 173

F.3d 933, 938 (4th Cir. 1999); *Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821, 2000 WL

19166, at *2 (4th Cir. Jan. 12, 2000).

The FAA's strong presumption in favor of arbitrability does not apply to this Court's

determination of whether the ICSA Arbitration Provision is enforceable.  That presumption

applies only to determinations of whether a particular dispute falls within the scope of an

arbitration agreement.  *Jackson v. Iris.com,* 524 F. Supp. 2d 742, 748 (E.D. Va. 2007).  It does

not apply to the question here of whether an enforceable arbitration agreement exists. *Id.*[124]

For the five reasons explained below, the ICSA Arbitration Provision is unenforceable because its terms do not allow Relators to "effectively . . . vindicate [their] statutory cause of action in the arbitral forum." *Murray*, 289 F.3d at 302; *see also Tillman*, 655 S.E.2d at 371.

First, the ICSA's terms requiring Relators to pay Academi's attorneys' fees render the arbitration provision unenforceable.  An arbitration provision is unenforceable if it "undermines the deterrent purposes of Title VII" by reducing the "monetary awards for claimants who bring discrimination claims" because such a provision diminishes the "incentive for employers to eliminate their discriminatory practices" and "prevents the remedial principles of Title VII from being effectuated." 317 F.3d at 672; *see also Johnson v. Circuit City Stores, Inc.*, 2000 WL 19166, at *2 (4th Cir. 2000); *Perez*, 253 F.3d at 1287 ("If the arbitration agreement limits remedies Congress determined were appropriate, it should not be enforced."); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003).

The ICSA's fee shifting provision is unenforceable because it requires Relators to pay attorneys' fees and costs, even if they prevail.  Courts repeatedly have invalidated arbitration terms that require or prohibit the shifting of attorneys' fees that conflict with remedies mandated by Congress in federal statutes.  *See, e.g., In re Checking Account Overdraft Litig.*, 685 F.3d 1269, 1280-82 (11th Cir. 2012); *Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 203 (3d Cir. 2010).[125]  Arbitration clauses that shift the burden of paying one parties' fees, contrary to the underlying statute, are substantively unconscionable.  *See Pokorny v. Quixtar, Inc.*, 601 F.3d

---

[124] *See also Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (refusing to apply FAA presumption in determining validity of arbitration agreement); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002); *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir.1994); *Grundstad v. Ritt*, 106 F.3d 201, 205 n.5 (7th Cir. 1997).
[125] *See also, e.g., Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 267 (3d Cir. 2003); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002); *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002); *Perez*, 253 F.3d at 1287; *Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1247-48 (9th Cir. 1994).

987, 1004 (9th Cir. 2010).  Accordingly, the ICSA Arbitration Provision is rendered

unenforceable by its unconscionable fee-shifting terms.

Second, the ICSA Arbitration Provision is unenforceable because it prohibits all

discovery and requires the hearing to occur within just 30 days of the arbitrator's appointment.[126]

Indeed, in the *Winston* matter, Judge O'Grady found this exact provision to be "ridiculous."[127]

While no court has upheld such a restrictive provision, many courts have ruled that arbitration

agreements must permit some discovery in order to be enforceable.  *See, e.g., Patterson v. Tenet

Healthcare, Inc.*, 113 F.3d 832, 838 (8th Cir. 1997); *Cole v. Burns Int'l Security Servs.*, 105 F.3d

1465, 1482 (D.C. Cir. 1997); *Domingo v. Ameriquest Mortg. Co.*, 70 F. Appx. 919, 920-21 (9th

Cir. 2003); *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 387 (6th Cir. 2005).[128]

Third, according to the ICSA, the hearing can last no longer than one day.[129]  There is no

case law to support such an arbitrary limitation, and at least one court has found a provision

limiting the hearing to two days to be unenforceable.  *Gourley v. Yellow Transportation, LLC*,

178 F. Supp. 2d 1196, 1204 (D. Colo. 2001).  In the *Winston* matter, Judge O'Grady

characterized this provision as "ridiculous."[130]  Given the complexity of this case, this one-day

limitation further contorts the procedures in ICSA § 20.5 into "a sham system unworthy even of

the name of arbitration."  *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999).

Fourth, the ICSA Arbitration Provision impermissibly restricts Relators' ability to be

heard by an impartial arbitrator.  The Arbitration Provision explicitly restricts qualified

arbitrators, instead electing for arbitrators without judicial or litigation experience.  Courts have

---

[126] Academi Br., Exs. 27, 28, ¶ 20.5.
[127] Hearing on Mot. at 21.22, Sept. 7, 2012, attached hereto as Ex. 7.
[128] *See also Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 545-46 (E.D. Pa. 2006); *Hooters of Am., Inc. v. Phillips*, 39 F. Supp. 2d 582, 614 (D.S.C. 1998); *Assaad v. Am. Nat'l Ins. Co.*, No. 10-3712, 2010 WL 5416841, at *5 (N.D. Cal. Dec. 23, 2010); *Hamrick v. Aqua Glass, Inc.*, No. 07-3089, 2008 WL 2853992, at *6 (D. Or. Feb. 20, 2008); *Sherwood v. Blue Cross*, No. 07-633, 2007 WL 2705262, at *4 (E.D. Cal. Sept. 14, 2007).
[129] Academi Br., Exs. 27, 28, ¶ 20.5.
[130] Hearing on Mot. at 21.22, Sept. 7, 2012, attached hereto as Ex. 7.

rejected similar provisions that provide for the selection of unqualified arbitrators.  The Fourth Circuit in *Murray v. United Food & Commercial Workers International Union*, 289 F.3d 297, 303-04 (4th Cir. 2002) and *Hooters of America*, 173 F.3d at 938-39, has prohibited similar attempts by a dominant party like Academi to restrict potential arbitrators in a manner that impedes parties from vindicating their rights.  As a result of this restrictive term, the ICSA Arbitration Provision is unenforceable.

Fifth and finally, the ICSA Arbitration Provision's term forfeiting Relators' claims should they fail to pay a fee or advance requested by an arbitrator renders the provision unenforceable.  Under this provision, there is no limitation on the fee or advance that an arbitrator can request.  It does not matter if the fee or advance is not due, unreasonable, prohibited under applicable rules, or otherwise improper.  Such a provision has no precedential support and impermissibly creates a risk that Relators' claims will be resolved on procedural default rather than their merits.  *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000) ("It may well be that the existence of large arbitration costs could preclude a litigant … from effectively vindicating her federal statutory rights.").  Accordingly, the ICSA Arbitration Provision is unenforceable.

## CONCLUSION

For the foregoing reasons, Relators respectfully request that the Court deny Academi's Motion to Dismiss.

Dated:  December 21, 2012

Respectfully submitted,


_____/s/_____
William E. Copley (VSB # 43960)
August J. Matteis, Jr. (admitted *pro hac vice*)
Neesa Sethi (admitted *pro hac vice*)
WEISBROD MATTEIS & COPLEY PLLC
1900 M Street, N.W., Suite 850
Washington, D.C.  20036
Telephone:  (202) 499-7901
Facsimile:  (202) 478-1795
Email:  wcopley@wmclaw.com

*Counsel for Plaintiffs Lyle Beauchamp and*
*Warren Shepherd*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of December, 2012, I will electronically file the

foregoing with the Clerk of the Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to the following:

> Brian Tully McLaughlin
> Richard L. Beizer
> David W. O'Brien
> CROWELL & MORING LLP
> 1001 Pennsylvania Ave. NW
> Washington, DC 20004
> Telephone:  (202) 624-2500
> Facsimile:  (202) 628-5116
> Email:  bmclaughlin@crowell.com
> Email:  rbeizer@crowell.com
> Email:  dobrien@crowell.com
>
> *Counsel for Defendant Academi Training Center, Inc.*

> _____/s/_____
> William E. Copley
> Virginia State Bar No. 43960
> August J. Matteis, Jr. (admitted *pro hac vice*)
> Neesa Sethi (admitted *pro hac vice*)
> WEISBROD MATTEIS & COPLEY PLLC
> 1900 M Street, N.W., Suite 850
> Washington, D.C.  20036
> Telephone:  (202) 499-7901
> Facsimile:  (202) 478-1795
> Email:  wcopley@wmclaw.com
>
> *Counsel for Plaintiffs Lyle Beauchamp and Warren*
> *Shepherd*