**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

FILED

MAR 2 1 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA ex             )
rel. Beauchamp and Shepherd,            )
    Plaintiff,                          )
                                        )    **Case No. 1:11cv371**
        v.                           )
                                        )
Academi Training Center, Inc.,          )
    Defendant.                          )

### MEMORANDUM OPINION

In this *qui tam* action[1] brought under the False Claims Act ("FCA"),[2] the relators allege

that defendant knowingly submitted false claims to the United States in connection with a United

States Department of State contract to provide security services in Afghanistan. As often occurs

in FCA actions, defendant here seeks threshold dismissal, arguing (i) that the relators' claims are

jurisdictionally barred under 31 U.S.C. § 3730(b)(5) because they are the subject of an already

pending FCA action, (ii) that the relators' claims and allegations are jurisdictionally barred

because they were publicly disclosed prior to the filing of this suit and neither relator qualifies as

an "original source," as required by 31 U.S.C. § 3730(e)(4), and (iii) that the relators have failed

to plead their claims in accordance with the pleading standards set forth in Rules 8(a) and 9(b),

Fed.R.Civ.P.

---

[1] The phrase *qui tam* is taken from the longer expression *qui tam pro domino rege quam pro se ipso in hac parte sequitor*, which means "who brings the action for the king as well as for himself." *See* William Blackstone, *Commentaries on the law of England* \*160. Although the FCA *qui tam* provision is the most commonly used *qui tam* provision, it is not alone. There is also a *qui tam* provision in 25 U.S.C. § 201 that protects commercial and property rights of Native Americans, and there was formerly a *qui tam* provision in the false patent marking statute, 35 U.S.C. § 292(b).

[2] 31 U.S.C. §§ 3729–33.

For the reasons that follow, defendant's motion to dismiss must be granted.[3]

## I.

Relator Lyle Beauchamp, a Montana resident, was employed by Academi Training Center, Inc. ("Academi") as an independent contractor on government contracts between Academi and the United States from August 2004 until May 9, 2011. Relator Warren Shepherd has been employed by Academi as an independent contractor on government contracts since 2004. Defendant Academi is a private security contractor with a principal place of business in Arlington, Virginia.[4] Academi provides a variety of services, including specialized training and, particularly pertinent here, protective security services in high risk environments, such as Iraq and Afghanistan.

## A.

In 2005, the United States Department of State ("State Department") awarded the Worldwide Personal Protective Services Contract II ("WPPS Contract") to Academi. Under the WPPS Contract, Academi agreed to provide personal security services in Iraq and Afghanistan. The WPPS Contract required the independent contractors ("contractors") deployed by Academi in protective services roles to attain and maintain a certain degree of proficiency with specified firearms, and for Academi to submit those scores regularly to the State Department. Personnel who failed to pass the initial qualification test or any intermittent qualification tests were prohibited from carrying firearms. In addition, the WPPS Contract required Academi to staff

---

[3] Defendant's motion to stay proceedings relating to the relators' retaliation claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 3, will be addressed in a separate memorandum opinion.

[4] The pleadings do not identify Academi's place of incorporation. Academi's predecessors in interest include: U.S. Training Center, Inc.; Xe Services, LLC; and, Blackwater Worldwide.

protective service assignments with appropriate contractors as specified by the Task Order.[5] Pursuant to the WPPS Contract, a failure by Academi to staff an assignment properly would result in a deduction of $1800 per day for each protective services position that was not properly staffed and $1200 per day for each support position that was not properly staffed.

The WPPS Contract required Academi contractors to qualify for work in either a protective services personnel role or a guard role. In either role, the contractor was required to demonstrate his proficiency on five firearms: (i) the Glock 19 pistol, (ii) the Colt M4 rifle, (iii) the Remington 870 shotgun, (iv) the M240 belt-fed machine gun, and (v) the M249 belt-fed machine gun. In addition, Academi contractors assigned to the "Designated Defensive Marksman" role ("DDM") were also required to qualify on either the M24 or the M25 sniper rifle. Academi contractors were required to pass both initial and intermittent weapons qualifications testing. The WPPS Contract's Appendix set out procedures to be followed when Academi conducted the qualification tests. Particularly pertinent here were two requirements set forth in the Appendix: (i) qualification testing was required to be conducted by a Certified Firearms Instructor and (ii) qualification testing for the belt-fed machine guns, the M240 and M249, was required to be performed on targets different from the targets used for the other firearms qualifications testing, and importantly, was also required to include 'no shoot' targets to simulate the presence of non-hostile civilians.

Relators, in their Second Amended Complaint ("SAC"), allege that Academi engaged in two separate schemes to submit false claims to the State Department. First, relators allege that from April 2007 until September 2011, Academi routinely submitted falsified weapons

---

[5] Task Orders assigned a private security contractor, such as Academi, to a specific location. Task Order 4 assigned Academi to provide protective services in Afghanistan.

qualification test scores for protective services personnel ("weapons qualification scheme"). Specifically, relators allege that Academi failed to conduct the M240 and M249 qualifications testing in the manner required under the WPPS Contract Appendix, (i) by not requiring Academi contractors to fire the M240 and M249 belt-fed machine guns during the qualifications testing and (ii) by performing this testing without the supervision of a Certified Firearms Instructor. Relators allege that in order to conceal this failure to conduct proper weapons qualifications testing, Academi knowingly falsified the records and fraudulently submitted these falsified records to the State Department.

Second, relators allege that Academi submitted false reports and bills to the State Department that listed contractors working in positions in which they did not actually work ("false billeting scheme"). For example, relators allege that Academi billed the State Department for a contractor's work as the shift leader of a protective services team when, in fact, that contractor was actually employed as the base's head cook. In another illustrative example, relators allege that Academi submitted claims to the State Department for a contractor filling the DDM position on a protective services team when, in fact, that contractor never actually deployed to Afghanistan with the assigned team. Put simply, relators allege that Academi systematically submitted false claims to the State Department for contractors' work in positions they never actually filled.

Relators' original Complaint was filed under seal on April 8, 2011.[6] While the Complaint was still under seal, relators, on May 24, 2011, filed the First Amended Complaint

---

[6] The original complaint alleged three separate schemes:

    (i)    The submission of claims that falsely reported both the positions being filled by Academi contractors and the qualifications of those contractors;

("FAC").[7] By Order dated July 14, 2011, the seal was lifted to the extent necessary to permit relators to testify in *U.S. ex rel. Davis v. U.S. Training Center, Inc.*, No. 1:08cv1244 (E.D. Va.). *See United States ex rel. Beauchamp v. Academi Training Center, Inc.*, No. 1:11cv371 (E.D. Va. July 14, 2011) (Order).  After receiving several extensions of time to consider whether to intervene, the Government ultimately declined to do so on July 31, 2012 and, thus as required by statute, *see* 31 U.S.C. § 3730(b)(2), the complaint was then unsealed and served on Academi. *See Beauchamp*, No. 1:11cv371 (E.D. Va. July 31, 2012) (Order).

On November 19, 2012, the relators filed the SAC, wherein the claims relating to failed drug screens and personal gear were dropped, and the claims relating to the weapons qualifications scheme and false billeting scheme were pled with greater specificity.

---

(ii)   The submission of claims that falsely reported that certain contractors were qualified for work under the WPPS Contract when, in fact, those contractors were ineligible to serve as contractors because they had failed drug screens; and,

(iii)   The submission of false claims for reimbursement to Academi for personal gear that was never issue to Academi contractors.

[7] In the FAC, relators alleged that Academi violated the FCA by:

(i)   submitting claims that falsely reported both the positions being filled by Academi contractors and the qualifications of those contractors;

(ii)   submitting claims that falsely reported that contractors were qualified for work under the WPPS Contract when, in fact, those contractors were ineligible to serve under the WPPS Contract because of failed drug screens;

(iii)   submitting claims that falsely reported that Academi had conducted required weapons qualifications tests;

(iv)   submitting false claims for reimbursement to Academi for personal gear that was never actually issued to Academi contractors; and,

(v)   Wrongfully terminating Beauchamp for his participation in the *Davis* action.

**B.**

Academi and its predecessors in interest are no strangers to FCA actions; in addition to this case, Academi and its predecessors in interest have been defendants in a prior FCA *qui tam* suit. Also, Academi, or one of its predecessors in interest, has been the subject of federal audits and news media reports regarding the submission of false claims to the Government. A brief description of these prior suits, investigations, and news media reports is pertinent to the disposition of the jurisdictional defenses of the first-to-file bar and the public disclosure bar.

1. *U.S. ex rel. Davis v. U.S. Training Center, Inc.*

On December 1, 2008, two relators filed an FCA *qui tam* suit against one of Academi's predecessor in interest. *Davis*, No. 1:08cv1244 (E.D. Va. Dec. 1, 2008) (Complaint). The *Davis* relators alleged, *inter alia*, that:

   (i)     Academi's predecessor in interest submitted false claims to the United States for the services of contractors who were unqualified to deploy to Iraq under the WPPS Contract because they had "proven themselves wholly incompetent"; and,

  (ii)    Academi's predecessor in interest submitted false claims to the United States by:
        a.  submitting a claim for the services of a prostitute;
        b.  submitting false claims for third party airline transportation services, when Academi's predecessor in interest was actually providing those transportation services in-house;
        c.  submitting claims that falsely purported to be contemporaneous travel records; and,
        d.  submitting false claims for certain services from third parties, who then paid kickbacks to Academi's predecessor in interest.

On April 14, 2010, the *Davis* relators filed their First Amended Complaint, in which they alleged that Academi's predecessor in interest submitted false claims to the State Department from June 2005 until May 2009. Specifically, they alleged three fraudulent schemes:

   (i)     The submission of claims that falsely reported the number of contractors that Academi's predecessor in interest deployed in both Afghanistan and Iraq;

–6–

(ii)   The submission of false claims for reimbursement of inflated travel and related expenses; and,

(iii)   The submission of claims that fraudulently concealed Academi's failure to ensure that contractors complied with use of deadly force provisions.

Following threshold dismissal of the First Amended Complaint, the *Davis* relators filed their Second Amended Complaint on July 26, 2010, in which they re-alleged the same schemes as alleged in the First Amended Complaint, albeit with somewhat greater specificity. Thus, the *Davis* relators alleged that the "shooters" (i.e., contractors authorized to use lethal force) were unqualified because of their drug use and their known predilection for violence. On January 5, 2011, this "worthless services" claim was dismissed pursuant to the FCA's public disclosure bar. *See Davis*, No. 1:08cv1244 (E.D. Va. Jan. 5, 2011) (Order & Mem. Op.).

In the course of the *Davis* litigation, a declaration was filed that Academi argues publicly disclosed the false billeting scheme. Specifically, Wendy Garrow's declaration, docketed on February 10, 2011, contains allegations that Academi's predecessor in interest, in order to avoid paying contractual fines to the State Department, manipulated musters to make sure that the musters reflected the correct number of contractors in specific positions. *See Beauchamp*, Deft.'s Mot. to Dismiss, Exh. 14.

In July 2011, the *Davis* case proceeded to trial on the remaining claims, including the claim that Academi's predecessor in interest submitted falsified musters that reflected more personnel present in Afghanistan and Iraq than were actually there. In August 2011, the jury returned a verdict in Academi's predecessor in interest's favor and judgment was entered accordingly. The *Davis* relators then appealed, and the Fourth Circuit then affirmed. *See United States ex rel. Davis v. U.S. Training Center, Inc.*, No. 11–2180, 2012 WL 6052051 (4th Cir. Dec. 6, 2012).

2. *Winston v. Academi Training Center, Inc.*

On July 12, 2012, two plaintiffs employed by Academi brought a civil action against

Academi in the Eastern District of Virginia, alleging, *inter alia*, unlawful retaliation under the

FCA for their investigation into, and internal reporting of, the weapons qualifications scheme.

*See Winston v. Academi Training Center, Inc.*, No. 1:12cv767 (E.D. Va. July 12, 2012)

(Complaint). Specifically, plaintiffs, both Academi firearms instructors, pled with great

specificity the weapons qualification scheme; the Complaint describes in substantial detail the

WPPS Contract,[8] the weapons qualifications testing requirements,[9] Task Order 4,[10] and the

alleged failure to conduct proper weapons qualifications testing.[11] Because the *Winston*

complaint was not a *qui tam* action, it was not filed under seal and has been publicly accessible

since the date of filing.

An online news publication, *Wired.com*, published a story about the *Winston* action on

July 16, 2012. *See* Spencer Ackerman, "Mercenaries Sue Blackwater Over Fake Gun Tests,"

*Wired.com*, July 16, 2012, Deft.'s Mot. to Dismiss, Exh. 5. The news story describes the

*Winston* plaintiffs' allegations of retaliation and the weapons qualifications scheme. In

particular, the article describes the plaintiffs' allegation that a firearms instructor, Timothy

Enlow, failed to conduct proper weapons qualifications testing with both shotguns and belt-fed

machine guns, and then, on two separate occasions, submitted false certifications of those

weapons qualifications to the State Department on Academi's behalf. *Id.* at *2.

---

[8] *See Winston* Complaint at ¶¶ 43–46.

[9] *See id.* at ¶¶ 47–54.

[10] *See id.* at ¶¶ 65–69.

[11] *See id.* at ¶¶ 100–130.

– 8 –

3. 2007 Program Management Review Report

The 2007 Program Management Review report ("PMR") was commissioned by the State Department to review Academi's performance on the WPPS Contract. The PMR identified that certain guard personnel employed by a subcontractor on the WPPS Contract were not properly qualified on several weapons, including the M249 belt-fed machine gun and the M-4 rifle. Yet, the PMR did not identify any problems with Academi's protective services contractors' weapons qualifications testing. Likewise, although the PMR identified Academi contractors that were not deployed in accordance with Task Order 4, and were instead used in administrative and logistical support roles, the PMR did not identify any instances of these contractors being the subject of false claims for their services in filling specific team roles.

The PMR was provided to several personnel in the State Department in 2007, including (i) the Contracting Officer; (ii) the Director of the Department of State Bureau of Diplomatic Security's Directorate for International Programs, Office of Overseas Protective Operations; (iii) State Department Regional Security Officers; and, (iv) the State Department's Office of Inspector General.

4. Blackwater USA: Hearing Before the House Committee on Oversight and Government Reform

In an October 2, 2007 public hearing, Representative Henry Waxman quoted an internal email that suggested that some contractors hired by Academi in Afghanistan had "background and experience shortfalls[.]" Deft.'s mot. to dis. Exh. 11, at 52. Significantly, this statement was made in the context of Academi having "knowingly hired pilots with background and experience shortfalls." *Id.* The hearing minutes do not note any mention of weapons qualifications testing or billeting musters.

5. State Department Commission Audit by Cotton & Co.

The State Department Commission Audit was an audit of Academi's performance under the WPPS Contract performed by Cotton & Co. The auditors identified problems with Academi's recordkeeping for weapons qualifications testing for personnel in Iraq. Yet, the Audit does not identify any problems with falsified weapons qualifications documents or with weapons qualifications testing performed in Afghanistan. Further, the Audit identified internal control problems relating to the maintenance of personnel records, but did not identify any specific incidents of fraud or a general scheme of fraud. This Audit was sent to various State Department personnel in November 2008.

6. House Committee on Oversight and Government Reform Memorandum

An October 2007 House Committee on Oversight and Government Reform memorandum refers to a 2005 State Department audit that found that Academi "was charging the government separately for 'drivers' and 'security specialists,' who were in fact the same individuals." Deft.'s Mot. to Dis. Exh. 12, at 15. This memorandum does not identify any scheme relating to Academi's performance on the WPPS Contract in Afghanistan.

7. Joint Audit of Blackwater Contract and Task Orders for Worldwide Personal Protective Services in Iraq

The Joint Audit of Blackwater Contract and Task Orders for Worldwide Personal Protective Services in Iraq ("SIGIR Audit") was completed and published on a State Department website in 2009. In addition, the SIGIR Audit was filed as an exhibit in the *Davis* action. The SIGIR Audit identified deficiencies in the muster sheets submitted between May 2006 and December 2007. In particular, the audit reported that Academi did not maintain the required number of "personal security specialists, designated defensive marksmen, emergency medical technicians, and explosive detection dog handlers on-site[.]" Deft.'s Mot. to Dis. Exh. 17, at 33–34. Importantly, this audit pertained to the performance of the WPPS Contract in Iraq rather than

Afghanistan and did not disclose any allegation that Academi falsely certified that it maintained the required number of specific personnel.

8. Department of State, Office of Inspector General, Audits MERO-IQO-09-02 and MERO-A-09-08

The MERO-IQO-09-02 and MERO-A-09-08 audits were conducted by the State Department in 2009 and publicly disclosed on the State Department website on January 19, 2010. The MERO-IQO-09-02 audit reviewed the State Department's use of security contractors in Iraq and the MERO-A-09-08 audit reviewed the use of security contractors in Afghanistan. These audits disclosed only general concerns about the State Department's verification practices and the related potential for inaccuracy on the part of the security contractors. Neither audit disclosed any allegation of fraud, nor any facts from which such an allegation could be inferred.

## II.

The FCA imposes civil liability on persons who knowingly submit false claims to the government. *See* 31 U.S.C. §§ 3729–33. To encourage the disclosure of fraud that might otherwise escape detection, the FCA allows private individuals, acting as relators, to file *qui tam* actions on behalf of the government against the perpetrators of the fraud. *See* 31 U.S.C. § 3730(b). When the relator files an FCA complaint, it must be filed under seal and it, along with a "written disclosure of substantially all material evidence and information the person possesses," must be served on the Government. *Id.* at § 3730(b)(2). The Government then has 60 days to decide whether to intervene, which time period may be extended for good cause. *See id.* at § 3730(b)(3). If the Government intervenes, then the relators may be entitled to an award of 15%–25% "of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." *Id.* at § 3730(d)(1). If the Government declines to intervene, then the relators have the right to conduct

– 11 –

the prosecution of the action. *See id.* at § 3730 (c)(3). As a reward to these relators, the FCA awards a 25%–30% share of the proceeds recovered in a successful *qui tam* action, as well as reasonable expenses and attorneys' fees. *See* 31 U.S.C. § 3730(d)(2).

Importantly, the FCA does not provide district courts with jurisdiction over all fraud claims; instead, the FCA bars courts from exercising subject matter jurisdiction in certain instances. Two exceptions to subject matter jurisdiction are pertinent here: (i) the first-to-file bar and (ii) the public disclosure bar. *See* 31 U.S.C. § 3730(b)(5), (e)(1)–(4).

## A.

The FCA's first-to-file bar deprives courts of subject matter jurisdiction over later-filed FCA actions while an earlier-filed action based on the same material elements of fraud remains pending. Specifically, the FCA provides, in pertinent part, that:

> When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

31 U.S.C. § 3730(b)(5). In other words, only one *qui tam* action relating to a fraud is permitted to be pending at any time. This jurisdictional limitation is based on the sensible notion that the first-filed action has already "provide[d] the government notice of the essential facts of an alleged fraud," and thus, the "first-to-file bar stops repetitive claims." *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001). Accordingly, the first-to-file bar comports with the two oft-stated purposes of the FCA's jurisdictional bars, namely "to promote incentives for whistle-blowing insiders and prevent opportunistic successive plaintiffs." *Id.*

Courts applying the first-to-file bar follow a two-step analysis. First, a court must determine whether the prior-filed action was pending at the time the later-filed action was brought. *See Lujan*, 243 F.3d at 1188 (explaining that a later-dismissed action is a pending action for the purposes of the first-to-file bar so long as that action was pending when the

– 12 –

subsequent relator brought her claim).[12]   Second, a court must determine whether the claims in the later-filed action are based on facts underlying the first-filed action, because "a later suit is barred if it is based upon the 'same material elements of fraud' as the earlier suit, even though the subsequent suit may 'incorporate somewhat different details.'" *United States ex rel. Carter v. Halliburton Co.*, No. 12–2011, 2013 WL 1092732, at *9 (4th Cir. Mar. 18, 2013) (quoting *Lujan*, 243 F.3d at 1189).[13]   In other words, the first-to-file bar does not require the exact same facts to be alleged in the subsequently filed FCA action; instead, it is sufficient for the operation of the bar that the subsequently filed FCA action alleges the same material elements of fraud. Thus, the goal of this inquiry is to determine "whether the [subsequent complaint] alleges a fraudulent scheme the government already would be equipped to investigate based on the [prior complaint.]" *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011). Accordingly, "a relator cannot avoid § 3730(b)(5)'s first-to-file bar by simply adding factual details or geographic locations to the essential or material elements of a fraud claim against the same defendant described in a prior complaint." *Carter*, 2013 WL 1092732 at *10 (quoting *Branch Consultants*, 560 F.3d at 378).[14]

---

[12] Of course, even if the later-filed action is filed after the first-filed action is dismissed, *res judicata* may block the later action. *See United States ex rel. Chovanec v. Apria Healthcare Group Inc.*, 606 F.3d 361, 362 (7th Cir. 2010) ("[I]f the action is related to and based on the facts of an earlier suit, then it often cannot be refiled—for, once the initial suit is resolved and a judgment entered (on the merits or by settlement), the doctrine of claim preclusion may block any later litigation.").

[13] *See also Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004) (the "first to file bar is not limited to situations in which the original and subsequent complaints rely on identical facts."); *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 377–78 (5th Cir. 2009) ("We agree with these circuits that the applicability of § 3730 (b)(5) should be determined under an 'essential facts' or 'material elements' standard.").

It is clear that the *Davis* action, which was filed on December 1, 2008, was pending at the time of the filing of this action on April 8, 2011. Accordingly, the first-to-file bar prohibits claims in this action that are based on the same material elements of fraud as those alleged in *Davis*. A comparison of the SAC and the *Davis* complaints make clear that the false billeting scheme is barred by the first-to-file bar, while the weapons qualification scheme is not.

First, the false billeting scheme is barred by the first-to-file rule because the same material elements of fraud were alleged in the *Davis* action. The *Davis* Second Amended Complaint describes the following false billeting scheme:

> The claims being submitted on a monthly basis by Blackwater to the State Department were materially false in several respects. First, Blackwater falsified the "musters," which are the records on a monthly basis to demonstrate how many personnel were on the ground and providing security services in Iraq and Afghanistan. Blackwater management intentionally submitted false and inflated musters to the Department of State. By doing so, Blackwater obtained—by fraud—significantly more funds than the Department would have paid had the musters been accurate.

*Davis*, No. 1:08cv1244, ¶ 27 (E.D. Va. July 26, 2010). This paragraph encompassed two separate fraudulent schemes: (i) billing for personnel who were listed as being 'in country,' meaning in Iraq or Afghanistan, when, in fact, they were not there, and (ii) billing based on musters that falsely listed personnel as working in positions in which they did not in fact work. *See Davis*, No. 1:12cv1244 (E.D.Va. June 1, 2011) (Order). The second scheme in *Davis* shares the same material elements of fraud as the false billeting scheme in issue here, namely that Academi (i) submitted claims to the State Department (ii) that fraudulently certified (iii) that

---

[14] *See also United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 234 (3d Cir. 1998) ("duplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds").

contractors worked in specific team positions as required under the WPPS Contract Task Orders, when, in fact, the contractors never worked in those positions.

Although the *Davis* Second Amended Complaint did not plead the second scheme with sufficient specificity for the purposes of Rule 9(b), Fed.R.Civ.P., this does not preclude the application of the first-to-file bar. [15]  This is so because the scheme in the *Davis* Second Amended Complaint that was pled sufficiently for Rule 9(b) purposes—the inflated musters scheme—shares material elements of fraud with the false billeting scheme in issue here. Both schemes involve the submission of "false and inflated" musters to the State Department relating to protective services personnel provided by Academi's predecessor in interest in Iraq and Afghanistan. And the first-to-file bar does not require identical facts, merely shared material elements of fraud. The two schemes share material elements of fraud and a government investigation of the *Davis* inflated muster scheme would likely lead to the discovery of the false billeting scheme. *See LaCorte*, 149 F.3d at 234 ("once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds"). Second, only one circuit has held that the first-filed complaint must comply with Rule 9(b) in order to trigger the first-to-file bar;[16] indeed, every other circuit to have addressed this issue has rejected such a

---

[15] Initially, it was held that both schemes were pled in the Second Amended Complaint with sufficient specificity. *See Davis*, No. 1:08cv1244 (E.D.Va. June 1, 2011) (Order). Later, a motion for reconsideration was granted because the *Davis* Second Amended Complaint "cannot be construed to encompass the allegation that defendants changed the job designations on the musters to show that personnel were working in positions that they did not actually work," since to do so "would run afoul of Rule 9(b), Fed.R.Civ.P." *Id.*

[16] *See Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972–73 (6th Cir. 2005) (holding earlier complaint could not preempt a later-filed action under the first-to-file bar where it failed to comply with Rule 9(b)).

requirement.[17] And there are sound reasons for rejecting such a requirement, as requiring the first-filed complaint to comply with Rule 9(b) "would create a strange judicial dynamic, potentially requiring one district court to determine the sufficiency of a complaint filed in another district court, and possibly creating a situation in which the two district courts disagree on a complaint's sufficiency." *Batiste*, 659 F.3d at 1210. Moreover, the Government needs only notice of the fraud in order to conduct its own investigation. Accordingly, the false billeting scheme is, at this time, barred by the first-to-file bar.[18]

The weapons qualifications scheme alleged in the SAC stands on different footing; it is not barred by the first-to-file bar. In the *Davis* action, the relators alleged that (i) Academi's predecessor in interest utilized contractors who, because of drug use and predilection for violence are (ii) unqualified for employment in 'shooter' positions and, therefore, (iii) those services for which Academi's predecessor in interest billed were useless. The weapons qualifications scheme alleged in the SAC is quite different from the scheme alleged in *Davis*. The schemes do not share material elements of fraud; here, relators allege that (i) the WPPS

---

[17] *See Batiste*, 659 F.3d at 1210 ("[F]irst-filed complaints need not meet the heightened standard of Rule 9(b) to bar later complaints; they must provide only sufficient notice for the government to initiate an investigation into the allegedly fraudulent practices, should it choose to do so."); *Branch Consultants*, 560 F.3d at 378 n.10 ("The sufficiency of the [earlier] complaint under Rule 9(b) is a matter for that court to decide in the first instance."); *United States ex rel. Wickliffe v. EMC Corp.*, 473 F.App'x 849, 851 (10th Cir. 2012) (acknowledging split and criticizing Sixth Circuit's position); *see also United States ex rel. Heineman-Guta v. Guidant Corp.*, 874 F.Supp.2d 35, 39–40 (D.Mass. 2012) (declining to follow the Sixth Circuit); *United States ex rel. Sandager v. Dell Marketing, L.P.*, 872 F.Supp.2d 801, 811 (D.Minn. 2012) (same).

[18] The first-to-file bar operates only to dismiss the false billeting scheme without prejudice to refiling once the first-filed action is no longer pending. *See Carter*, 2013 WL at *10–*11 ("once a case is no longer pending the first-to-file bar does not stop a relator from filing a related case[;] [t]he first-to-file bar allows a plaintiff to bring a claim later"); *see also Chovanec*, 606 F.3d at 365 (same); *In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 963–64 (10th Cir.) (same).

Contract required initial and quarterly weapons qualifications, (ii) the WPPS Contract specified

the procedure for the qualifications, (iii) Academi failed to follow the procedure, and (iv)

Academi falsified its records in order to show compliance with the required qualifications

procedure. Beyond the commonality of 'unqualified personnel', it is clear that these two

schemes do not share material elements of fraud. And it is unlikely that the claim that Academi

employed contractors who were unqualified to serve because of drug use, illegal arms dealing,

and excessive use of force, would have led to an investigation that would uncover the

falsification of quarterly weapons testing for otherwise qualified personnel. Put simply, one

scheme alleged that inappropriate contractors were used, while the other alleged that appropriate

contractors failed to receive the proper periodic testing. Because the two schemes are wholly

separate and do not share essential or material facts, the first-to-file bar does not preclude the

weapons qualifications scheme.

## III.

The FCA public disclosure bar prohibits relators from bringing a suit based on allegations

that have already been disclosed to the public, unless the relator qualifies as an original source.

*See* 31 U.S.C. § 3730(e)(4).[19] Specifically, the FCA provides that:

> The court shall dismiss an action or claim under this section, unless opposed by
> the Government, if substantially the same allegations or transactions as alleged in
> the action or claim were publicly disclosed—
>
> (i)     in a Federal criminal, civil, or administrative hearing in which
>         the Government or its agent is a party;
> (ii)    in a congressional, Government Accountability Office, or other
>         Federal report, hearing, audit, or investigation; or
> (iii)   from the news media,

---

[19] This portion of the FCA was amended in 2010 as part of the Patient Protection and Affordable
Care Act, Pub.L. 111-148, 124 Stat. 119. *See Graham County Soil and Water Conservation
Dist. v. United States ex rel. Wilson*, 130 S.Ct. 1396, 1400 n.1 (2010) (acknowledging the
amendment and noting that the amendment was not retroactive).

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id.* at § 3730(e)(4)(A). The FCA then defines "original source":

> For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.[20]

*Id.* at § 3730(e)(4)(B). The oft-stated purpose of the public disclosure bar is "to prevent 'parasitic' *qui tam* actions in which relators, rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud." *United States ex rel. Siller v. Beckton Dickinson & Co.*, 21 F.3d 1339, 1347 (4th Cir. 1994).[21]

As a threshold matter, it is clear from the FCA's history and from the text of the 2010 amendments that the public disclosure bar is jurisdictional. Prior to the 2010 amendments, the FCA provided that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure [in an enumerated source.]" 31 U.S.C. § 3730(e)(4) (2006). The FCA now provides that "the court shall dismiss an action" if public disclosure has occurred, unless opposed by the Government. 31 U.S.C. § 3730(e)(4) (2010). The relators argue that the FCA's public disclosure bar has been rendered non-jurisdictional by the 2010 amendment

---

[20] The inconsistent numbering within the "original source" provision appears in the original 2010 amendment.

[21] *See also United States ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994) (explaining that Congress has repeatedly amended the public disclosure bar in order to find "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own").

because Congress has not made clear that the public disclosure bar is jurisdictional. This argument fails.

To be sure, the Supreme Court has stated that a "rule is jurisdictional '[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional.'" *Gonzales v. Thaler*, 132 S.Ct. 641, 648 (2012). Yet, the Supreme Court has also made clear that Congress need not "incant magic words in order to speak clearly." *Sebalius v. Auburn Regional Medical Center*, No. 11-1231, 2013 WL 215485, at *6 (Jan. 22, 2013). For example, in *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003), the Supreme Court held that the language "[u]nless a circuit justice or judge issues a certification of appealability, an appeal may not be taken to the court of appeals"[22] is jurisdictional. Moreover, courts may "consider context . . . as probative of whether Congress intended a particular provision to rank as jurisdictional." *Id.* (internal quotation marks omitted). Here, it is clear that the public disclosure bar remains jurisdictional because it commands district courts to dismiss actions subject to the public disclosure bar, unless the Government specifically opposes the application of the bar. *See* 31 U.S.C. § 3730(e)(4)(A) ("[t]he court shall dismiss an action or claim under this section, unless opposed by the Government").[23] Further, context makes clear that the public disclosure bar remains

---

[22] 28 U.S.C. § 2253(c)(1).

[23] If the public disclosure bar was not jurisdictional, then it would be an affirmative defense and would be appropriately addressed at the summary judgment stage. Of course, a Rule 12(b)(6) motion can itself be converted to a Rule 56, Fed.R.Civ.P., motion for summary judgment. *See* Rule 12(d), Fed.R.Civ.P.; *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1311 (4th Cir. 1995) (discussing Rule 12(d)), *rev'd on other grounds by, Anheuser-Busch, Inc. v. Schmoke*, 116 S.Ct. 1821 (1996).

jurisdictional, as the public disclosure bar has long been interpreted as jurisdictional and is contained in a subsection entitled "certain actions barred."[24]

A district court resolving a public disclosure bar jurisdictional challenge must, on a claim by claim basis,[25] apply a three-prong analysis to determine whether the public disclosure bar applies: (i) whether there was a public disclosure, (ii) whether the relators' allegations are substantially the same allegations or transactions,[26] and (iii) whether the relators are entitled to original source status. *See United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292, 299 (4th Cir. 2008), *rev'd on other grounds by Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S.Ct. 1396, 1411 (2010).[27] In other words, if a public disclosure occurred and the allegations or transactions publicly disclosed are substantially the same as those alleged in the claim, then the matter cannot go forward unless relators qualify as original sources. As the party seeking to invoke the subject matter jurisdiction of the Court, relators bear the burden of proving each jurisdictional fact by a preponderance of the evidence. *See United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009).

---

[24] "'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947)); *see also I.N.S. v. Nat'l Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("the title of a statute or section can aid in resolving an ambiguity in the legislation's text").

[25] *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007) (holding that § 3730(e)(4) requires a claim by claim analysis).

[26] Prior to the 2010 amendments, the FCA required that the allegations be "based upon" the public disclosure. That language has been replaced with "substantially the same[.]"

[27] *See also United States ex rel. Black v. Hosp. Corp. of Marion County*, No. 11-1726, 2012 WL 3538820 (4th Cir. Aug. 17, 2012) (applying the three-pronged analysis from *Wilson*, 528 F.3d at 299).

**A.**

A district court deciding whether there has been a qualifying "public disclosure" must determine (i) whether the disclosure occurred via a source specifically identified in the statute, (ii) whether the disclosure was made "public" prior to the filing of the relevant complaint, and (iii) whether the public disclosure revealed "allegations or transactions." *See* 35 U.S.C. § 3730(e)(4)(A). With respect to the first of these determinations, § 3730(e)(4)(A), as amended in 2010, identifies three sources through which a qualifying public disclosure may occur: "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party," "(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation," or "(iii) from the news media." And the Fourth Circuit has made clear that this "list of disclosure sources is exclusive; a public disclosure of fraud operates as a jurisdictional bar against a *qui tam* plaintiff's action only if the public disclosure is through one of the specified sources." *Wilson*, 528 F.3d at 300, n.3 (citing *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 870 (4th Cir. 1999)).

Second, a court must determine whether the qualifying disclosure was made "public" prior to the filing of the complaint. *See Wilson*, 528 F.3d at 307 (holding that an investigation qualifies as a public disclosure only if "the investigation or fact is in fact publicly disclosed"). Although the Fourth Circuit has not specifically construed the term "public" as it appears in § 3730(e)(4)(A), other circuits are in general agreement that "public disclosure" requires (i) the disclosure to be accessible to the general public, (ii) the disclosure to be made to strangers to the fraud, or (iii) the disclosure to be placed in the public domain.[28]

---

[28] *See, e.g., United States ex rel. Poteet v. Bahler Med., Inc.*, 619 F.3d 104, 110 (1st Cir. 2010) ("a disclosure is 'public' if it is generally available to the public"); *United States ex rel.*

Third, a court must determine whether the public disclosure reveals "allegations or transactions" as required by § 3730(e)(4)(A). *See Springfield*, 14 F.3d at 653; *United States ex rel. Davis v. Prince*, 753 F.Supp.2d 569, 580 (E.D.Va. 2011). The Fourth Circuit has not specifically elucidated the phrase "allegations or transactions," but the many courts that have done so have adopted the D.C. Circuit's interpretation of the phrase. *See Davis*, 753 F.Supp.2d at 580 n.17 (collecting cases). In essence, under the D.C. Circuit's test, a qualifying "public disclosure" must either reveal: (i) an allegation of fraud or (ii) the true state of facts and a false state of facts, from which a fraud may be inferred. *See Springfield*, 14 F.3d at 654–55.[29] As the Sixth Circuit has explained, either type of disclosure satisfies the purpose of the public disclosure requirement, namely to "put the government on notice to the possibility of fraud." *United States ex rel. Gilligan v. Medtronic*, 403 F.3d 386, 389 (6th Cir. 2005).

## B.

Prior to the 2010 amendment to the FCA, a public disclosure only triggered the public disclosure bar if the relator's allegations were "based upon" the public disclosure. *See* 31 U.S.C. § 3730(e)(4)(A) (2006). A split of authority formerly existed[30] in which the Fourth Circuit took

---

*Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) (public disclosure bar was "designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction"); *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 332 (3d Cir. 2005) (same); *United States ex rel. Fine v. Advanced Scis., Inc.*, 99 F.3d 1000, 1005 (10th Cir. 1996) (same); *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) ("a public disclosure happens when the critical elements exposing the transaction as fraudulent are placed in the public domain"); *Springfield*, 14 F.3d at 654 (same).

[29] *See also Poteet*, 619 F.3d at 110 ("the disclosure must contain either (1) a direct allegation of fraud, or (2) both a misrepresented state of facts and a true state of facts so that the listener or reader may infer fraud") (internal citations and quotation marks omitted); *Davis*, 753 F.Supp.2d at 581 (same).

the minority—indeed, singular—view that "a *qui tam* action is barred only if the relator's allegations are actually derived from public disclosures[.]" *Davis*, 753 F.Supp.2d at 582 (discussing circuit split); *Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994).[31] The 2010 amendment resolved this split of authority, as it is now clear that a "public disclosure" need only consist of "substantially the same allegations or transactions" in order to qualify for the public disclosure bar. 31 U.S.C. § 3730(e)(4)(A). Accordingly, if the allegations or transactions contained in the "public disclosure" are "substantially the same" as the allegations or transactions at issue in the FCA suit, then the public disclosure bar applies, without regard to whether the relators' allegations are actually, or partially, derived from the public disclosure. *Id.*

## C.

If substantially the same allegations or transactions have been publicly disclosed, then the claims are barred unless the relator can establish that he is an "original source." Section 3730(e)(4)(B) defines an "original source" as:

> an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations

---

[30] Under the majority view, "a lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (reversing prior 7th Circuit authority and joining the majority view); *see United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, 496 F.3d 1169, 1171–72 (10th Cir. 2007); *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1047 (8th Cir. 2002); *United States ex rel. Mistick PBT v. Hous. Auth. of the City of Pittsburgh*, 186 F.3d 376, 388 (3d Cir. 1999); *United States ex rel. Biddle v. Bd. of Trs. Of the Leland Stanford, Jr. Univ.*, 161 F.3d 533, 537 (9th Cir. 1998); *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.*, 123 F.3d 935, 940 (6th Cir. 1997); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 684–85 (D.C. Cir. 1997); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995); *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 324 (2d. Cir. 1992).

[31] The Fourth Circuit had expanded on this view, holding that the public disclosure bar "encompasses actions even partly based upon prior public disclosures." *Vuyyuru*, 555 F.3d at 351; *see also Black*, 2012 WL 3538820 at *8.

or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

Accordingly, a relator may qualify as an original source (i) by either voluntarily disclosing the information to the Government prior to the public disclosure or (ii) by possessing independent knowledge—meaning that "the knowledge is not dependent on public disclosure"[32]—that materially adds to the publicly disclosed allegations, and disclosing that information to the Government prior to filing suit. Further, the amended language no longer requires that the relator possess direct knowledge, that is, knowledge "acquired through his own efforts, without an intervening agency;"[33] instead, the information must either have been voluntarily disclosed to the Government prior to the public disclosure or it must "materially add[]" to the information already publicly disclosed. 31 U.S.C. § 3730(e)(4)(B).

Although the new definition of an "original source" still imposes a barrier to putative relators after public disclosure has occurred, the amendment opens the door to late-comer relators who possess knowledge that can materially add to what has already been publicly disclosed.

## IV.

Analysis of the public disclosure bar properly proceeds on a claim-by-claim basis. Here, two separate fraud schemes are alleged: (i) the false billeting scheme and (ii) the weapons qualifications scheme.

---

[32] *Grayson v. Advanced Management Tech., Inc.*, 221 F.3d 580, 583 (4th Cir. 2000).

[33] *Id.*

A.

Under the false billeting scheme, the relators allege that Academi is liable under the FCA

for submitting false reports and bills, which resulted in the government overpaying for labor

costs.  The first step in the public disclosure bar analysis is to determine whether the disclosures

identified by Academi are qualifying public disclosures for the purpose of § 3730(e)(4).

Although Academi identifies a number of disclosures that it argues qualify as public disclosures

under the FCA, it is clear that only two, the *Davis* complaints and the Garrow declaration,

qualify as public disclosures.[34]

First, the *Davis* complaints and the Garrow declaration are disclosed via a source

enumerated in the FCA.  Section 3730(e)(4)(A)(i) specifies that disclosures via a "Federal

criminal, civil, or administrative hearing in which the Government or its agent is a party" qualify

as public disclosures.  The *Davis* complaints and the Garrow declaration were filed in the *Davis*

action, an FCA *qui tam* suit brought on behalf of the Government, thus the disclosures occurred

in a federal civil case in which "the Government or its agent is a party[.]"  Accordingly, both

were disclosed in a statutorily enumerated source.  *See Siller*, 21 F.3d at 1350 ("every court of

appeals to have addressed the question [has held] that any information disclosed through civil

litigation and on file with the clerk's office should be considered a public disclosure of

allegations in a civil hearing").  Second, the *Davis* complaints and the Garrow declaration are

---

[34] Academi also argues that the 2007 PMR, an internal federal investigation, the SIGIR audit, the Cotton & Co. audit, the OIG audits, and media reports of the SIGIR audit are qualifying public disclosures for the false billeting scheme.  Yet, none of these are qualifying public disclosures. The 2007 PMR, as well as any internal federal investigation, were only disclosed to other federal officials, rather than the public and hence do not qualify.  And the other audits do not reveal any allegations of fraud and, accordingly, neither those audits, nor any media coverage of those audits, qualify as public disclosures.  *See Springfield*, 14 F.3d at 654–55 (requiring that a public disclosure disclose (i) an allegation of fraud or (ii) the true state of facts and a false state of facts, from which a fraud may be inferred).

generally accessible by the public, as both were publicly filed in the *Davis* action. Third, the documents contain actual allegations of fraud. *See Springfield*, 14 F.3d at 654–55. Moreover, the *Davis* complaints and the Garrow declaration contain the same allegations of fraud as the billeting scheme at issue here. As noted, although the *Davis* complaint failed to plead the false billeting scheme with the specificity required by Rule 9(b), Fed.R.Civ.P., the false billeting scheme was pled by the complaint. *See Davis*, No. 1:12cv1244 (E.D.Va. June 1, 2011) (Order). Likewise, the Garrow declaration describes the same false billeting scheme at issue here, and it does so with greater specificity than the *Davis* complaints. Accordingly, the *Davis* complaints and the Garrow declaration are qualifying public disclosures. It follows that the public disclosure bar applies to the false billeting scheme unless the relators are able to qualify as "original sources." *See* 31 U.S.C. § 3730(e)(4)(A).

To qualify as an "original source," a relator must have voluntarily disclosed the information upon which the allegation is based to the government prior to the disclosure or must possess independent knowledge that materially adds to the allegation already publicly disclosed. *See* 31 U.S.C. § 3730(e)(4)(B) (2010). This did not occur here; relators did not voluntarily disclose the information upon which their allegations are based prior to the public disclosures in the *Davis* action. Essentially conceding this, relators instead seek to rely on their possession of independent knowledge that materially adds to the allegations already disclosed. *See* 31 U.S.C. § 3730(e)(4)(B)(ii). To prevail in this respect, relators must establish (i) that they disclosed the information to the government prior to filing suit, (ii) that they possessed independent knowledge, and (iii) that this knowledge materially added to the allegations already disclosed. *See id.* Although relators may have had independent information that they obtained from their observations as Academi contractors, this knowledge does not materially add to the allegations

– 26 –

already publicly disclosed.  Indeed, all essential elements of the false billeting scheme were disclosed in the Garrow declaration, and relators' knowledge appears to add only illustrative examples of the specific behavior that the Garrow declaration describes with specificity. Accordingly, the relators' knowledge does not materially add to the already disclosed allegations and, therefore, the relators do not qualify as "original sources" for the false billeting scheme. Given this, the false billeting scheme is barred by the public disclosure bar, even were it not already barred by the first-to-file bar.

## B.

Under the weapons qualifications scheme, relators allege that Academi failed to conduct the required weapons qualifications tests properly and falsified records and certifications to conceal this.  Once again, Academi has identified a number of sources as qualifying public disclosures.  Yet, a close examination of the identified sources makes clear that only one of the alleged disclosures is a qualifying public disclosure, namely the news report of the *Winston* action.  First, the different audits identified by Academi identify only control issues at the State Department that might allow a contractor to perpetrate a fraud, including, for example, that the State Department did not require sufficient documentation to verify contractor's reports. Accordingly, the audits do not contain "allegations or transactions," but disclose only conditions in which fraud could occur.  This is not a disclosure of either the allegation of the fraud or the necessary facts of the fraud. *See Springfield*, 14 F.3d at 654–55 (requiring disclosure of either an allegation of fraud or a misrepresented state of facts and a true state of facts such that the listener or reader may infer fraud).

Second, although the 2007 PMR discloses allegations of weapons qualifications testing problems in Iraq under the WPPS Contract, it does not disclose any allegations of weapons

qualifications problems in Afghanistan. More importantly, Academi fails to identify when or how the 2007 PMR was disclosed to the public. Indeed, Academi argues that the 2007 PMR was publicly disclosed because it was provided to a public official. In so arguing, Academi relies on *United States ex rel. Matthews v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999). Yet, to date no other circuit has followed *Matthews*, and instead, circuits that have addressed this issue have uniformly held that merely providing information to a public official is not a public disclosure. *See United States ex rel. Rost v. Pfizer, Inc.* 507 F.3d 720, 730–31 (1st Cir. 2007) (holding that public disclosure requires information to be in the public domain).[35]   Thus, there is no sound reason for construing the public disclosure bar to include disclosures that have only been revealed to Government officials.   Accordingly, the 2007 PMR is not a qualifying public disclosure because it was not made public as required.

Third, the *Winston* complaint, which reveals precisely the same fraudulent scheme with great specificity, is also not a qualifying public disclosure. The 2010 amendment to the FCA makes clear that a federal civil or criminal hearing qualifies for public disclosure status only if it is one "in which the Government or its agent is a party[.]" 31 U.S.C. § 3730(e)(4)(A)(i).[36] The

---

[35] *See Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1043 (10th Cir. 2004) (public disclosure requirement "clearly contemplates that the information be in the public domain in some capacity and the Government is not the equivalent of the public domain"); *United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1518 (9th Cir. 1995) ("information that was 'disclosed in private' [between government and defendant company] has not been publicly disclosed"); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496 n.7 (11th Cir. 1991); *Springfield*, 14 F.3d at 653; *see also United States v. Smith & Nephew, Inc.*, 749 F.Supp.2d 773, 782–84 (W.D. Tenn. 2010).   Indeed, this majority view finds firm support in the history of the FCA public disclosure bar, as Congress removed the Government knowledge jurisdictional bar in the 1986 amendment to the FCA. *See Findley*, 105 F.3d at 684 (D.C. Cir. 1997) ("Congress thus changed the focus of the jurisdictional bar from evidence of fraud inside the government's overcrowded file cabinets to fraud already exposed in the public domain.").

*Winston* complaint only alleges a violation of the FCA's anti-retaliation provision, § 3730(h),

and is not, itself, an FCA *qui tam* action. Thus, the Government is not a party to the *Winson*

action. Since neither the Government, nor its agent, is a party to the *Winston* action, the *Winston*

complaint is not a qualifying public disclosure.

In contrast to the non-qualifying public disclosures, the news coverage of the *Winston*

complaint is a qualifying public disclosure. On July 16, 2012, *Wired.com*, Wired Magazine's

on-line component, published an article about the *Winston* action. *See* Ackerman, "Mercenaries

Sue Blackwater Over Fake Gun Tests." First, an article from *Wired.com* is an enumerated

source, as the FCA specifically identifies "news media" as an enumerated source. *See* 31 U.S.C.

§ 3730(e)(4)(A)(iii).[37]

Second, the disclosure was made public prior to the filing of the SAC, the complaint in

issue here. The public disclosure bar inquiry applies to "the allegations in the original complaint

*as amended.*" *Rockwell*, 549 U.S. at 473 (emphasis in original). Thus, "courts look to the

amended complaint to determine jurisdiction." *Id.* at 474. A contrary rule "would leave the

relator free to plead a trivial theory of fraud for which he had some direct and independent

knowledge and later amend the complaint to include theories copied from the public domain or

---

[36] Prior to the 2010 amendments, the FCA provided that public disclosures could occur in a "criminal, civil, or administrative hearing," and there was no requirement that the Government or its agent be a party. *See* 31 U.S.C. § 3730(e)(4)(A) (2006). It is clear that the 2010 amendment now requires that the disclosure occur through a hearing in which the Government or its agent is a party in order for the disclosure to be a qualifying public disclosure.

[37] *See also United States ex rel. Green v. Service Contract Educ. and Training Trust Fund*, 843 F.Supp.2d 20, 32–33 (D.D.C. 2012) (holding that webpages may qualify as news media under the FCA public disclosure bar); *United States ex rel. Repko v. Guthri Clinic, P.C.*, No. 3:04cv1556, 2011 WL 3875987, (M.D. Pa. Sept. 1, 2011) (same); *Davis*, 753 F.Supp.2d at 585 (audit was publicly disclosed "when it was posted on an internet website maintained by the online publication Talking Points Memo").

from materials in the Government's possession." *Id.* at 473. The *Wired.com* article was published on July 16, 2012, while the SAC—the first complaint that describes with specificity the weapons qualification scheme—was filed on November 19, 2012. Accordingly, it is clear that the *Wired.com* article satisfies the public prong of the public disclosure analysis.

Third, the article reveals "allegations or transactions." [38] Specifically, the article identifies with specificity the weapons qualifications scheme. For example, the article states that a firearm instructor "informed the State Department inaccurately that Academi's guards were proficient with shotguns and machine guns" and that the same firearms instructor "failed to bring an M249 belt-fed machine gun to the test range near Kabul, but reported a successful test anyways." Ackerman, "Mercenaries Sue Blackwater Over Fake Gun Tests" at \*2. Accordingly, it is clear that the article also satisfies the "allegations or transactions" prong of the public disclosure analysis. As the article satisfies all three prongs of the public disclosure bar, the *Wired.com* article is a qualifying public disclosure. Moreover, the *Wired.com* article reveals the same weapons qualifications scheme as alleged in the SAC and, therefore, satisfies the FCA's "substantially the same" requirement for public disclosures. *See* 31 U.S.C. § 3730(e)(4)(A). Thus, the *Wired.com* article is a public disclosure that bars the weapons qualifications scheme, unless relators qualify as an original source.

Relators argue that they qualify as "original sources" for the weapons qualifications scheme because they disclosed the allegation of the weapons qualifications scheme to the United States through "Statements of Material Disclosures" submitted to the Department of Justice in this case. Yet these material disclosures do not satisfy the "original source" requirement, as they

---

[38] The SAC's allegations concerning the weapons qualifications scheme are strikingly similar to those in the *Winston* complaint.

were not voluntarily provided to the Government. It appears that the statements of material

disclosures were provided to the Department of Justice in compliance with 31 U.S.C. §

3730(b)(2), which requires relators to serve a "written disclosure of substantially all material

evidence and information the person possesses" with a copy of the complaint to the Government.

Courts that have addressed whether these mandatory disclosures under § 3730(b)(2) also qualify

as voluntary disclosures under § 3730(e)(4) have held that they do not, as these are mandatory

disclosures rather than voluntary disclosures. *See, e.g., United States ex rel. King v. Hillcrest*

*Health Center, Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001) ("It is also clear from the statutes that

compliance with the disclosure requirements of § 3730(b)(2) at the time of filing does not satisfy

the pre-filing disclosure requirement of § 3730(e)(4)."); *Farmington*, 166 F.3d at 866 ("it is clear

that the requirement is not satisfied by informing the government at the time of filing the

action").[39] Here, the only disclosures that relators allege they made to the Government were sent

to the Government approximately two weeks prior to the filing of the Complaint, accompanied

by an email stating that relators "plan to file the case in EDVA again[.]" Pls.' Mem. in Opp.,

Exh. 11. Thus, it appears that these disclosures were the material disclosures required by §

3730(b)(2), rather than voluntary disclosures to the Government. This stands in stark contrast to

FCA cases wherein the relator disclosed suspicions or allegations of fraud far in advance and

independent of filing an FCA *qui tam* action. *See, e.g., Vuyyuru*, 555 F.3d at 362 (finding that

relator had voluntarily reported fraud to the Government by speaking to FBI Agents "in and

---

[39] *See also United States ex rel. Branch Consultants, L.L.C. v. Allstate Insur. Co.*, 782 F.Supp.2d
248, 268–69 (E.D. La. 2011) ("The pre-filing disclosure requirement is distinct from the
requirement of § 3730(b)(2) that the relator serve the government with a copy of the complaint
and written disclosure of substantially all material evidence and information the person
possesses.") (internal quotation marks and alterations omitted); *United States ex rel. Ackley v.
Intern'l Bus. Machines Corp.*, 76 F.Supp.2d 654, 667–68 (D.Md. 1999) (same).

around 2002, 2003, and 2004" and speaking to "the Attorney General's Office . . . in and around 2002 and 2003") (alterations omitted).  Accordingly, neither relator has satisfied the voluntary disclosure requirement for "original source" status.

**V.**[40]

In summary, the false billeting scheme must be dismissed because it is barred by both the first-to-file bar, pursuant to 31 U.S.C. 3730(b)(5), and the public disclosure bar, as the allegation has been disclosed via a qualifying public disclosure and neither relator qualifies as an "original source," pursuant to 31 U.S.C. § 3730(e)(4).  Although the weapons qualifications scheme is not barred by the first-to-file bar, it is barred by the public disclosure bar, as the scheme was disclosed in a qualifying public disclosure and neither relator qualifies as an "original source."  Accordingly, both false claim schemes alleged in the SAC must be dismissed.[41]

An appropriate Order will issue.

Alexandria, VA
March 21, 2013

/s/

_____

T. S. Ellis, III
United States District Judge

_____

[40] It is unnecessary to reach or to address the defendant's arguments regarding the sufficiency of the pleadings in the SAC relating to either FCA scheme under Rule 9(b), Fed.R.Civ.P., and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544 (2007), as neither survives threshold jurisdictional dismissal.  It is also therefore not necessary to grant the Government's motion for leave to file a statement of interest, because that statement was forecasted to address only the impact of a recent Eastern District of Virginia case "on Academi's Fed. R. Civ. P. 12(b)(6) and 9(b) dismissal arguments."  *See* U.S.'s Unopposed Mot. for Leave to File Statement of Interest at *1.

[41] The retaliation claims will be addressed in a separate memorandum opinion.