IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LYLE BEAUCHAMP, *et al.*,   Plaintiffs,   v.   ACADEMI TRAINING CENTER, INC., *et al.*,   Defendant. ) ) ) ) ) ) ) ) ) ) | Case No. 1:11-cv-371 |

## MEMORANDUM OPINION

At issue on a motion for judgment on the pleadings in this False Claims Act ("FCA")[1] case is whether relators' second amended complaint ("SAC") adequately alleges an implied false certification claim under 31 U.S.C. § 3729(a)(1)(A), as required by the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). After full briefing and oral argument, a bench ruling issued answering this question in the affirmative, and an Order issued denying the motion for judgment on the pleadings. *United States ex rel. Beauchamp v. Academi Training Ctr., Inc.*, No. 1-11-cv-371 (E.D. Va. Nov. 18, 2016) (Order). This Memorandum Opinion records the reasons in support of that Order.

## I.

The facts pertinent to defendant's motion for judgment on the pleadings may be succinctly summarized from relators' SAC, defendant's answer, and the documents referred to therein. Those facts are as follows.

---

[1] 31 U.S.C. § 3729 *et seq.*

Defendant Academi Training Center, Inc.[2] is a private security company that entered into a contract with the U.S. State Department to provide protective security services for U.S. diplomats and other government officials in Afghanistan. The individuals who provide protective services under that Worldwide Personal Protective Services ("WPPS") contract are known as "protective service personnel" ("PRS"). Relators Lyle Beauchamp and Warren Shepherd worked for defendant as PRSs in Afghanistan in various roles, such as shift leader and operations chief.

Relators' SAC alleges that defendant submitted false weapons qualifications reports to the government and that defendant fraudulently billed the government for the services of PRSs who had not fulfilled the WPPS contract's weapons qualifications requirement.[3] Specifically, the WPPS contract requires defendant's PRSs to qualify with all of the firearms used on security details, and to requalify with those firearms every three months. For instance, the contract describes the roles of various types of PRSs, including "shift leader/team leader" and "protective security specialists." Under the contract, both types of PRSs must "maintain weapons qualifications as outlined in this contract" for five types of firearms, including two belt-fed machine guns. The WPPS contract provides for specific qualification procedures, and PRSs must achieve a certain score with each firearm in order to requalify. The WPPS contract further

---

[2] Academi Training Center, Inc. is the current incarnation of the entity formerly known by the following names: Blackwater USA, Blackwater Worldwide, U.S. Training Center, Inc. and Xe.

[3] Relators also alleged in their SAC that defendant submitted false reports and bills to the government listing employees in positions in which the employees did not actually serve. Those "false billeting claims" were dismissed on jurisdictional grounds. *See United States ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 846 (E.D. Va. 2013), *reversed on other grounds United States ex rel. Beauchamp v. Academi Training Ctr., LLC.*, 816 F.3d 36 (4th Cir. 2016). Relators did not appeal the dismissal of their false billeting claims. *See Beauchamp*, 816 F.3d at 42 n.3. Relators also brought retaliation claims against defendant, but relators eventually voluntarily dismissed those claims.

requires firearms instructors to oversee the requalification tests and to submit all scores to the government. Under the WPPS contract, PRSs who fail any requalification test are allowed two opportunities to requalify; a third failure results in permanent disqualification from serving as a PRS under a State Department contract and being sent back to the United States.

Relators allege that defendant repeatedly failed to follow proper qualification procedures for the two machine guns that PRSs must requalify with under the WPPS contract, and that many times defendant's firearms instructors did not even require PRSs to fire those two weapons. The machine guns are particularly difficult to operate because they are heavy, automatic weapons that require PRSs to control the number of rounds fired in a burst while avoiding "no-shoot" targets that simulate civilians. PRSs must also fire one of the machine guns while moving. Relators allege that, rather than properly administering the firearms requalification tests, defendant's firearms instructors simply fabricated scores for the tests and recorded those fake scores on official government scorecards. Defendant allegedly then submitted those fake scorecards to the government, thereby falsely certifying that PRSs requalified on certain firearms when they in fact had not.

Relators further allege that defendant fraudulently billed the government for defendant's PRSs, who were not properly qualified on various firearms and therefore ineligible to serve under the WPPS contract. Specifically, defendant claimed payment for the services of various PRSs under the WPPS contract by submitting invoices to the government that listed the number of PRSs in various roles that defendant used in a given month and the price of each PRS. For example, an invoice submitted by the parties sought payment for 540 "shift leaders," each costing $819.99, which totals to $442,794.60. That invoice also sought payment for 54 of the firearms instructors who were allegedly fabricating the PRSs' scorecards; at a cost of $796.43

each, the total claim for the instructors came out to $43,007.22. Besides using job titles such as "shift leaders" and "firearms instructor" in the invoice, defendant also repeatedly used the billing code "PSS" to seek payment for protective security specialists (a particular type of PRS).

As relevant here, relators bring a claim against defendant under 31 U.S.C. § 3729(a)(1)(A), which makes it unlawful knowingly to present, or to cause to be presented, to the government a "false or fraudulent claim for approval." 31 U.S.C. § 3729(a)(1)(A). Defendant filed a motion for judgment on the pleadings under Rule 12(c), Fed. R. Civ. P., on the ground that relators' claim can proceed only under the implied false certification theory of liability, and that relators' claim fails to meet the requirements for that theory established in *Escobar*.[4]

## II.

The standard for a motion for judgment on the pleadings is equivalent to the familiar *Iqbal/Twombly*[5] plausibility standard governing motions to dismiss under Rule 12(b)(6), Fed. R. Civ. P. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In addition, relators must satisfy the heightened pleading requirements under Rule 9(b), Fed. R. Civ. P., because they are alleging fraud. *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455–56 (4th Cir. 2013). The parties have submitted excerpts from the WPPS contract and an invoice defendant submitted to the government, which may be considered because they

---

[4] Relators argue that they have adequately pleaded an FCA violation of § 3729(a)(1)(A) under an "express" false certification theory, but it is unnecessary to address this argument because relators' SAC § 3729(a)(1)(A) claim survives, as explained *infra*, under the implied false certification theory.

[5] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

are integral to the SAC and neither party disputes the authenticity of these documents.
*See Massey v. Ojaniit*, 759 F.3d 343, 347–48 (4th Cir. 2014).

Under the implied false certification theory, "when a defendant submits a claim [to the government], it impliedly certifies compliance with all conditions of payment," and, accordingly, if that "claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, . . . the defendant has made a misrepresentation that renders the claim 'false or fraudulent'" under 31 U.S.C. § 3729(a)(1)(A). *Escobar*, 136 S. Ct. at 1995. Although doubts existed as to the validity and scope of the implied false certification theory prior to *Escobar*, the Supreme Court in *Escobar* dispelled that doubt, holding that the implied false certification theory "can be a basis for [FCA] liability." *Id.* at 1998–99, 2001. In reaching this result, the Supreme Court reasoned that the use of the term "fraudulent" in § 3729(a)(1)(A) incorporated the common-law understanding that "fraud . . . encompasse[s] certain misrepresentations by omission," and not just "express falsehoods." *Id.* at 1999. Importantly, and pertinent here, the Supreme Court made clear that the implied false certification theory can serve as a basis for liability, at least where the relator shows (i) that "the claim does not merely request payment, but also makes specific representations about the goods or services provided," and (ii) that "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001. Defendant contends that relators' § 3729(a)(1)(A) claim fails both of those requirements.

## A.

Defendant first argues that relators have not pleaded sufficient facts showing that defendant made "specific representations" to the government about the services provided by defendant's PRSs. *Id.* at 2001. In particular, defendant argues that the PRS billing codes and job titles in the invoices defendant submitted to the government represented only that the PRSs satisfied certain job qualifications which are not in dispute, such as years of experience and language proficiency, and did not represent to the government that defendant's PRSs complied with the contractual weapons qualifications requirement. That argument fails because the billing codes and job titles in the invoices, when viewed in conjunction with the WPPS contract, did indeed specifically represent to the government that defendant's PRSs had fulfilled the weapons qualifications requirement. The facts of *Escobar* confirm this conclusion.

In *Escobar*, a teenager who received counseling services at a Massachusetts mental health clinic died after suffering an adverse reaction from a medication prescribed by a clinic practitioner. *Escobar*, 136 S. Ct. at 1997. The teenager's parents later discovered that the clinic practitioner, who prescribed the medication and held herself out to be a psychiatrist, was actually a nurse who was not authorized to prescribe medications. *Id.* Moreover, many of the clinic's employees were improperly licensed and unqualified to provide certain medical services, in violation of many state Medicaid regulations. *Id.* The teenager's parents, proceeding under the implied false certification theory, alleged that the clinic's Medicaid reimbursement claims "made representations about the specific services provided by specific types of professionals," and accordingly the clinic's failure to disclose its significant regulatory violations was fraudulent because the government would have never paid the clinic's reimbursement claims had the government known of the violations. *Id.* at 1997–98.

6

The Supreme Court concluded that the clinic's claims were more than mere demands for payment because "by submitting claims for payment using payment codes that corresponded to specific counseling services, [the clinic] represented that it had provided" various types of medical services. *Id.* at 2000. And by submitting reimbursement claims using codes that corresponded to certain job titles, the clinic further represented that particular types of practitioners provided those services. *Id.* For example, one of the practitioners who treated the teenager "registered for a number associated with 'Social Worker, Clinical,' despite lacking the credentials and licensing required for social workers engaged in mental health counseling." *Id.* at 1997. In the context of Medicaid reimbursement claims, those representations were "clearly misleading" because "[a]nyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably — but wrongly — conclude that the clinic had complied with core Massachusetts Medicaid requirements." *Id.* at 2000. As a result, the clinic's claims constituted misrepresentations because it used "payment and other codes that conveyed [licensing and qualification information] without disclosing [the clinic's] many violations of basic staff and licensing requirements." *Id.* at 2000–01.

A close look at defendant's invoice indicates that defendant, in billing the government, made the same type of misrepresentations as did the defendant in *Escobar*. Indeed, the similarities are striking. Just as the clinic in *Escobar* submitted "claims for payment using payment codes that corresponded to specific counseling services," defendant used payment codes (such as "PSS") indicating that defendant's PRSs provided particular services, such as weapons instruction. *Id.* at 2000. Just as the clinic's employees used identification numbers "corresponding to specific job titles," defendant's invoice in this case repeatedly refers to job

titles such as "shift leader" or "firearms instructor." Further, just as the clinic's use of the payment codes represented "that it had provided [various medical services]," defendant's use of the "PSS" billing code represented that defendant had staffed fully qualified, weapons-trained PRSs on its security assignments. *Id.* And just as "[a]nyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably — but wrongly — conclude that the clinic had complied with core Massachusetts Medicaid requirements," so, too, anyone informed that PRSs providing armed protection for governmental officials in a high-risk country or warzone like Afghanistan would probably — but wrongly — conclude that the PRSs were qualified to handle the very firearms they needed to protect those officials. *Id.*

All of those similarities between the Medicaid reimbursement claims in *Escobar* and defendant's invoices in this case support the conclusion that defendant made specific misrepresentations to the government. The invoice the parties have provided even seeks payment for a "PSS/Firearms Instructor," which means that defendant submitted claims to the government for the services of the very weapons instructors who allegedly submitted false weapons qualifications scorecards to the government. In sum, "by using payment and other codes that conveyed [weapons qualifications] information without disclosing [defendant's] many [alleged] violations of [the contract's weapons qualifications requirement], [defendant's] claims constituted misrepresentations" under § 3729(a)(1)(A). *Id.* at 2000–01.

**B.**

Defendant also argues that relators' § 3729(a)(1)(A) claim fails because relators have not alleged sufficient facts to satisfy the materiality element for that claim. Under *Escobar*, relators must allege facts showing that the government's decision to pay defendant under the WPPS

8

contract would likely or actually have been affected had it known of defendant's failure to comply with the weapons qualification requirement.[6] *See id.* at 2002 (stating that the materiality standard "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation") (alterations and internal quotation marks omitted).

This argument is meritless because it requires leaving common sense at the door. Simply put, it strains credulity to argue that the government's payment decision would not have been affected had the government known that the PRSs responsible for protecting U.S. officials in Afghanistan had not fulfilled the weapons qualifications requirement. *See id.* at 2003 (noting that a "matter is material" in tort law where "a reasonable man would attach importance to it in determining his choice of action in the transaction") (alterations and internal quotation marks omitted). Relators have alleged that the WPPS contract repeatedly states that PRSs must train with and requalify on the required firearms to serve as a PRS under the contract, and a failure to do so would require them to be shipped back home, indicating that the weapons qualifications requirement is central to the contract. *Compare United States v. Fulton Cty.*, No. 1:14-cv-4071, 2016 WL 4158392, at *8 (N.D. Ga. Aug. 5, 2016) (holding that relators' allegations failed the *Escobar* materiality requirement because relators did not show that "defendants misrepresented matters 'so central' to the [c]ontract that the government 'would not have paid [the] claims had it known of [the] violations'") (quoting *Escobar*, 136 S. Ct. at 2004). Relators have also alleged that defendant routinely failed to score its PRSs beginning in April 2007, and that defendant submitted multiple false scorecards to the government for relators' own weapons qualifications

---

[6] Relators have also brought FCA claims under § 3729(a)(1)(B) and § 3729(a)(1)(G), which contain materiality elements. Even assuming that the standard for the materiality elements for those claims is equivalent to the materiality standard for § 3729(a)(1)(A) claims established in *Escobar*, relators have alleged sufficient facts to show materiality for all three claims.

tests. *See Escobar*, 136 S. Ct. at 2003 ("Materiality . . . cannot be found where noncompliance is minor or insubstantial."). As a result, relators have alleged sufficient facts to support the common-sense proposition that PRSs' inability to shoot straight with firearms in a high-risk warzone in the course of protecting U.S. officials likely would have influenced the government's decision to pay or not to pay defendant under the WPPS contract.

### III.

For the foregoing reasons, defendant's motion for judgment on the pleadings must be denied.

An appropriate Order has issued.

Alexandria, Virginia
November 30, 2016

/s/

T. S. Ellis, III
United States District Judge

10